TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

# COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No.

............MIDDLESEX............ , SS



*Joseph A. Takuttis* , Plaintiff(s)

**1681 CV 03452**

*Town of Dracut, et al. and*
*Michael V. O'Hanlon* , Defendant(s)

## SUMMONS

To the above-named Defendant: *Michael V. O'Hanlon*

You are hereby summoned and required to serve upon *Lawrence E. Sweeney, Esq.*

.................................... plaintiff's attorney, whose address is *9 Lynn Ave.*

......*North Chelmsford MA 01863*...... an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at *360 Gorham St.*

*Lowell MA 01852*.................... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, Judith Fabricant, Esquire, at ............*Woburn*............

the ........................ *2nd* day of *December*...................................

....................., in the year of our Lord *2016*..............................

............................................
Clerk

TRUE COPY ATTEST:
KEVIN X. WHIPPEN, CONSTABLE &
SPECIAL PROCESS SERVER

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used
for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

*NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the the original in the Clerk's Office*

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ...................................................................................., 20........., I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5)):

........................................................................................................................................................

........................................................................................................................................................

........................................................................................................................................................

...........................................................................................................

Dated: ........................................................................................, 20..........

## N.B.  TO PROCESS SERVER:
PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

(  _____  )
(  _December 5_, 20 16 )
(  _____  )

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX ......, ss.

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

No. .......... 1681 CV 03452

JOSEPH A. TAKUTIS ..............., Plff.

v.

MICHAEL V. O'HANLON ..............., Deft.

SUMMONS
(Mass. R. Civ. P. 4)

## COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT
## SUPERIOR COURT DEPARTMENT

**Middlesex, ss**                                    Docket No.:

                                                          **1681 CV 03452**

| | | |
|---|---|---|
| JOSEPH A. JAKUTTIS, <br> an individual, | ) <br> ) <br> ) | |
| **Plaintiff** | ) <br> ) | |
| v. | ) <br> ) | **COMPLAINT** |
| TOWN OF DRACUT, MASSACHUSETTS, <br> a municipal corporation and public <br> employer, <br> DAVID J. CHARTRAND, Jr., <br> in his individual and official capacity, <br> MICHAEL V. O'HANLON, <br> in his individual capacity, <br> JOHN DOE 1 (a pseudonym), <br> in his individual capacity, <br> JOHN DOE 2, (a pseudonym), <br> in his individual capacity, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **AND** <br> **DEMAND FOR JURY TRIAL** <br><br> **(Including Civil RICO Claim)** |
| **Defendants** | ) | |

### INTRODUCTION

This "Introduction" section is an outline of the complaint for the convenience of the court and is not intended as part of the complaint itself and is not intended to be answered.

The claims against the various Defendants for damages are for the following causes of action, all specified in detail in the Complaint below:

I. 42 U.S.C., § 1983 (Joseph Jakuttis v. All Defendants) (First Amendment: free speech violation) - (alternatively against Defendant O'Hanlon, First Amendment Violation as a federal agent, via a *Bivens* claim).

II. M.G.L. c.12 § 11H and 11I (state civil rights claim) (free speech rights) (Joseph Jakuttis v. All Defendants, underline excluding Town of Dracut).

III. Whistleblower Act – M.G.L. c. 149, § 185 (Joseph Jakuttis v. Town of Dracut <u>only</u>).

IV. Intentional Interference with Advantageous Economic Relationship (Joseph Jakuttis v. Chartrand, Doe1 and Doe2, only).

V.  Intentional Interference with Contractual Relations and/or Advantageous Relationship (Joseph Jakuttis v. Defendant John Doe2 and Defendant O'Hanlon, only).

VI. Intentional Infliction of Emotional Distress (Joseph Jakuttis v. All Defendants, <u>excluding</u> Town of Dracut).

VII. Civil Conspiracy (Joseph Jakuttis v. All Defendants, <u>excluding</u> Town of Dracut).

VIII. 18 U.S.C. § 1962(c) and § 1964(c), Civil RICO (Joseph Jakuttis v. All Defendants, <u>excluding</u> Town of Dracut).

IX. 18 U.S.C. § 1962(d) and § 1964(c), Civil RICO Conspiracy (Joseph Jakuttis v. All Defendants <u>excluding</u> Town of Dracut)

## <u>INTRODUCTORY STATEMENT OF THE CASE</u>

This case comes before the court because the Plaintiff, a police officer and detective for the Town of Dracut, Massachusetts, and an officer for the DEA working on a special drug task force, was removed from the DEA task force and removed from the detective unit on the Dracut police department and demoted to patrolman in retaliation for the Plaintiff coming forward with information which implicated two Dracut police officers in serious criminal activities involving the illegal use, sale, purchase, possession and otherwise handling of controlled substances, including heroin and cocaine, often while on the job and while conducting undercover operations with a drug informant.  The Plaintiff obtained the information implicating the two Dracut police officers from a confidential drug informant, and although not witnessing the alleged illegal activity himself, the Plaintiff felt compelled and obligated as a citizen to report the alleged criminal activity (as relayed by the confidential informant) to the federal government, which he did.

After he provided the information to the federal government, a series of retaliatory actions and events transpired, including threats, intimidation, harassment and coercion, all in an effort to silence the Plaintiff and thwart any further inquiry into the matter and to punish him for such revelation by demotion within the DPD and loss of job position with the DEA.

Although there are several Counts, the primary claims include Free Speech Violations (42 U.S.C. § 1983); Whistleblowing Retaliation (M.G.C. c.149 § 185); and Civil RICO violations (18 U.S.C. § 1964(c)).

## <u>COMPLAINT</u>

## <u>THE PARTIES</u>

1. The Plaintiff, Joseph A. Jakuttis, is an individual person residing in Deerfield, New Hampshire, and is currently employed as a member of the police department in Dracut, Massachusetts, but is currently out on sick/disability leave.

2. The Defendant, Town of Dracut, is a municipal corporation duly incorporated under the laws of the Commonwealth of Massachusetts, with a principal place of business at 62 Arlington St., Dracut, Massachusetts, and was and is the employer of the Plaintiff, Joseph Jakuttis.

3. The Defendant, David Chartrand, is an individual person residing in Dracut, Middlesex County, Massachusetts, and at all times material to this complaint was employed as a member of the police department in Dracut, Massachusetts, and is currently officially the Deputy Chief of the Dracut Police Department ("DPD").

4. The Defendant, Michael O'Hanlon, is an individual person residing in Andover, Middlesex County, Massachusetts, and at all times material to this Complaint was employed by the United States Department of Justice officially as an agent for the Drug Enforcement Agency ("DEA"), a federal agency.

5. The Defendant, John Doe1[1], is an individual person residing in Dracut, Middlesex County, MA, and at all times material to this Complaint was and is employed as a member of the police department in Dracut, Massachusetts.

6. The Defendant, John Doe2[2], is an individual person residing in Lowell, Middlesex County, Massachusetts, and at all times material to this Complaint was and is employed as a member of the Massachusetts State Police.

---

[1] John Doe1 is a pseudonym for a Dracut police officer, and he is named as such and not by actual name because of certain allegations of criminal activity of one or more officers, including John Doe1, and in the event this matter is resolved timely, out of courtesy the Plaintiff is naming him as such, but will be amending the Complaint to name said officer. **

[2] John Doe2 is a pseudonym for a State Police Officer, and he is named as such and not by actual name because of certain allegations which suggest a close relationship with one or more persons who may have engaged in criminal activity, and out of courtesy in the event of a timely resolution to this matter, the Plaintiff is naming him as such, but will be amending the Complaint to name said officer. **

### **BACKGROUND**

7. The Plaintiff, Joseph Jakuttis, was appointed as a police officer in the Town of Dracut on or about June 1, 1998, after successfully completing the police academy training.

8. Shortly thereafter Jakuttis was elevated to detective within the DPD.

9. The then Chief of Police was the one who promoted the Plaintiff to detective.

10. Officer Jakuttis' responsibilities as a detective were numerous, but were primarily focused on performing drug and narcotic investigations.

11. Detective Jakuttis' job performance was exemplary, and in March, 2005, he received the Dracut Police Department's "Officer of the Year 2004" award, and in December, 2005, he received a letter of commendation from the Massachusetts Executive Office for Public Safety for "outstanding job performance and courageous actions in identifying a drug cartel operation in and around Dracut," citing that Detective Jakuttis is "an exceptional member of the law enforcement community and a credit to the Dracut Police Department." He also in that year was nominated for the prestigious George L. Hanna Memorial Award for Bravery.

12. On or about May 22, 2002, Plaintiff Jakuttis, Defendant Chartrand (a detective at the time prior to being appointed Deputy Chief), a third officer (a member of the Massachusetts State Police, not the Defendant in this case) and a fourth officer (a member of the Postal Inspector's office) participated in the seizure of approximately 35 pounds of high-grade marijuana.

---

\*\* Copies of the Complaint filed with the court have been served on John Doe1 and Doe2 along with a Complaint naming them with their actual names (which will be filed as an Amended Complaint in short order) and they are each aware that they are the particularly named defendants in this matter as John Doe1 and John Doe2, and have been informed that an Amended Complaint will be filed substituting their actual identities in place of the Doe references, and are on notice of all claims.

13. This "evidence" (the 35 pounds of marijuana), was initially stored in the evidence room inside the Dracut police department building, along with 120 pounds of marijuana from a separate seizure.

14. The 35 pounds of marijuana from the Jakuttis/Chartrand seizure mentioned above was sealed in air- tight wrap when seized, but the 120-pound seizure was not in air-tight wrap.

15. After some time in the evidence room within the police department building, the marijuana in the non-air-tight containers began to smell, so it was moved to an "evidence trailer" behind the police department building, as was the 35 pounds of marijuana seized by Detectives Jakuttis and Chartrand.

16. This "evidence trailer" was one of two trailers in the back of the police department building used to store a variety of evidence from different cases, as well as stolen bicycles.

17. The trailer used to store the marijuana was a new (second) trailer and the marijuana was the first evidence to be placed in that trailer.

18. The evidence trailer that contained the marijuana was secured with two padlocks which required separate keys to unlock.

19. Access to the trailers were restricted to members of the detective bureau of the DPD, although most employees knew where one or more of the keys were kept.

20. On or about April 17, 2003, Defendant Chartrand, still a detective at this point, went to the second trailer to return some evidence from a separate case that had been removed from the trailer for an ongoing court case.

21. On April 17, 2003, when said evidence for the ongoing court case was returned as mentioned above, Defendant Chartrand noticed that the two padlocks on the trailer had been cut, and upon entering the trailer Chartrand noticed that the marijuana was missing.

22. After an inventory of the trailer was taken, it was confirmed that the only evidence missing were the 35 pounds of marijuana from the Jakuttis/Chartrand seizure and the 120 pounds from the other seizure.

23. After the theft, the Middlesex County District Attorney's office ("DA's office") was contacted to investigate the theft, and a criminal investigation began, with the DA's office assigning a Massachusetts State Police Lieutenant to head the investigation.

24. As the investigation began, it was requested by the state police or the DA's office that all members of the DPD detective unit voluntarily take a polygraph (lie detector) test regarding their knowledge of or participation in the theft of the marijuana.

25. The DA's office, at this time during the criminal investigation, would not grant transactional immunity for anyone taking the polygraph test, so most of the department refused to take the polygraph test.

26. Only two detectives agreed to voluntarily take the test – Detective Jakuttis (the Plaintiff) and Detective Chartrand (the Defendant).

27. Both Plaintiff Jakuttis and Defendant Chartrand passed the polygraph test.

28. In no small part because of passing the test, Plaintiff Jakuttis and Defendant Chartrand were chosen to work with the state police in the criminal investigation of the theft of the marijuana.

29. On November 20, 2006, however, prior to any conclusion of the investigation, Plaintiff Jakuttis suffered a severe physical injury while working in an undercover capacity and went out on leave until May 2, 2009, at which time he was medically retired from the DPD because of that injury.

30. Plaintiff Jakuttis ultimately recovered from his injury and was reinstated on the DPD as an officer on August 13, 2012 and performed additional work as a detective, but did not resume

any investigation of the theft of the marijuana because the investigations had concluded in his absence.

31. While Plaintiff Jakuttis was out of work between 2006 and 2012, however, the investigation into the theft of the marijuana from the Dracut police did continue, but did not result in any criminal charges, and the Middlesex District Attorney's office officially closed the case and informed the then Dracut Chief of Police, Kevin Richardson, of such by way of a letter dated November 11, 2008.

32. In or about November, 2008, following receipt of the notice that the criminal investigation was over, Chief Richardson of the DPD requested an "internal investigation" of the 2003 marijuana theft with the assistance of the North Eastern Massachusetts Law Enforcement Council's Internal Investigation Unit ("NEMLEC").

33. The NEMLEC internal investigation was headed by Chief Alfred Donovan (Ret.) of the Tewksbury Police.

34. The final report from the NEMLEC was issued on or about April 19, 2010, approximately a year and a half after being initiated. By this time, the statute of limitations had run on any criminal charges related to the 2003 theft of the marijuana from the Dracut Police Department.

35. This final report from the NEMLEC, despite being started near the expiration of the statute of limitations for the crime, and finishing after the expiration of the statute of limitations, is a thorough and detailed account of the circumstances surrounding the theft, including information regarding the possible knowledge and/or participation in the crime by not only various civilians, but also some of the Dracut Police Department officers and/or personnel.

36. The final conclusion of the NEMLEC report was that the perpetrators of the crime were known to the Dracut police, and that the perpetrators may have had the assistance of at least two

Dracut police officers, Dracut Officer 1 (DO1)[3] and Dracut Officer 2 (DO2). In this Complaint those two officers are simply referred to as DO1 and DO2. DO1 is still employed at the DPD; DO2 is retired. They are not defendants in this Complaint.

37. That report also pointed to a prime civilian suspect in the case.

38. That prime civilian suspect has a familial relation with DO1 (his brother).

39. A second report on the Dracut Police was commissioned by the Town of Dracut itself for a risk assessment of the Dracut Police Department. This "risk assessment" report/project was conducted by Municipal Resources Inc., ("MRI"), located in Meredith, New Hampshire, and was completed in October, 2015, just over one year ago. It is a ninety (90) page report.

40. The scope of the MRI project was to review the manner in which law enforcement services were provided within the town of Dracut from a risk management, as well as an operational, perspective.

41. Over a period of several months, a team of MRI police consultants spent considerable time meeting with staff, reviewing documents, analyzing data, and inspecting on-site operations. In addition, MRI provided all employees with an opportunity to provide input through the distribution of an internal survey instrument and one-on-one interviews.

42. One important aspect of that MRI report is that it found that there was a perception by several officers that there was a group of officers who were considered "cronies, friends and favorites" of management, and that those outside that circle were "ruled by fear and intimidation."

43. Plaintiff Jakuttis became one of those ruled by fear and intimidation as a result of the actions of the Defendants taken in retaliation for the Plaintiff exercising his United States Constitution

---

[3] Because of the criminal nature of the allegations in the NEMLEC report, and despite the expiration of the statute of limitations, the identities of those police officers mentioned in the report as most likely being involved in the theft of the marijuana are not being mentioned in this Complaint, out of courtesy.

First Amendment rights and his rights under Article 16 of the Declaration of Rights of the

Inhabitants of the Commonwealth of Massachusetts, as well as his rights under the

Massachusetts Whistleblower Act, M.G.L. c. 149, § 185, all of which shall be more fully

alleged and articulated below.

### Plaintiff Assigned to DEA Unit

44. In or about August, 2013, approximately one year after returning to the DPD following his

medical retirement and recovering from his injuries, Detective Jakuttis was selected as the first

ever non-funded[4] Task Force Officer in the Northeast District of the Drug Enforcement

Administration, and was assigned to the Cross-Borders Initiative office ("CBI") of the DEA in

Lowell, Massachusetts.

45. The CBI (located in Lowell at the time, now in Andover) is a joint venture between the DEA,

state and local law enforcement, and the U.S Attorneys from Maine, New Hampshire, Vermont,

and Massachusetts, established to address the use of Lawrence and Lowell as drug supply

centers for northern New England.[5]

46. In his role as a member of the CBI team, Detective Jakuttis was still an employee of the Town

of Dracut, and was paid his salary from the Town of Dracut.

47. During his time as a member of the CBI team, Detective Jakuttis spent the majority of his time

working directly with or within the CBI unit but also still functioned as a detective within and

for the DPD during "down time" or during his time off from the CBI, and this detective work

for the DPD was primarily focused on narcotic/controlled substance crime.

---

[4] A "non-funded" task force officer works with the DEA on a particular case or specific cases, rather than working "in general" within the DEA's CBI unit, and does not receive extra compensation from the DEA, although he would receive credentials, a gas card, and some expenses.
[5] DEA website: https://www.justice.gov/archive/ndic/pubs/658/overview.htm

48. Detective Jakuttis was selected as a member of the CBI because of his reputation as an honest, hard-working and ethical police officer, and Detective Jakuttis was realizing his longtime dream of becoming a highly active law enforcement detective in combating the illegal sale and trafficking of narcotics and dangerous drugs to protect the public from the overwhelming epidemic of narcotic and drug trafficking and community drug abuse and addiction. This dream would soon evaporate at the hands of the Defendants.

**Free Speech and Whistleblower Content/Information Received by Plaintiff**

49. On or about January 16, 2015, Detective Jakuttis was engaged in a DPD undercover operation with an officer from the Lowell Police Department.[6] Jakuttis and the Lowell officer were utilizing two confidential sources. At the end of this operation, one of the confidential sources ("CS")[7] was being debriefed by Detective Jakuttis in Jakuttis' vehicle, while the Lowell officer gave the other confidential source a ride back to that source's vehicle.

50. During the debriefing with CS, CS told Detective Jakuttis "I have to tell you something." CS then proceeded to give unsolicited information to Detective Jakuttis regarding some disturbing information about two fellow Dracut police officers at the DPD.

51. These two fellow Dracut police officers mentioned in paragraph 50 above are *not* the two officers referenced earlier in this Complaint as DO1 and DO2. The two police officers mentioned in paragraph 50 above are Defendant John Doe1 and another Dracut police officer referred to in this Complaint as Dracut Officer 3 ("DO3"), but that officer is not a defendant in this case at this time.

---

[6] This Lowell officer was also a member of the DEA's CBI representing the Lowell Police Department, but the undercover operation mentioned in paragraph 49 was not a CBI case.

[7] CS is well known to Plaintiff Jakuttis and the DPD as CS had been used on many undercover operations, and worked a great deal with the Plaintiff prior to the Plaintiff going out following his injury. Plaintiff Jakuttis was the first police officer CS worked with when CS began as an informant for the DPD.

52. John Doe1 and DO3 are still employed as police officers in the DPD.

53. The information which CS revealed to Detective Jakuttis (which will be discussed below) was subsequently revealed by Detective Jakuttis to several officers in the CBI unit, including federal law enforcement officers. It was also revealed to the Plaintiff's supervisor from the DPD, Defendant Chartrand, after a formal interview of CS at the CBI office on February 18, 2015, with three detectives present, where CS reiterated his accounts of the events that he revealed to Detective Jakuttis on January 16, 2015.

54. Present at this formal interview of CS on February 18, 2015, were officers from the CBI unit including Special Agent (SA) Willoughby, who is an officer from the DEA, Defendant John Doe2 and Plaintiff Jakuttis.

### Info Provided by CS to Detective Jakuttis on January 16, 2015

55. CS had worked with Detective Jakuttis in the past, and the operation on January 16, 2015, resulting in the debriefing was the first time the two had worked on an operation with Jakuttis being CS's handler since Jakuttis was injured in 2006.

56. After CS told Detective Jakuttis that he "had something to tell him," he proceeded to reveal information of events that had occurred while Detective Jakuttis was out of work.

57. CS told Detective Jakuttis that during the time Jakuttis was out on disability that he (CS) used to "party" with John Doe1 and DO3. Detective Jakuttis asked CS what he meant by that.

58. CS then went on to say that John Doe1 and DO3, and occasionally a third unknown male, brought "whores" to CS's apartment and that they all had sex and consumed drugs together. CS stated to Detective Jakuttis that "they would all get fuxxxx-up and those guys would bang the chicks" in CS's bedrooms.

59. CS stated that some years ago, John Doe1 arrived at CS's apartment and asked CS to obtain some cocaine and heroin for them.

60. CS told Detective Jakuttis that CS thought that John Doe1 was "setting him up" and possibly arrest him if he actually ordered the drugs, so CS questioned John Doe1 about that, and John Doe1 said he would share the drugs with CS if he got some from one of CS's regular sources.

61. CS told Detective Jakuttis that CS then produced a "Percocet"[8] pill, crushed it, and told John Doe1 that he would place the order if John Doe1 snorted the crushed pill right then.

62. John Doe1 snorted the crushed pill, and CS subsequently ordered an "eight ball" of cocaine and one gram of heroin from one of CS's drug suppliers.

63. When the drugs arrived John Doe1 paid for them and CS consumed the heroin and John Doe1 consumed an amount of the cocaine.

64. CS told Detective Jakuttis that John Doe1 took the remaining cocaine with him when he left CS's apartment.

65. CS told Detective Jakuttis that he found that encounter strange, but that he trusted John Doe1 after that and that the two developed a symbiotic relationship in which CS would allow John Doe1 "and company" (various individuals, sometimes including DO3) to use CS's apartment in return for free narcotics, which usually consisted of one gram of heroin and an eight ball of cocaine. CS told Detective Jakuttis this occurred roughly two or three times a month over an eight month to one-year period; being the time that CS was being used for undercover operations.

---

[8] Drug users and dealers on the street often refer to oxycodone tablets as, "Perc 5's," Perc 10's," or "Perc 30's," referring to the amount of oxycodone in the tablet. While they use the term Percocet or Perc in referring to the tablets, particularly the "Perc 30," they are often refereeing to straight oxycodone tablets, which are much smaller than an actual Percocet tablet and more easily snorted when crushed. Percocet tablets contain not just oxycodone, but an additional non-prescription drug (acetaminophen (Tylenol®)) and there is no such thing as a Perc-30 (meaning 30mg of the narcotic oxycodone in the tablet). The pill Doe1 snorted was most likely just straight oxycodone.

66. CS then continued to detail other events at CS's apartment with John Doe1 and his companions and mentioned that John Doe1 would pay for the drugs when they arrived and that he remembers on two occasions that John Doe1 actually handed the money himself directly to the dealer as they all stood in the kitchen area of CS's apartment.

67. CS told Detective Jakuttis that on one occasion at CS's apartment John Doe1 came over in the afternoon in an undercover police vehicle and asked CS to place an order for some cocaine and heroin for them, and that John Doe1 gave CS a Fentanyl[9] patch as they waited in CS's apartment for the dealer to arrive.

68. CS placed the order and then sucked on the Fentanyl patch.

69. When the drugs arrived, John Doe1 and CS consumed an amount of each, and shortly thereafter CS suffered an overdose and became ill.

70. CS was in and out of consciousness and said that he remembered being carried by John Doe1 from inside the apartment to outside and then driving CS to the hospital "near the rotary in Lowell" in John Doe1's undercover police vehicle.

71. CS told Detective Jakuttis that John Doe1 assisted CS into the hospital and told hospital personnel that he (John Doe1) "found him walking in the area" and saw that he (CS) potentially needed medical attention, and that CS remembers John Doe1 leaving the hospital directly after that.

---

[9] Fentanyl is a powerful synthetic opioid 50 to 100 times more potent than morphine and is available in different forms, but most commonly as a "patch" that is worn on the skin. The amount of drug in the patch is designed to be delivered into the bloodstream slowly through the skin, over a three (3) day period. The patch is commonly abused on the street by opioid addicts by sucking on the patch to get the drug into the system quickly – an extremely dangerous method of using Fentanyl and the source of numerous overdoses and deaths.

72. CS said that John Doe1 called CS the following day and asked how he was doing, and also that at some point in time John Doe1 yelled at CS and said the he was never going to give CS a Fentanyl patch again.

73. CS told Detective Jakuttis that at one point during this period of time that John Doe1 and CS were both involved in an undercover DEA directed operation targeting a street level dealer that CS knew. John Doe1 was working in an undercover capacity and CS had introduced John Doe1 as a "friend" to buy some cocaine from the individual.

74. The investigation lasted for several weeks and was focused at CS's apartment in Dracut.

75. CS said that several DEA funded/controlled buys of cocaine had transpired within CS's apartment, and that on one occasion the dealer gave John Doe1 three or four extra free one gram bags of cocaine during a transaction, and that after the dealer left the apartment John Doe1 "motioned" to CS not to speak or say anything (according to CS to avoid being detected by an attached recording device). John Doe1 then showed CS the extra cocaine and took it and placed it in the bathroom over or in the medicine cabinet.

76. CS told Detective Jakuttis that the extra free cocaine was hidden in the bathroom over the medicine cabinet during the event and not submitted as case evidence, and that sometime after the conclusion of that controlled purchase John Doe1 returned to CS's apartment and the two of them consumed the cocaine.

77. CS also recounted several instances where CS had a prescription bottle of Percocet from a medical prescription issued to CS, and that CS would sell the bottle of Percocet (sometimes 20 or 30 pills at a time) to John Doe1 for $5.00 per pill. These transactions occurred in the parking lots of an apartment complex in Dracut, the Heritage Night Club on Pleasant Street, and Brox Industries, in Dracut.

78. CS told Detective Jakuttis that John Doe1 would arrive either in an unmarked police vehicle or in his own personal vehicle, described as possibly a Black Chevy or GMC truck.

79. CS said he would peel the label that had CS's name on it and would then give the bottle to John Doe1 in exchange for the money.

80. On two different occasions during these Percocet prescription transactions CS had different females present in CS's vehicle during the transaction. CS told Detective Jakuttis that both these females recognized John Doe1 and told CS that he was "crazy" to sell drugs to a police officer.

81. Detective Jakuttis, during this January 16, 2015 disclosure of events by CS, asked CS whether or not CS had told anyone, including other law enforcement officers, of all this.

82. CS responded that he had not.

83. Detective Jakuttis then asked why CS had not told John Doe2 (Defendant John Doe2 in this Complaint), as CS was working with Detective John Doe2 in Jakuttis' absence from work.

84. CS replied that he did not trust John Doe2 not to tell John Doe1 and DO3 because CS believed that John Doe2, John Doe1 and DO3 were all friends.

85. Detective Jakuttis asked CS if he was being completely truthful, and CS said "yes," but that he would only tell the information to Detective Jakuttis and nobody else, and that he was afraid of John Doe1 and DO3 and feared for his (CS's) safety if it was revealed.

86. Detective Jakuttis told CS that he would most likely have to tell this information to other officers in the future, and CS said he would think about it.

87. The conversation on January 16, 2015, ended here, and CS exited Detective Jakuttis' vehicle and returned to his own vehicle.

88. Following this discussion with CS, Detective Jakuttis met with the Lowell officer and Detective Jakuttis informed him of the conversation with CS.  Detectives Jakuttis and the Lowell officer decided to meet with Detective John Doe2 (Defendant John Doe2) and arrange a formal interview with CS at a later date regarding the allegations he had just made.

89. That formal interview with CS occurred at the CBI office in Lowell, MA, on February 18, 2015, and will be discussed later.

**Additional Information Received Beyond Info from CS**

90. On January 30, 2015, approximately two weeks after CS revealed the alleged illegal activity of John Doe1 and DO3 and prior to the formal interview of CS in February, Detective Jakuttis was present at the U.S. Attorney's office in Boston on an unrelated matter.  This was a "proffer hearing" involving a narcotics distribution defendant, referred to in this Complaint as a Boston Confidential Source, or "BCS".

91. Present at this January 30, 2015 hearing/meeting were an Assistant U.S. Attorney, Special Agent Willoughby of the DEA, Defendant John Doe2 (Mass State Police), Plaintiff Jakuttis, and BCS and his attorney.

92. At this January 30, 2015 meeting at the U.S. Attorney's office, prior to the meeting starting and prior to all persons entering the room, in the room were Special Agent Willoughby, John Doe2 and Detective Jakuttis, all members of the CBI unit in Lowell.

93. Prior to everyone else entering, Detective John Doe2 became visibly aggressive toward Detective Jakuttis, and as Detective Jakuttis took out his notebook and pen or pencil, John Doe2 demanded, in an intimidating manner, that he (John Doe2) be the only person to take notes and no one else needed to record the information.  Willoughby, John Doe2 and Jakuttis

are all members of the CBI and John Doe2 did not make this demand on the others when they eventually entered the room.

94. It is normal practice that all present would take notes, but Detective Jakuttis has known John Doe2 since they were young children, and Detective Jakuttis attributed John Doe2's strange reaction as to perhaps John Doe2 having a bad day or some personal problem, and decided not to question him on this, and therefore Detective Jakuttis and Willoughby did not take notes. The Assistant U.S. Attorney and BCS's attorney did take notes, along with John Doe2.

95. Defendant John Doe2 is and was good friends with John Doe1 and DO3, and they regularly associate not only in a working capacity but also socially as a group.

96. During this January 30, 2015 hearing/meeting, BCS reported knowledge of multiple individuals involved in the distribution of narcotics, including a Dracut police officer. He named this officer who happened to be DO3. BCS stated that DO3 was a participant in a variety of criminal activities, including the consumption and sale of illegal narcotics.

97. It was revealed by BCS at this January 30, 2015 meeting that BCS's wife is friends with DO3's wife, and that he (BCS) met DO3 through his (BCS's) wife, and received information from his wife, and that information included DO3 using drugs at a concert in New Hampshire where DO3, BCS and their wives were present, and on one occasion BCS's wife saw a drug deal at DO3's house.

### Official "Disclosure" to "Public Body"

98. On or about February 2, 2015, while at a meeting at the CBI office in Lowell, Plaintiff Jakuttis revealed the information that CS had told him approximately two weeks earlier on January 16, 2016. Also discussed at that meeting was the information that was obtained from BCS at the proffer hearing in Boston on January 30, 2015. Present at the CBI office during this meeting on

February 2, 2015, were SA Willoughby, Defendant O'Hanlon[10], Defendant John Doe2 and Plaintiff Jakuttis.

99. As a result of this meeting, it was determined that a formal interview with CS would be conducted at the CBI office. Defendant O'Hanlon at this point ordered all CBI office personnel to "stay away" from the accused Dracut officers (John Doe1 and DO3) and that those accused officers were not to be involved in any future OCDETF cases.[11] O'Hanlon also told the personnel not to even have lunch with the accused officers pending any investigation into the matter. O'Hanlon at this meeting used the term "off limits" in referring to staying away from John Doe1 and DO3, and he was furious that he was allowed to sit at lunch with DO3 several days earlier prior to receiving the information about the BCS proffer hearing and CS's information provided to Plaintiff Jakuttis.

100. Sometime after this February 2, 2015 meeting at the CBI office and being told that John Doe1 and DO3 were "off limits," but prior to the formal interview of CS on February 18, 2015, several officers from the CBI unit went to lunch, including Defendant John Doe2 and Plaintiff Jakuttis. Unbeknownst to Detective Jakuttis, Defendant John Doe2 had invited John Doe1 and DO3 to the lunch. When being seated, John Doe2 gave the number of people to the waitress or hostess and said "we're waiting for two more," and John Doe1 and DO3 arrived shortly thereafter at the lunch after the other officers had already been seated.

101. The lunch was very uncomfortable for the Plaintiff with Defendants John Doe2 and John Doe1 sitting next to each other and glaring at Detective Jakuttis making snide comments to Detective

---

[10] Defendant O'Hanlon is the DEA agent in charge of the CBI unit of the DEA sitting in Lowell, now in Andover.
[11] OCDETF is the Organized Crime Drug Enforcement Task Force of the DEA.

Jakuttis, including John Doe1 making a comment that Detective Jakuttis would never get a vehicle that was to become available for use.[12]

102. This was the beginning of the retaliation, hostility, intimidation and harassment by the Defendants against Plaintiff Jakuttis for bringing to light the allegations against John Doe1 and DO3, and it would only get worse.

103. Thus, it was only after the Plaintiff revealed the information from CS implicating John Doe1 and DO3 in alleged illegal activity that the harassment, threats, intimidation, coercion and retaliation by the Defendants took root and progressed, which shows the causal connection between the exercise of the free speech and whistle blowing and the retaliatory acts and adverse employment action.

104. The formal interview with CS regarding the allegations against John Doe1 and DO3 by CS took place on February 18, 2015 at the CBI office in Lowell.

105. Present at this Feb. 18, 2015 meeting were SA Willoughby, Defendant John Doe2 and Plaintiff Jakuttis.

106. At the outset of the meeting, Defendant John Doe2 again demanded in an intimidating and hostile manner that he be the only person to record notes of the interview.

107. SA Willoughby and Detective Jakuttis looked across the table at each other looking dumbfounded, as if to say "what's with that again?" and the two shook their heads in disbelief of this strange behavior of Defendant John Doe2.

108. Defendant John Doe2 directly and intentionally controlled the entire interview and its complete record keeping through intense intimidation.

---

[12] Detectives often used or were assigned vehicles which were seized in operations and which became available basically as Dracut Police (or Town of Dracut) property. At this time Detective Jakuttis did not have a department provided vehicle and had to use his own personal vehicle for work and operational purposes, and the reference to Jakuttis not getting the vehicle was referring to a seized vehicle that would have been available for Jakuttis to use.

109. This demand of being the only one to take notes of the interview of CS and controlling the interview was a conflict of interest because Defendant John Doe2 knew that a bulk of the information was regarding allegations of his two friends (John Doe1 and DO3) engaging in criminal activity.

110. The February 18, 2015 interview of CS reiterated and formalized the information CS had provided to Detective Jakuttis on January 16, 2015, with substantially the same information as told to Detective Jakuttis, but also revealed additional information regarding the association of John Doe1 with a known area resident with a lengthy criminal record, and that this area resident associates with another local resident (referred hereafter as "Subject 1", or "S1") who has been the subject of numerous local and federal narcotic investigations and who is a suspected high-level narcotics trafficker. The Plaintiff has independent knowledge that the area resident who associates with John Doe1 also associates with DO3.

111. After the February 18, 2015 formal interview of CS, on that same day, Deputy Chartrand was contacted and informed of the information provided by CS, and the Deputy at some point went to the CBI office to discuss the matter.  Present at this meeting was Defendant Chartrand, Defendant O'Hanlon, SA Willoughby, Defendant John Doe2 and Plaintiff Jakuttis.

112. During this meeting, it was determined that the information obtained from the January 30, 2015, meeting with BCS and that day's (February 18, 2016) meeting with CS would be gathered and forwarded to the Public Corruption unit of the DEA.

113. A report of the information was generated by John Doe2, who had controlled both interviews of BCS and CS and was the only one among the CBI officers to take any notes by John Doe2's design, and that information was forwarded to the Public Corruption unit of the DEA.

114. Subsequently, in or about May, 2015, information was received by Defendant O'Hanlon that the Public Corruption Unit would not be conducting an investigation of the matter.

115. On March 6, 2015, Detective Jakuttis was ordered to respond to the DPD for a meeting with ICE[13] personnel to discuss Jakuttis' assistance on a case.

116. The meeting mentioned above was to discuss an active narcotics distribution organization involving S1, the person mentioned in paragraph 110 above. At this meeting were Defendant Chartrand, Defendant John Doe1, Plaintiff Jakuttis, and two officers from ICE, a female, "N.L." and male, "J.S."

117. Detective Jakuttis informed the officers at the meeting mentioned in paragraph 116 above that he had been investigating the drug distribution organization for roughly a year and a half and had developed a wealth of knowledge and intelligence regarding that organization.

118. Detective Jakuttis also informed the officers that the investigation was recently put on hold due to his transfer to the CBI unit, but that he brought the case with him when he transferred to the CBI unit and presented it to Defendant John Doe2, who re-opened the case through the federal agency, and that two DEA funded and controlled purchases of narcotics had been completed using a confidential informant previously handled by Detective Jakuttis, and that the investigation had appeared to be developing into a substantial case, but for some unknown reason the case was closed by Defendant John Doe2.

119. At this meeting mentioned above, Detective Jakuttis was instructed by Defendant Chartrand to copy all the case evidence that he had, and to provide copies of the same to Officer N.L. who was going to be re-opening the case at the federal level through ICE.

---

[13] The federal Immigration and Customs Enforcement agency.

120. During the month of May, 2015, in the late morning, Detective Jakuttis met with Officer N.L. at a location in Dracut, MA, with the purpose of transferring the case documents and to discuss a starting direction for the investigation. The meeting with Officer N.L. was brief, but Detective Jakuttis informed Officer N.L. that the main target, S1, was well known in the area and the owner of a car lot, and known for giving low prices to law enforcement officers, and as a result had many friends and acquaintances who were police officers in local police departments, including Lowell and Dracut.

121. Detective Jakuttis informed Officer N.L. that because of S1's local contacts with law enforcement it would benefit the investigation if she approached it from an out-of-town angle (meaning not involving local officers if possible).

122. Detective Jakuttis, during this meeting with Officer N.L., did not mention any officers' names nor discuss the contents of the packet with Officer N.L..

123. In or about May, 2015, Defendant Chartrand met with or spoke to a member of the FBI regarding the information on John Doe1 and DO3 which was revealed in the interviews of BCS and CS, and Chartrand revealed that the FBI agent informed him that the FBI would assist Dracut in any investigation, but for some unknown reason the FBI would not conduct their own investigation. No investigation was undertaken by Chartrand.

124. From this point on, Detective Jakuttis did not receive any official information regarding the status of any investigation, or of any type of administrative follow-up, regarding the allegations against John Doe1 and DO3, other than being told there would be no investigation.

125. Sometime in June, 2015, Detective Jakuttis and Officers N.L. and J.S. (the two officers taking over the investigation of the distribution ring involving S1) met in the parking lot of the CBI in