Lowell so that Detective Jakuttis could answer a few questions regarding the received intelligence package Jakuttis turned over relative to that investigation.

126. In this parking lot meeting, Officer N.L. was seeking assistance from the Dracut police in identifying an unknown male that had been seen with the case target (S1).

127. Detective Jakuttis reminded Officer N.L. that S1 had friends/associates within the local law enforcement world, and that it was not sound to involve them on any level. Again, no specific names were given by Detective Jakuttis regarding S1's "friends/associates" in the area law enforcement field. The Plaintiff's goal was to prevent the investigation being compromised in the event that one of the law enforcement officers with a relationship or friendship (whether past or present) with S1 got involved to the point where S1 would be tipped off either inadvertently or intentionally. Additionally, the Plaintiff was trying to avoid any difficulty for the law enforcement personnel who have a relationship with S1, including John Doe1, DO3, and another law enforcement officer, by not revealing the names of those individuals but just telling officer N.L. to use an out-of-town angle.

128. Officer N.L. agreed and said she would use other means to try to identify the male individual.

129. In the information packet, there was also information regarding an Asian female who was an identified associate with the criminal organization being investigated. She functioned as a money supplier for the members of the group, and she had a dating relationship with Defendant John Doe1 in the past.

130. Officer N.L. had specific questions regarding this female, and Detective Jakuttis answered her questions and the dating relationship with "a Dracut police officer" was discussed, but Defendant John Doe1 was not named specifically by Detective Jakuttis as that officer, just that it was a Dracut Police officer.

131. When the meeting with N.L. and J.S. was ending, Defendant John Doe2 exited the CBI location and saw Detective Jakuttis, and Officers N.L. and J.S., but didn't engage them in any conversation, and drove off in his vehicle glaring at them.

132. Two days after this June, 2015, meeting in the CBI parking lot, Officer N.L. called Detective Jakuttis and told him that Defendant John Doe2 had spoken with her and was basically interrogating her regarding the meeting. She also stated that she felt very uncomfortable and was wondering what John Doe2's problem was.

133. Several days later, while in the CBI office, Defendant John Doe2 was aggressive, intimidating and overbearing and began to interrogate Detective Jakuttis about the meeting in the parking lot, just as he had "interrogated" Officer N.L.

134. Detective Jakuttis felt threatened and intimidated and attempted to avoided this confrontation by electing not to discuss anything, not knowing if Defendant John Doe2 would become upset and report back to his friend, John Doe1, that there was an investigation into S1 which included the mention of a relationship between the Asian woman and "someone in the police department," which Detective Jakuttis knew John Doe1 would know that "someone" was he.

135. The glares and staring and aggressive attitude and behavior from Defendant John Doe2 toward Detective Jakuttis continued to escalate and began to cause a great deal of stress and anxiety for Detective Jakuttis.

136. On July 10, 2015, Defendant John Doe2 contacted Detective Jakuttis on his cell phone and began to yell and swear at him, accusing Detective Jakuttis of telling Officer N.L. that John Doe1 and DO3 were "dirty cops and couldn't be trusted." Defendant John Doe2 told Detective Jakuttis that he learned this from a "friend" who worked with Officer N.L.

137. During this phone call from Defendant John Doe2, Detective Jakuttis was on a field investigation and told John Doe2 that he would have to talk to him later, and the phone call ended.

138. Later that evening Detective Jakuttis called Defendant John Doe2 and the two agreed to meet the following day at the CBI office to discuss Defendant John Doe2's issues.

139. At a later date, Detective Jakuttis was told by two CBI officers that the July 10, 2015, phone call from Defendant John Doe2 to Detective Jakuttis was made from the CBI office, and that before or after he made the call, Defendant John Doe2 was yelling obscenities and swearing regarding Detective Jakuttis and that he also punched a file cabinet.

140. On July 11, 2015, Detective Jakuttis and Defendant John Doe2 met at the CBI office for what Detective Jakuttis thought would be a conversation to perhaps clear the air and resolve any issues that Defendant John Doe2 may be having with Detective Jakuttis' role and function in exposing the possibility of more corruption in the Dracut Police Department, but this meeting actually turned into a two-hour interrogation by Defendant John Doe2 of Detective Jakuttis.

141. During this July 11, 2015, "interrogation" of Detective Jakuttis, Defendant John Doe2 was loud, aggressive, intimidating, threatening and hostile toward Detective Jakuttis, and at one point the stress and pressure from Defendant John Doe2 caused Detective Jakuttis to break down in tears.

142. On two occasions during this interrogation, Defendant John Doe2 threatened and intimidated Detective Jakuttis by saying on two separate times: "I don't believe you, I'm going to the boss and have you kicked out of here." He then called Detective Jakuttis a "rat" and said he was going to have Officers N.L. and J.S. ordered to the office to meet with the O'Hanlon (Defendant) to find out more about the meeting in parking lot between Jakuttis, N.L. and J.S.

143. Also during this July 11, 2015, interrogation, Defendant John Doe2 informed Detective Jakuttis that he (John Doe2) had spoken with Deputy Chartrand (Defendant Chartrand) and John Doe1 and that they informed him (John Doe2) that there would be no investigation into the allegations from CS.

144. Detective Jakuttis then told Defendant John Doe2 that if he felt the need to go to the boss (O'Hanlon) then "so be it," but that he (Jakuttis) hadn't done anything wrong.

145. From this point forward, besides being hostile, intimidating and threatening toward Detective Jakuttis, Defendant John Doe2 also began to discredit Detective Jakuttis and his ongoing investigations.

146. On August 6, 2015, at approximately 10:45 a.m., Detective Jakuttis met with Defendant O'Hanlon at the CBI office in Lowell. A conversation took place relative to the parking lot meeting between Jakuttis, N.L. and J.S., and Detective Jakuttis explained that he was asked to provide more information regarding the investigation N.L. and J.S. were handling, and that he didn't feel the need to inform Defendant John Doe2 of such, particularly where it may place Defendant John Doe2 in a difficult or compromising positon because of John Doe2's friendship with John Doe1 and DO3 and their potential relationship with the target and others in the investigation.

147. Defendant O'Hanlon informed Detective Jakuttis that in the future if Detective Jakuttis was going to be meeting with other agencies that he (O'Hanlon) was to be informed of any such meetings in advance. Detective Jakuttis agreed.

148. At this point, Detective Jakuttis explained to Defendant O'Hanlon about the harassment, threats and intimidation he was receiving for the past several months from Defendant John Doe2.

149. Defendant O'Hanlon's response was simply, "try to get along."

150. A few days later Defendant John Doe2 was again harassing and intimidating Detective Jakuttis by asking him if he had been in touch with CS recently.  Detective Jakuttis responded "no," and Defendant John Doe2 called Jakuttis a liar.

151. It is not common practice for agents working on cases to inform each other of every single angle they were working on or each and every conversation in minute detail, just to inform each other regarding pertinent conversations or developments as the particular case progresses.

152. On August 19, 2015, at approximately 2:00 p.m., there was a meeting at the CBI in Lowell, in Defendant O'Hanlon's office, to discuss again Defendant John Doe2's issue that he wasn't invited to the meeting with Jakuttis, N.L. and J.S. at the CBI parking lot. Present in this meeting were Detective Jakuttis, Defendants John Doe2 and O'Hanlon, and another agent, Glen Coletti.

153. During this meeting, Detective Jakuttis explained that Defendant John Doe2 had been harassing him for approximately six months, and that it has to do with the allegations against John Doe2's friends, John Doe1 and DO3.

154. Detective Jakuttis also complained in this meeting that Defendant John Doe2 had directly threatened him on two occasions by calling him (Jakuttis) a "rat" and that he would "go to the boss and have him kicked out of the unit."

155. At this point, after Detective Jakuttis complained about the harassment from John Doe2, Defendant John Doe2 started swearing and calling Jakuttis a liar and sprang from his chair and continued swearing as he headed toward the office door.

156. Defendant O'Hanlon directed John Doe2 to calm down and return to his seat, and as he was returning to his seat Defendant John Doe2 called Detective Jakuttis a "fucking liar."

157. As the meeting continued, Defendant John Doe2 seemed to calm down a bit and Defendant O'Hanlon just said for Jakuttis and John Doe2 to "get along" from that point forward. Defendant John Doe2 reluctantly shook Detective Jakuttis' hand with John Doe2 having a threatening and intimidating look on his face sneering at Jakuttis.

158. Following this meeting, Defendant John Doe2 continued to treat Detective Jakuttis with distain and would avoid answering questions or answer with quick curt answers and would often give intimidating and threatening glares and stares at Detective Jakuttis, instilling a great deal of stress, tension, anxiety and fear into Detective Jakuttis.

159. Despite Defendant John Doe2's efforts to interfere with Detective Jakuttis' position within the CBI unit and to get him removed therefrom, Detective Jakuttis was appointed as a "funded"[14] member of the CBI unit.

160. To memorialize this appointment as a funded member of the CBI unit, on August 24, 2015, a two-year contract was executed between the DEA and the DPD, with Plaintiff Jakuttis being the beneficiary of this contractual arrangement as the DPD officer assigned to the DEA task force.

### The Haverhill Incident

161. It is not uncommon for there to be overlap with suspects or targets of criminal activity being involved with more than one criminal group, with each group being investigated by different law enforcement teams.

---

[14] The difference between a "funded" position in the CBI and a "non-funded" is that as a funded member Detective Jakuttis was paid overtime up to approximately $18,000.00 per year from the DEA for his work on the unit beyond his base salary that was paid by the Dracut Police Department. Although as a "non-funded" member he would have a gas card and be allowed some expenses, his duties were limited to a specific case that he was chosen to work on and was not eligible for general overtime from the DEA. As a "funded" member of the CBI unit, beside the overtime he could receive, he would have general responsibilities within the CBI unit and was not limited to a particular case, and had expanded duties and responsibilities.

162. It is also common for a suspect or target of one investigation, because of this overlap, to be arrested by a different investigative unit investigating a different criminal element or organization.

163. This overlap did in fact occur on or about October 6, 2015, with Detective Jakuttis being a member of one CBI team and Defendant John Doe2 being a member of a different team, investigating different groups.

164. This event of October 6, 2015, occurred in the town of Haverhill. Detective Jakuttis was working with a particular CBI officer, and during a mobile/stationary surveillance[15] Detective Jakuttis and his partner for this surveillance followed a vehicle within Haverhill, MA, and the other officer determined that the two should approach the suspect vehicle when the occupants got out. They did, and an arrest of two individuals for violations of the Controlled Substance Act occurred, with Detective Jakuttis participating in the arrest.

165. While the other officer was taking one of the arrestees to the Haverhill Police Department, Detective Jakuttis remained at the location awaiting a narcotics detection dog.

166. While waiting, a crowd of citizens had gathered watching the events.

167. With the crowd present, several other units/officers had arrived, including officers from the Haverhill Police Department, the Essex Sherriff Department, Defendant O'Hanlon and Defendant John Doe2.

168. When Defendant John Doe2 arrived he immediately ran over to where Detective Jakuttis was and began to shout and swear at him loudly because apparently one of the individuals arrested was the target of an active case of Defendant John Doe2.

---

[15] "Mobile/Stationary" surveillance is where the officers may be in a vehicle watching a location and someone is exiting a building or location and leaves, or someone arrives at the location and then leaves, and the officers then leave the location to follow.

169. The arrest of one of Defendant John Doe2's case suspects was not intended to interfere with Defendant John Doe2's case and was done without Detective Jakuttis' knowledge that the suspect was one of Defendant John Doe2's targets.

170. While Defendant John Doe2 was in the middle of this uncalled for and irrational tirade and outrageous display of contempt for Detective Jakuttis in view of the general public and Defendant O'Hanlon, O'Hanlon just stood by and said nothing, allowing John Doe2's tirade to continue, and with deliberate indifference overtly condoned and encouraged such harassment and intimidation of the Plaintiff by John Doe2.

171. Defendant John Doe2's public tirade included going back and forth from the suspects' vehicle to where Detective Jakuttis was standing, all the while swearing and berating Detective Jakuttis with Defendant O'Hanlon acquiescently standing by watching the enraged and out of control John Doe2 in silence.

172. When the officers, including Defendant O'Hanlon and Detective Jakuttis, arrived at the Haverhill Police Department for booking of the arrestees, Detective Jakuttis approached Defendant O'Hanlon in an attempt to discuss Defendant John Doe2's behavior, and O'Hanlon rebuffed Detective Jakuttis in a dismissive manner.

173. Defendant John Doe2's actions against Detective Jakuttis were clearly extreme and outrageous conduct, intentional, malicious, willful and wanton, and in bad faith, as was all other retaliatory and harassing, intimidating and threatening actions of Defendant John Doe2 against Detective Jakuttis, and was intended to cause harm to Detective Jakuttis and did cause harm. The reason for the hostility, intimidation, harassment, coercion, threats and other abusive treatment by John Doe2 was because Plaintiff Jakuttis revealed the alleged illegal activity of John Doe2's friends (John Doe1 and DO3).

### The Vehicle Incident

174. As being assigned to an investigative unit of the DEA, individuals are mandated to be supplied a vehicle from their supporting department (in this case, the Dracut Police Department) for official business use.

175. Although Detective Jakuttis was initially assigned a vehicle from the DPD after being assigned to the DEA, that vehicle became non-functional in September of 2014, and from that point on Detective Jakuttis was using his own personal vehicle for work purposes, riding with other officers, or borrowing vehicles from other agencies, such as the Lowell Police Department, Middlesex County Sheriff's Department or State Police.

176. Finally, on October 15, 2015, after approximately one year of using his own vehicle and after John Doe1 had made comments that Detective Jakuttis wouldn't get a vehicle (at the lunch, mentioned previously), and after the harassment, threats and intimidation of Detective Jakuttis had been ongoing, a vehicle was finally provided to Detective Jakuttis.

177. This vehicle was provided by Defendant John Doe1, and was further retaliation, intimidation and harassment against Detective Jakuttis because of the condition of the vehicle.

178. The vehicle was issued and "checked over" by Defendant John Doe1. The then Chief of Police, Kevin Richardson, told Detective Jakuttis that John Doe1 had checked over the vehicle and told the Chief that the vehicle "was in good condition."

179. Upon receipt of the vehicle, Detective Jakuttis discovered that the vehicle was in anything but "good condition." It had extremely high mileage, and a plethora of mechanical issues.

180. The tires of the vehicle were all unserviceable with barely any tread, making the vehicle actually dangerous to drive.

181. The vehicle shook and rattled as if it had been in a collision.

182. The vehicle reeked of urine.

183. The vehicle had a family of field mice living within the interior.

184. The fact that Defendant John Doe1 provided this vehicle in the condition it was to Detective Jakuttis and told the Chief that it was in "good condition," is clearly extreme and outrageous conduct and was intentional, malicious, willful and wanton, and in bad faith, as was all other retaliatory and harassing, intimidating and threatening actions that Defendant John Doe1 took against Detective Jakuttis, all for the purpose of retaliating against and punishing Plaintiff Jakuttis for revealing the information provided by CS regarding the alleged illegal activity of John Doe1 and DO3.

### Plaintiff Jakuttis Removed from DEA (John Doe2's and O'Hanlon's Actions)

185. Defendant John Doe2 ultimately accomplished his goal of getting the Plaintiff removed from the CBI in retaliation for the Plaintiff being what Defendant John Doe2 viewed as "a rat."

186. On or about October 20, 2015, Wednesday, at approximately 4:30 p.m., Detective Jakuttis received a call on his cellular phone from Defendant O'Hanlon.

187. Defendant O'Hanlon told Detective Jakuttis that he "wasn't working out and would no longer be a task force officer."

188. Detective Jakuttis then asked Defendant O'Hanlon why he was doing something like this over the telephone and not in person, and Detective Jakuttis also asked him for the "reasons" for this action being taken against him.

189. Defendant O'Hanlon said "it's just not working out," and then discussed the relationship between Detective Jakuttis and Defendant John Doe2.

190. Defendant O'Hanlon also said "You're just a victim of circumstance, but something has to be done."

191. Defendant O'Hanlon also told Defective Jakuttis that his (Jakuttis') work ethic and productivity were "outstanding and excellent" and that was "most certainly not part of the reason for his decision."

192. Defendant O'Hanlon ended the conversation by saying "you can call me an asshole if you want, but [John Doe2] has to be treated with kid gloves," and also said "I have no idea what he's capable of."

193. Defendant O'Hanlon then said "if you could turn in your identification and gas card and get all of your things out of the office by Friday, that would be good."

194. Defendant O'Hanlon's removal of the Plaintiff from the CBI unit was done in concert with and in conspiracy with the demands, wishes or requests of Defendant John Doe2 to retaliate against Jakuttis for bringing to light possible serious corruption and criminal activity within the Dracut Police Department, and the need to appease and placate an out of control state trooper (Defendant John Doe2) who was friends of those Dracut officers accused of corruption and illegal activity, and to avoid the embarrassment and difficulty of dealing with serous possible police corruption within cooperating law enforcement units, all at the expense of failing to protect the public by sacrificing the one person doing the right and moral thing as a citizen - the Plaintiff.

195. It was out of his moral and civic duty that detective Jakuttis revealed the information he obtained from CS, not out of any desire to open an investigation for his own workload or that of the CBI.

196. Defendant O'Hanlon encouraged Defendant John Doe2 in John Doe2's harassment and retaliation against Detective Jakuttis by his blatant silence, passive attitude and deliberate indifference with all of Defendant John Doe2's retaliatory actions against Detective Jakuttis,

with full and complete knowledge that the reason Defendant John Doe2 was taking such

retaliatory actions against Detective Jakuttis was because of his exercising his free speech rights

and whistleblowing regarding the alleged illegal activities of Defendant John Doe2's friends –

Defendant John Doe1 and DO3.

197. In fact, it was because of the efforts of Detective Jakuttis many years earlier, prior to

Jakuttis himself being assigned to the CBI, that Defendant John Doe2 was assigned to the DEA

unit. Detective Jakuttis had communicated with the then sitting group supervisor of the CBI unit

during his work as a detective for the DPD, and when Plaintiff Jakuttis learned that a position

for a state trooper was opening in the CBI, Detective Jakuttis mentioned John Doe2 and

recommended him for the position, which he got.

198. Defendant John Doe2 and Detective Jakuttis were in fact long-time friends from as far back as

grammar school, and such long-time friendship is why the hostile, retaliatory, harassing,

intimidating and threatening actions and behavior directed by Defendant John Doe2 toward

Detective Jakuttis has been so painful for Detective Jakuttis, and can only be attributed to John

Doe2's outrage at and distain for Detective Jakuttis because he exposed John Doe2's other

friends' (Doe1 and DO3) alleged illegal activity.

199. One of the explanations for Defendant John Doe2's behavior toward Detective Jakuttis is also

obviously to protect Defendant John Doe2's friends (Defendant John Doe1 and DO3) from

future additional exposure of their possible criminal and unethical behavior while active police

officers for the Town of Dracut, but another reasonable inference is that an additional reason for

such behavior is because John Doe2 knows the allegations to be true and/or that he has some

involvement in wrongful acts himself and doesn't want exposure for himself.

200. The actions by Defendant O'Hanlon were clearly part of a conspiracy between Defendant

O'Hanlon and Defendant John Doe2 to retaliate and punish Detective Jakuttis for exercising his

free speech and whistleblower rights in exposing the alleged illegal activity of Defendant John

Doe2's friends (John Doe1 and DO3).

201. During that conversation of October 20, 2015, Defendant O'Hanlon also attempted to appease

Detective Jakuttis by saying that to prevent him from getting "jammed up" with the DPD he

would tell his boss, Defendant Chartrand, that because the CBI office was moving to a different

location (the office was going to be moved from Lowell to North Andover), that they wouldn't

be working cases in the Dracut area and wouldn't need a representative from the DPD.

202. This was of little consequence or importance to Detective Jakuttis, nor did he feel the need for

any type of distortion of the real reason for the termination of the agreement between Dracut

and the DEA having Plaintiff Jakuttis working with the DEA – retaliation and adverse action

against Detective Jakuttis for bringing to light possible serious corruption and criminal activity

within the Dracut Police Department, and the need to appease and placate an out of control state

trooper (Defendant John Doe2).

203. The fact that O'Hanlon said he would lie to Defendant Chartrand about the real reason for the

termination of Jakuttis' CBI position so that the Plaintiff wouldn't get "jammed up" shows that

O'Hanlon was covering-up his own wrongful act of retaliation. If he stated the real reason for

Jakuttis' removal he would be admitting illegal, retaliatory adverse employment action. The lie

to the Dracut Police regarding the reason for discharging the Plaintiff from the CBI was to

cover-up O'Hanlon's own wrongdoing.

204. O'Hanlon's unilateral attempt to hide his own wrongful acts did not have any protective results

for the Plaintiff.

205. Defendant O'Hanlon informed Defendant Chartrand that Detective Jakuttis was no longer going to be working with the CBI unit of the DEA, and Defendant Chartrand subsequently told Detective Jakuttis to take a couple of weeks off till they could "figure out what to do."

206. Detective Jakuttis took a couple of weeks off, and would soon find out what that "what to do" would be.

### Plaintiff Demoted to Patrol, Not Allowed to be Detective (John Doe1's and Chartrand's Actions)

207. When discussions took place between Detective Jakuttis and Defendant Chartrand regarding returning to work after taking a couple of weeks off, Defendant Chartrand told Detective Jakuttis that he could not put him back on as a detective in the detective unit because "[John Doe1] doesn't want you there," but that he (Jakuttis) could return to patrol.

208. Defendant Chartrand also said (regarding John Doe1) that "he's been here for me for ten years and I can't kick sand in his face."

209. This action constitutes a conspiracy between Defendant Chartrand and John Doe1, at a minimum, and also DO3 and Defendant John Doe2, to retaliate against and punish the Plaintiff for exercising his free speech rights and whistleblower rights in exposing the potential corruption and illegal activity within the already troubled Dracut Police Department.

210. Being removed from the CBI and being told that he would not be able to return as a detective on the DPD was devastating to Detective Jakuttis.

211. Being removed from the CBI and being told that he would not be able to return as a detective for the DPD, both together and separately, caused a great deal of emotional distress and harm to Detective Jakuttis, and as a result the Plaintiff was and is unable to return to work at the DPD because of the harassments, intimidation, threats, coercion, retaliation, and otherwise because of the unlawful treatment of the Plaintiff because of his exercising his free speech rights and

whistleblower activities, and the physical and emotional harm and fear that he suffered and continues to suffer as a result of the acts of all the Defendants.

212. The Defendants actions were the proximate cause of the Plaintiff losing his position with the DEA; losing his status and position as a detective with the DPD; suffering retaliatory threats, intimidation, coercion, harassment and aggression; and has caused Plaintiff Jakuttis to suffer, among other things: high blood pressure, headaches, stress, anxiety, insomnia, bruxism (excessive grinding of the teeth), sadness, depression, loss of self-esteem, loss of ability to concentrate, loss of appetite, fear, loss of sexual desire, decreased libido, humiliation and loss of income, past and future.

213. Being told that he could only return as a patrol officer after being a detective for almost ten years, was also an attempt by the Defendants to discredit Detective Jakuttis as far as the allegations he facilitated bring forward against John Doe1 and DO3. Being "demoted" to patrol would make it look like the department did not take Detective Jakuttis' allegations or revelations of allegations from CS as credible, and also functioned as an inhibition on the free speech of the Plaintiff and of others.

214. Showing other employees what happened to Detective Jakuttis (removal from the DEA and demotion to patrol) for doing the right thing (exposing fellow officers alleged criminal and corrupt actions) would have a chilling effect on other law abiding and ethical officers or employees within the Dracut Police Department by placing fear and intimidation into their minds if they stood up for what was right.

215. The actions taken against Detective Jakuttis by the Defendants tells those who would exercise their free speech rights or perform whistleblowing functions that they do so at their peril.

216. The return to patrol may or may not have had an effect on the base pay of Detective Jakuttis, but it was nevertheless an adverse employment action.

217. Being a detective on the police force is in fact a higher level of employment, status, responsibility, esteem, and qualification than that of a patrol officer, regardless of whether or not there is a pay increase or differential, and whether or not there is an official "rank" difference.

218. The difference in status is that in the law enforcement world being a detective is in fact looked upon by law enforcement employees as an increase grade, level, position or otherwise a higher status within the law enforcement community in general, and generally garners greater respect from others in the law enforcement field than that of a patrol officer.

219. The difference in responsibility is that being a detective, regardless of any pay difference or official computer listed "rank," affords greater privileges, power and responsibilities than a patrolman.

220. For example, as far as responsibility, if a detective arrives upon a crime scene, and present at the scene are patrol officers, the detective will be the one who takes the lead and has greater authority as to the conduct of the on-scene investigation.

221. In fact, even if there is a higher-ranking police officer, such as a Deputy Chief or even the Police Chief himself, at a crime scene, if there is a detective "on scene" generally the detective will have command of the investigation, even over the Chief.

222. As far as esteem, generally in the civilian community, as well as the law enforcement community, a detective garners more esteem than patrolmen.

223. As far as qualifications, a detective has greater training and greater experience in handling a crime scene and is in a better position to take charge of the investigation of any crime scene and other investigatory functions within the police department.

224. As far as Detective Jakuttis' qualifications as a detective, he was *the most* qualified and experienced detective on the Dracut Police Department regarding violations of the Controlled Substance Act and narcotics diversion, and the refusal to allow Detective Jakuttis to return as a detective on the Dracut Police not only didn't make sense from an administrative standpoint, it caused decreased public safety because a much less qualified individual was placed in the detective bureau rather than Detective Jakuttis.

225. Defendant Chartrand has known that the emotional distress and physical ailments that the Plaintiff has been suffering is a result of his removal from the CBI and subsequent denial of being able to continue as a detective on the DPD.

226. Despite Chartrand knowing that the cause of the Plaintiff's current psychological and physical ailments is because of the adverse employment actions taken against him, the Plaintiff was not allowed to return as a detective, and would not have been allowed to return as a detective even if he did not have such ailments because of John Doe1's demand to Defendant Chartrand that the Plaintiff not be allowed to continue as a detective.

227. Despite knowing that not being allowed to be a detective was a contributing factor to the Plaintiff's ailments, Defendant Chartrand went forward and filled a position in the detective unit of the DPD with a much less qualified individual, rather than allowing the Plaintiff to return as a detective or offering him the opportunity to continue as a detective.

228. Also, the ability to earn overtime as a detective is not as limited as the ability of a patrolman to earn overtime and the potential for income was greatly reduced by Detective Jakuttis being prevented from returning as a detective.

229. The degree of harm suffered by Detective Jakuttis is elevated and enhanced because it comes as a result of his desire to do what any citizen would want to do if they came upon the

information that Detective Jakuttis did – expose illegal and corrupt actions involving narcotics and law enforcement personnel, perpetrated by the very people charged with protecting the public by preventing that very same conduct.  Such exposure was for the purpose of protecting the public and enhancing public safety.

230. The public safety in jeopardy was police officers performing their civic duty while under the influence of illegal and dangerous narcotics; encouragement of illegal activity of narcotic dealers by the very people who should be preventing such activity; and police officers facilitating the arrival of illegal drugs on the streets of the community, a community already riddled with narcotic overdoses and deaths from illegal use and distribution of narcotics and other controlled substances.

231. Yet the unlawful harassment, intimidation and retaliation against Detective Jakuttis did not stop with his termination from the DEA position and his demotion to patrol, nor was such harassment, intimidation, threats and coercion limited to Detective Jakuttis himself.

232. During the month of November, 2015, after taking the time off when demoted to patrol, Plaintiff Jakuttis visited a friend who lives in Dracut.  This friend happens to be a detective in the Dracut Police Department.

233. At some point during the time spent with his friend, Plaintiff Jakuttis was informed by his friend that Defendant John Doe2, Defendant John Doe1, and DO3 all contacted the friend, either by phone call or phone text, sequentially and almost immediately after each other, to question him as to why he was with the Plaintiff, Jakuttis, and to chastise and harass him for associating with the Plaintiff.

234. This friend told Plaintiff Jakuttis that the three (John Doe2, John Doe1 and DO3) all asked the same type of questions and made various negative comments regarding the friend associating with Jakuttis.

235. For several days following the phone call, DO3 directly harassed and intimidated the friend for his association with Plaintiff Jakuttis, and it got to such an intolerable level that the friend lodged a verbal harassment complaint with Defendant Chartrand for DO3's harassment for associating with Plaintiff Jakuttis.

### COUNT I – First Amendment, Free Speech
### (42 U.S.C., § 1983 – Plaintiff J. Jakuttis v. All Defendants.)
### (alternatively, a *Bivens* Action for Federal Agent Defendant O'Hanlon)

236. The Plaintiff reasserts and re-alleges the allegations in Paragraphs 1 through 235 above, inclusive, and incorporate the same herein by reference as if fully set forth in this paragraph.

237. At all times material to this Complaint, Defendants Chartrand, John Doe1, John Doe2 and O'Hanlon, were "persons" within the meaning of 42 U.S.C., § 1983, as was the Town of Dracut (a *Monell* claim).[16]

238. At all times material to this Complaint the Defendants were acting under color of state law.

239. The Defendants have deprived the Plaintiff, Joseph Jakuttis, of his rights secured by the Constitution and laws of the United States.

### 42 U.S.C., § 1983 Claim Against Federal Defendant – O'Hanlon

---

[16] Monell v. Dept. of Soc. Servs., 436 U.S. 658, 701(1978) ("[A]bsent a clear statement in the legislative history supporting the conclusion that § 1 was not to apply to the official acts of a municipal corporation—which simply is not present—there is no justification for excluding municipalities from the 'persons' covered by § 1.").

240. Notwithstanding a potential *Bivens*[17] claim against the federal defendant (O'Hanlon), the Plaintiff alleges facts below which allow a 42 U.S.C., § 1983 claim against Defendant O'Hanlon for violations of the Plaintiff's First Amendment free speech rights, applicable to the states through the Fourteenth Amendment, even though he is a federal agent.

241. At all times material to this Complaint, notwithstanding that he was a federal agent, O'Hanlon was working directly with the Massachusetts State Police; one or more Massachusetts State Police officers (Defendant John Doe2); the Town of Dracut; one or more Town of Dracut police officers (Plaintiff Jakuttis); and various other local police agencies including the Haverhill and Lowell, Massachusetts police, and the Essex County Sherriff's Department.

242. Such concerted work mentioned in the preceding paragraph was through the work of the CBI unit, run under the auspices of the DEA but in full cooperation and concerted efforts and work with the State of Massachusetts and its political subdivisions and their law enforcement employees.

243. The state, through its employee, Defendant John Doe2, had a great deal of control and influence over the workings within the CBI, and the state played an integral role in the operations of the CBI through Defendant John Doe2, as did the Town of Dracut through its employee, Plaintiff Jakuttis, as well as other local town or city police departments and their respective employees working with the CBI unit of the DEA.

244. It can be said that the CBI unit was even more of a local or state operation because of the extensive involvement of state and local law enforcement officers and the use of state prosecutors for many of the arrests effectuated through the CBI.

---

[17] Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971). There is no adequate federal statutory remedial scheme available to the Plaintiff under the Federal Civil Services laws because the Plaintiff was not a civil service employee, so a *Bivens* action would be appropriate if no "state action" is found for Defendant O'Hanlon.

245. The violation of the Plaintiff's rights was a joint product of the exercise of state power and federal power, but the functions, actions, operations and control of the federal agent and federal agency unit (CBI) were so inextricably intertwined that the two cannot be separated for purposes of 42 U.S.C., § 1983.

246. The actions of Defendant O'Hanlon can be said to be that of the State because of (1) the nature of the operations of the CBI in relation to state crimes, (2) the symbiotic, extensive and melded operational entanglement with the state, (3) the state's influence and direction by Defendant John Doe2, Plaintiff Jakuttis, and other local police department employees, and (4) local and state implications of the speech in question (the allegations of corruption and illegal activity of local police).

247. There is nothing to make the actions or operations that O'Hanlon was involved in even close to a purely or primarily federal operation. State and Local law enforcement officers had a primary role in the day-to-day ground work, with O'Hanlon overseeing from a somewhat administrative perspective.

248. O'Hanlon's capitulating to Defendant John Doe2's desire to have Plaintiff Jakuttis removed from the CBI, despite Jakuttis' outstanding job performance as articulated by O'Hanlon, and the knowledge that such a desire by John Doe2 was to silence the Plaintiff and punish him in retaliation for exposing John Doe2's friends' alleged illegal conduct, renders O'Hanlon's termination of the Plaintiff's position with the CBI and his deliberate indifference to the harassment, intimidations, threats and retaliation by John Doe2, as joint action with the state (Defendant John Doe2) in the violation of the Plaintiff's rights and, thus, actionable under 42 U.S.C., § 1983.

249. By the acts and means alleged above, the Defendant, O'Hanlon, has violated the Plaintiff's First Amendment Rights of Free Speech and has caused the Plaintiff harm, as more fully described below.

250. If there is no liability for O'Hanlon under 42 U.S.C., § 1983 because he is determined not to be a state actor for such purposes, then liability still lies with a *Bivens* claim.

### 42 U.S.C., § 1983 Claim Against Town of Dracut – *Monell* Claim

251. At all times material to this Complaint, the Defendant, Town of Dracut, had a policy, custom or practice of inhibiting constitutionally protected speech, and which policy, custom or practice caused the Defendants to violate the Plaintiff's free speech rights, resulting in harm to the Plaintiff.

252. At all times material to this Complaint the Defendant, Town of Dracut, was the employer of the Defendants David Chartrand and John Doe1, and Plaintiff Jakuttis.

253. At all times material to this Complaint, Defendant Chartrand was the de-facto Chief of Police as far as day-to-day operations and management decisions, including policy and procedure decisions, and was in fact the policy maker for the Dracut Police Department.

254. That Defendant Chartrand was the de-facto policy maker for the Dracut Police is evidenced in the MRI report (referenced in paragraph 39 above).

255. That MRI report found the following: (a) the deputy chief was the principal force behind the day-to-day operations of the department; (b) there was a delegation of duties and responsibilities as well as policies and procedures; (c) the chief abrogated many of his responsibilities to the deputy chief (Defendant Chartrand) and that Chartrand's duties thus included in addition to the above: internal affairs investigations and complaints; communications; investigations; budgeting; staffing; performance reviews.

256. That MRI report found that because of all the duties Defendant Chartrand had, revisions of policies and procedures lagged. If they lagged because of Chartrand's workload, he obviously had policy and procedure making responsibilities in the first place.

257. The MRI report also found that internal affairs cases "lagged."

258. Defendant Chartrand was the final policy maker for purposes of the Police Department and its operations.

259. A single decision of a final policy maker can give rise to city and town liability for a policy, custom or usage claim (a *Monell* claim) under 42 U.S.C., § 1983.

260. The Plaintiff's state and federal constitutional rights of free speech were violated because of a policy, custom or practice of not properly investigating complaints about internal police corruption, and by being punished and retaliated against for bringing forward allegations of further police corruption and illegal activity.

261. It was the actions and inactions of the final policy maker, Defendant Chartrand, which was a major cause of the violations of the Plaintiff's free speech rights by Chartrand himself and others.

262. The MRI report also found training opportunities are "very limited."

263. There was a failure to train employees, including Defendant Chartrand himself, of the rights of employees as public employees to exercise their rights of free speech as it relates to matters outside their normal job duties and of public concern, and the failure to train was deliberate indifference to the specific risk that free speech of the public employees would be infringed by the unlawful suppression thereof.

264. This failure to train also caused the violation of the Plaintiff's free speech rights.

265. The policy, customs, practice and procedures of the Town of Dracut directly and proximately
caused the Plaintiff's constitutional rights to be interfered with by Defendant Chartrand and
Defendant John Doe1 by the retaliatory actions and adverse employment action taken against
the Plaintiff.

### Section 1983 – All Defendants

266. By the acts and means alleged above, <u>all</u> the Defendants have unlawfully infringed upon the
Plaintiff, Joseph Jakuttis', free speech rights as secured by the First Amendment to the United
States Constitution, made applicable to the State of Massachusetts through the Fourteenth
Amendment to the United States Constitution.

267. The speech which the Plaintiff claims was protected was his revealing information that he
received from a confidential source (CS) regarding alleged illegal activity of fellow police
officers (John Doe1 and DO3).

268. Said illegal activity includes the illegal use of narcotics and distribution of narcotics within the
community and the association of police officers with illegal narcotic drug traffickers and/or
dealers in the Dracut, Massachusetts area, outside of lawful undercover work.

269. The speech to which the Plaintiff claims is protected was not speech which was part of his
normal job duties.

270. The speech to which the Plaintiff claims is protected was citizen speech.

271. The speech to which the Plaintiff claims is protected was acquired by virtue of his employment
with the Town of Dracut and the DEA, but such fact does not transform that speech into
employee speech rather than citizen speech.  Lane v. Franks, U.S. Supreme Court, No. 13–483,
slip op. at 10 (June 19,2014).

272. Revealing potential corruption and illegal activity within the Dracut Police Department was not ordinarily within the scope of the Plaintiff's job duties.

273. The ordinary scope of the Plaintiff's job duties was to investigate, reveal, prevent and prosecute (through arrest) the illegal use and sale of narcotics and other controlled substance activity within the community committed by citizens.

274. Only upon special commission or direction by his employer to investigate internal corruption and illegal activity within the police department could the Plaintiff's activities and speech in this case be seen as part of his ordinary job duties. There was no such commission or direction.

275. When the Plaintiff was assigned the task of investigating the theft of the marijuana from the Dracut Police evidence trailer, that could reasonably be seen as part of the Plaintiff's ordinary job duties, but that commission and assignment was over and ceased when the Plaintiff went out on disability in 2006 and when the investigation was officially closed, and that investigation has long been over.

276. The Plaintiff's speech infringement was by way of the adverse employment action, harassment, threats, intimidation and coercion because the Plaintiff revealed the allegations against Defendant John Doe1 and DO3 made by a confidential source (CS). The CS revealed the information containing allegations of illegal activity of John Doe1 and DO3 in an "off-the-cuff" discussion that had nothing to do with the actual undercover operation in which CS and the Plaintiff were engaged when that information was revealed.

277. The Plaintiff's receipt, obtaining, gathering, and revelation of the speech in this case (the information provided by CS) was not commissioned by or paid by the employer or employees of the employer, but was an inadvertent obtaining of such information by the Plaintiff.

278. Publishing the information can be by verbal publication and does not need to be in writing.

279. There is a citizen analog to the publication of such information.  The citizen analog is that if a citizen had information regarding illegal drug activity and corruption of a local police department, the citizen would naturally turn to a federal agency such as the DEA, which is where the Plaintiff in this case first went.  In fact, there *is* a citizen analog which happened, to wit, CS informing the Plaintiff, a task force officer for the DEA in the CBI unit.  When the Plaintiff revealed this information, he was no less a citizen than CS in bringing the information forward.

280. In this case, a citizen would be even more likely to go to a federal agency rather than the Dracut Police itself because of past corruption which went largely unpunished (the theft of tens of thousands of dollars of marijuana most likely involving police officers), which was largely publicized in the local press and was the subject of much local talk.

281. Buttressing the characterization of the Plaintiff revealing the information CS gave him as "citizen speech" is that the Plaintiff did not do what he normally would do under his ordinary job duties when obtaining and revealing the information in this case.

282. If he was performing his normal job duties, the Plaintiff would have opened his own investigation and begin interviewing people or contacting other informants or begin to arrange for some kind of undercover work to find out more information about the alleged illegal activity of John Doe1 and DO3. The Plaintiff did not do that, he published the information to the DEA for processing outside the normal chain of command.

283. Any further investigation into the matter was set in motion by persons other than the Plaintiff – it was sent to the Public Corruption Unit of the DEA, outside of the normal chain of command within the Dracut Police Department and outside the responsibilities of the Plaintiff, which he would have participated in if it was part of his normal job duties.

284. Besides being citizen speech, the speech clearly touched upon a matter of public concern.

285. Corruption and illegal acts of law enforcement personnel holds a place of extreme public importance and concern.

286. The value and interest of the public and the Plaintiff in this speech coming out (the disclosure of the alleged illegal activity and corruption of law enforcement personnel) far outweighs any interest the employer may have in workplace harmony, particularly where any "disharmony" would clearly come from the alleged corrupt and unlawfully acting police officers.

287. The Defendants took adverse action against the Plaintiff in an effort to silence him and punish him for his expression of protected speech.

288. The temporal proximity of the revelation by the Plaintiff of the information received by CS and the beginning of harassment, intimidation, threats, coercion and retaliation was almost instantaneous.

289. The harassment, intimidation, threats and coercion was continuous against the Plaintiff even beyond when the Defendants reached their goal of silencing the Plaintiff by his discharge from the DEA position and the demotion to patrol officer at the DPD.

290. The causal link is also evident because even after the Plaintiff was out of work because of the threats, intimidation, retaliation and the demotion, the threats and intimidations continued against other employees who continued to associate with the Plaintiff. (See paragraphs 231-235 above).

291. But for the Plaintiff revealing the information provided by CS, there would have been no retaliation, harassment, threats or intimidation of the Plaintiff by the Defendants, nor removal from the CBI unit nor a demotion to patrol officer.

292. The Plaintiffs work history with the DPD includes an "officer of the year" award, other accolades, promotions and advancements; and as far as his work with the CBI unit the Plaintiff was even told by Defendant O'Hanlon, <u>as he was firing him</u>, that his "work ethic and production was exemplary" and not part of the reason for discharging him.

293. Because of his positive work record and accolades, the only reasonable conclusion is that the adverse employment action taken against the Plaintiff was because he exercised his free speech rights in exposing public corruption and illegal activity of public employees.

294. The Defendants acted with deliberate indifference to the Plaintiff's constitutional rights and their actions were intentional, willful, wanton, reckless and in bad faith.

295. By the acts and means alleged above, the Defendants infringed upon, abridged and deprived the Plaintiff of his federally protected constitutional free speech rights.

296. The First Amendment rights of the Plaintiff in this case, specifically, among other things, revealing allegations of criminal activity of local police, was a *clearly established* constitutional right.

297. All reasonable persons in the place of any of the Defendants would have known that inhibiting the Plaintiff's speech in these circumstances and taking adverse employment action against him for exercising such speech or otherwise retaliating, harassing, threatening, intimidating or coercing the Plaintiff for exercising such rights was or would be a violation of his federally and state protected free speech rights and would cause harm to the Plaintiff.

### Defendant John Doe2

298. Defendant John Doe2's actions were clearly in retaliation against the Plaintiff for revealing information that could potentially affect John Doe2's friends in the Dracut police department (both from an administrative disciplinary standpoint and from a criminal liability standpoint),

and to prevent possible exposure of wrongdoing by Defendant John Doe2 himself, and his retaliatory actions against the Plaintiff were to silence him by threats, intimidation, coercion, aggression, attempts to discredit him, and cause him the loss of his job.

299. Defendant John Doe2's violative actions include, but are not limited to: all previous allegations in this complaint above regarding John Doe2, being openly hostile in the work environment in order to undermine the Plaintiff's protected speech and to cause difficulty for the Plaintiff with his employment, threatening to get the Plaintiff fired from his position within the CBI, getting the Plaintiff fired from his position in the CBI, calling the Plaintiff a liar, complaining to others about the Plaintiff, and concerting with John Doe1 and DO3 to intimidate and threaten a friend of the Plaintiff to prevent that friend from associating with the Plaintiff.

300. Defendant John Doe2's actions directly and proximately caused the constitutional violation of the Plaintiff's free speech rights and are actionable under 42 U.S.C. § 1983.

### Defendant Michael O'Hanlon

301. Defendant O'Hanlon's liability is based on both deliberate indifference and inaction to the constitutional violations of the Plaintiff's rights, and is ALSO directly based on his own actions taken against the Plaintiff.

302. Defendant O'Hanlon was deliberately indifferent to the harassment, threats, intimidation, and retaliation by Defendant John Doe2 against the Plaintiff by standing by during all the various tirades and intimidating and threatening behavior exhibited by Defendant John Doe2 against the Plaintiff in the office, after the complaints by the Plaintiff directly to Defendant O'Hanlon about the treatment he (Plaintiff) was receiving from Defendant John Doe2, and standing by at the arrest in Haverhill, MA, watching Defendant John Doe2's irrational and intimidating tirade in front of the public against the Plaintiff.

303. Defendant O'Hanlon knew that the behavior of Defendant John Doe2 against Plaintiff Jakuttis was for the specific purpose of retaliating for his revealing the information regarding Defendant John Doe1 and DO3, and Defendant O'Hanlon had the ability and authority to stop the harassment, intimidation and coercion from John Doe2, but did nothing.

304. Defendant John Doe2 would be aggressive in meetings at the CBI office and would directly contradict the information revealed by the Plaintiff about Defendant John Doe2's friends (Defendant John Doe1 and DO3) saying that there "was no way" his friends (John Doe1 and DO3) "would have engaged in criminal activity."

305. Defendant O'Hanlon was well aware that the hostility and harassment and intimidation against the Plaintiff by Defendant John Doe2 only began after the Plaintiff revealed the information from CS regarding the suspected criminal activity of John Doe1 and DO3, and that those two individuals were friends of Defendant John Doe2.

306. Defendant O'Hanlon actually participated in and took positive action himself against the Plaintiff when he dismissed him from his position as a member of the CBI unit.

307. Defendant O'Hanlon took adverse action against the Plaintiff because of the problem Defendant John Doe2 had with the Plaintiff for exercising his free speech rights and because he (O'Hanlon) "did not know what John Doe2 was capable of," and thus, in his own right, Defendant O'Hanlon directly punished the Plaintiff for exercising his free speech rights.

308. That is, Defendant O'Hanlon resolved the turmoil that was created by the person who was retaliating (John Doe2) against the person exercising constitutionally protected rights (Plaintiff) by firing the innocent person exerting those rights and appeasing the constitutional violator.

309. This inaction AND action by Defendant O'Hanlon directly and proximately caused the constitutional violation of the Plaintiff's free speech rights and is actionable under 42 U.S.C. § 1983.

310. This inaction AND inaction by Defendant O'Hanlon also directly caused and/or materially contributed to Defendant Chartrand's demotion of the Plaintiff to patrolman and prevention of the Plaintiff from returning to the DPD as a detective.

### Defendant David Chartrand

311. Defendant Chartrand's liability is based on both deliberate indifference and inaction to the constitutional violations of the Plaintiff's rights, and ALSO directly based on his own actions taken against the Plaintiff.

312. Defendant Chartrand was deliberately indifferent to the harassment, threats, intimidation, and retaliation of Defendant John Doe2 and John Doe1 against the Plaintiff by standing by and allowing the harassment to take place.

313. Defendant Chartrand knew that the behavior of Defendant John Doe2 against Plaintiff Jakuttis was for the specific purpose of retaliating for his revealing the information regarding Defendant John Doe1 and DO3.

314. Defendant Chartrand was well aware that the hostility, harassment and intimidation against the Plaintiff by Defendant John Doe2 and John Doe1 began only after the Plaintiff revealed the information from CS about John Doe1 and DO3, and Chartrand knew that those two individuals were friends of Defendant John Doe2.

315. Defendant Chartrand stood by in deliberate indifference to the violation of the Plaintiffs first amendment free speech rights and allowed the retaliation to continue but had the ability and authority to stop such retaliation and infringement of the Plaintiffs constitutional rights.