## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH A. JAKUTTIS,<br>an individual,<br><br>**Plaintiff**<br><br>v.<br><br>TOWN OF DRACUT, MASSACHUSETTS,<br>a municipal corporation and public<br>employer,<br>DAVID J. CHARTRAND, Jr.,<br>in his individual and official capacity,<br>MICHAEL V. O'HANLON,<br>in his individual capacity,<br>DEMETRI MELLONAKOS (a/k/a John Doe1),<br>in his individual capacity,<br>RICHARD P. POIRIER, Jr., (a/k/a John Doe2),<br>in his individual capacity<br><br>**Defendants** | C.A. No. 1:16-cv-12643-DPW<br><br>(*Leave to file Memorandum in Excess of 20 pages ALLOWED by the Court (verbally) on March 4, 2019. See ECF Doc. #96, Clerk's Notes for Status Conference*) |

## PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANTS'
## (TOWN OF DRACUT, DAVID CHARTRAND and DEMETRI MELLONAKOS)
## SEVERAL MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Plaintiff herby opposes the Defendants' (Town of Dracut, David Chartrand and Demetri Mellonakos) Motions for Summary Judgment and submits this Consolidated Memorandum of Law in opposition to said motions.

1

TABLE OF CONTENTS

Introduction----------------------------------------------------------------------------------p. 2

Statement of Facts--------------------------------------------------------------------------p. 3

Summary Judgment Standard-------------------------------------------------------------p. 4

Argument-------------------------------------------------------------------------------------p. 4

    A.  42 U.S.C. § 1983 - First Amendment Free Speech-----------------------------p. 4

        1.  In General----------------------------------------------------------------------p.4

        2.  First Amendment-------------------------------------------------------------p.5

            (a) Citizen Speech on a Matter of Public Concern------------------------p.5

            (b) Employee's Interest in Communicating the Matter Outweighs

                Employer's Interest-------------------------------------------------p.13

            (c) The Protected Speech was a Substantial or Motivating Factor in the

                Adverse Employment Action----------------------------------------p. 14

            (d) The Action Taken Against the Plaintiff by Preventing Him From

                Continuing as a Detective was an Adverse Employment Action--- p.16

        3.  Monell Claim - Municipal Liability - TOWN OF DRACUT-----------p.20

        4.  No Qualified Immunity----------------------------------------------------p. 24

    B.  G.L. c. 149, § 185 - Whistleblower Claim - TOWN OF DRACUT---------p. 25

    C.  Massachusetts Civil Rights Act ("MCRA") - G.L. c. 12, §§ 11H, 11I------p.29

    D.  Interference with Advantageous Relationship----------------------------------p.32

    E.  Intentional Infliction of Emotional Distress-------------------------------------p.35

    F.  Civil Conspiracy---------------------------------------------------------------------p. 36

    G.  Civil R.I.C.O. - Violation - 18 U.S.C. § 1962 (c)-----------------------------p. 37

    H.  Civil R.I.C.O. - Conspiracy - 18 U.S.C. § 1962 (d)--------------------------p.44

## *Introduction*

The Plaintiff, Joseph A. Jakuttis ("Jakuttis"), a police officer for the Town of Dracut,

brings this action based on retaliatory and adverse employment actions taken against him

because he came forward with information that he received from an individual about corruption

within the Dracut police department - corruption which included the illegal possession and use of

controlled substances, and theft of drugs from evidence by fellow police officers.  The facts

show a pattern of illegal activity which included various individuals using their position as law

2

enforcement officers, and the use of the Dracut police department itself,  to run a criminal enterprise to engage in such activity, and to take retaliatory and threatening action against anyone who would expose or interfere with the corruption.

After coming forward with this information, a series of events occurred which can best be described as a concerted effort to punish, intimidate, harass, and otherwise derail the Plaintiff's career as a successful and well respected detective, not only to silence him, but to send a message to anyone else who might consider speaking out against corruption within the department, and that they had better not break the *Blue Code of Silence*.

The Defendants are attempting to minimize the events which led to the Plaintiff's claims in this case, and to relegate them basically into an employer/employee dispute that is devoid of any facts which give rise to liability.  This is, however, a case epitomizing the insidious and dangerous world of police corruption, cover-up and consequences for breaking that *blue* code-of-silence.

Prior to coming forward, the Plaintiff was a well-respected and accomplished detective for the Town of Dracut and the Federal Drug Enforcement Agency, and after coming forward he was all of a sudden a "difficult" person to work with and no longer worthy of being a detective. A victim of doing the right thing, with those in power exacting revenge against the Plaintiff for exercising his First Amendment rights, and for disrupting the corrupt "way of life" for certain corrupt officers.

### *Statement of Facts*

For a description of the factual background, see the Plaintiff's Statement of Disputed Material Facts ("**Pl's SOF**"), filed herewith.  The Plaintiff respectfully refers the Court to the

Plaintiff's Statement of Material Facts in Dispute, with accompanying Exhibits, all incorporated herein by reference.

### *Summary Judgment Standard*

> "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F.Supp.2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) ) (additional citation omitted). The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.' " Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) ). "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

Thomas v. Town of Salisbury, 277 F. Supp. 3d 161, 169-70 (D. Mass. 2017)

"In reviewing motions for summary judgment, courts must resolve all disputed facts and inferences in favor of the non-moving party." Crawford v. Blue, 271 F. Supp. 3d 316, 321 (D. Mass. 2017) (citing Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 219 (1st Cir. 2004). "When ruling on a motion for summary judgment, '[t]he Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor.'" Williams v. City of Brockton, 146 F. Supp. 3d 290, 295-96 (D. Mass. 2015) (citing PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F.Supp.2d 274, 275 (D.Mass.2011).

### *Argument*

**A.  42 U.S.C. § 1983**

    **1.  In general.**

To "state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States[,] and (2) that the perpetrator of the

violation was acting under color of law." Cruz–Erazo v. Rivera–Montanez, 212 F.3d 617, 621 (1st Cir. 2000).  The Defendants do not question whether the alleged actors in violating the Plaintiff's constitutional rights were acting under color of law (state action).

### 2. First Amendment.

In the present case, the Plaintiff is alleging a violation of, among other things, his First Amendment free speech rights.  To determine whether an adverse employment action against a public employee violates a First Amendment right, the First Circuit has articulated a three-part inquiry: (1) whether the employee spoke as a citizen on a matter of public concern (a two-pronged test), (2) whether the employee's interest in commenting on these matters outweighed the defendant's interest in the efficient performance of its public service, and (3) whether the protected expression was a substantial or motivating factor in the adverse employment action. Stuart v. Town of Framingham & Brian Simoneau, 301 F. Supp. 3d 234, 239-40 (D. Mass. 2018) (citing Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011).

The general question as to Section 1983 liability here will center mostly on citizen speech vs. employee speech, and whether there was an adverse employment action.

### a. The Speech Was Citizen Speech on a Matter of Public Concern.

### i. Public Concern

We'll start with the second prong - Matter of Public Concern. The Defendants do not seriously question whether the matter (public corruption of police officers engaging in illegal drug activity and theft of evidence in drug cases, at times while on duty) is of public concern. Nor could they.  It cannot be seriously questioned that the matter involved here is of grave public concern.  In evaluating whether the Plaintiff has stated a claim for a violation of his First Amendment rights, "[t]he Court must . . . determine whether the speech touched upon a matter of

public concern." <u>Decotiis</u>, 635 F.3d at 30. "Whether an employee's speech involves a 'matter of public concern' is a case-specific, fact-dependent inquiry." <u>Curran v. Cousins</u>, 509 F.3d 36, 46 (1st Cir. 2007). When the topic of the speech relates to a matter of "inherent public concern" such as "official malfeasance, abuse of office, and neglect of duties[,]" no further inquiry is required. <u>Id</u>.  Police officers engaged in violations of state and federal controlled substance laws, including the illegal use and possession of narcotics and tampering with or stealing evidence in undercover narcotic investigations, cannot seriously be seen as anything other than a matter of grave public concern. "Where speech relates to a matter of *inherent* public concern, the court need not inquire further." <u>McGunigle v. City of Quincy</u>, 944 F. Supp. 2d 113, 121 (D. Mass. 2013)

### ii.      Citizen Speech - Plaintiff's Speech Not "Ordinary Job Duty"

Citizen speech vs. employee speech.  The seminal cases in this regard are <u>Garcetti v. Cellabos</u>, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006), and <u>Lane v. Franks</u>, 573 U.S. 228, 134 S. Ct. 2369 (2014).  In <u>Garcetti v. Ceballos</u>, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti</u> at 421. The Court reasoned that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over <u>what the employer itself has commissioned or created</u>." <u>Id</u>. at 421-22 (citation omitted) (emphasis added).  This highlighted language is relevant.

The Supreme Court in <u>Lane</u> clarified <u>Garcetti</u>, in a limiting way, that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ***ordinarily*** within the scope of an employee's duties, not whether it merely concerns those duties." <u>Lane</u> at 239-40 (emphasis added).  "Formal job descriptions often bear little resemblance" to an employee's actual duties, and the mere inclusion of a task in a job description "is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties." <u>Garcetti</u>, at 424-25.

So, what are the ordinary duties of the Plaintiff?  That depends on whether coming forward with information about serious criminal corruption within the police department of his employer is an "ordinary job duty."  In determining that, one thing we look at is whether revealing what he learned (the corruption within the Dracut police department) was something that his employer (the Town of Dracut police department) has "commissioned or created." <u>Garcetti</u>, at 421-22.

The fact that it may be a "general" duty of all police officers to combat crime or report misconduct is not dispositive.

In <u>Garcetti</u>, the Supreme Court rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions" and noted that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." <u>Garcetti</u> at 424–425. "Generalized reporting duties would similarly not seem to justify restrictions on employee rights." <u>Stuart v. Town of Framingham & Brian</u>

Simoneau, 301 F. Supp. 3d 234, 240 (D. Mass. 2018). "Garcetti is not meant to strip an employee of First Amendment protection when speaking out regarding issues of serious and widespread public concern ... just because a garden-variety rule requires him to tell a supervisor." Stuart, at 240 (citing Taylor v. Town of Freetown, 479 F.Supp.2d 227, 237 (D. Mass. 2007).

In the present case, the scope of the Plaintiff's duties was not to act as an internal affairs investigator to investigate corruption within the Dracut Police Department. The Plaintiff's duty was conducting undercover operations in the community to uncover drug operations of citizens and drug dealers in Lowell and Lawrence areas being used as drug supply centers for northern New England. This is in stark contrast to his duty to investigate possible police corruption when the Plaintiff *was* specifically commissioned to conduct an investigation into the theft of the marijuana from the Dracut Police evidence trailer in 2003. See **Pl's SOF, 5.** The Plaintiff's job duties during the time that he was investigating the theft of the marijuana, which implicated Dracut police involvement, may have been be part of his "normal job duties" *for that incident* because he was specifically charged with the responsibility of conducting such an investigation. He was intimately involved in interviewing whomever he wanted - i.e., he was conducting the investigation. **Ex. 3**, Jakuttis Aff., ¶21.

However, according to the Defendants' argument regarding "normal job duty" (i.e., that officers and detectives have a duty to report crime and misconduct) they would have the police officers that were interviewed during such an investigation[1] forfeit First Amendment rights when answering questions about the facts surrounding the theft of the marijuana and revealing

---

[1] Although the Plaintiff was initially investigating the theft of the marijuana, he stopped investigating because he was injured and went out on disability (prior to the statute of limitations running on that crime), and where the investigation went from there - well who knows. Suffice it to say, the investigation was taken up again by an outside organization

information they know, simply because they are police officers and have a general duty to fight

crime and report misconduct.  Surely that couldn't be the case. Giving information about the

possible theft by police officers of drug evidence from the Dracut police evidence facility was

not part of their "ordinary" job duties.  More importantly, many of those interviewed during the

investigation were Dracut police detectives. Would those detectives have no First Amendment

rights and be able to be retaliated against for providing information?  A bizarre result.

Why, then, can the Plaintiff be retaliated against (with no First Amendment rights) when

he was providing information about the same level of corruption and police misconduct in

violation of the public trust when he was not specifically charged with or assigned the job of

investigating that corruption?

The *nature* of the speech involved here is important.  It is speech that goes to the very

heart of public safety and public trust in law enforcement - the exposure of police officers using

and manipulating their position of authority and the police department itself to engage in illegal

narcotic activity.  This is critical in the analysis of the term "ordinary job duty" espoused in

Lane.  For it was the Supreme Court in Lane that pointed out: "There is considerable value,

moreover, in encouraging, rather than inhibiting, speech by public employees. For government

employees are often in the best position to know what ails the agencies for which they work. The

interest at stake is as much the public's interest in receiving informed opinion as it is the

employee's own right to disseminate it."  Lane, 134 S. Ct. at 2377.

The Lane Court continued:

> It would be antithetical to our jurisprudence to conclude that the very kind of
> speech necessary to prosecute corruption by public officials—speech by public
> employees regarding information learned through their employment—may
> never form the basis for a First Amendment retaliation claim. Such a rule would
> place public employees who witness corruption in an impossible position, torn

> between the obligation to testify truthfully and the desire to avoid retaliation and
> keep their jobs.

Lane, 134 S.Ct. at 2380.

See also, Kristofek v. Vill. of Orland Hills, 832 F.3d 785, 793 (7th Cir. 2016) ("we must be especially careful in concluding that employees have spoken pursuant to their official duties when the speech concerns allegations of public corruption.").

Although there have been no prosecutions in this case, the decision to decline prosecution does not diminish or void the First Amendment right itself.  The fact that the Plaintiff obtained the information during the course of his work is not dispositive.  The First Circuit has set forth a list of non-exclusive factors to guide courts in their evaluation. Id. Those factors include:

> whether the employee was commissioned or paid to make the speech in question;
> the subject matter of the speech; whether the speech was made up the chain of
> command; whether the employee spoke at [his] place of employment; whether
> the speech gave objective observers the impression that the employee
> represented the employer when [he] spoke (lending it "official significance");
> whether the employee's speech derived from special knowledge obtained during
> the course of [his] employment; and whether there is a so-called citizen analogue
> to the speech.

Williams v. City of Brockton, 146 F. Supp. 3d 290, 304 (D. Mass. 2015) (citing Decotiis, 635 F.3d at 32).

Of those factors, no one contextual factor is dispositive, and the list is non-exclusive.

Decotiis, at 32.

The Decotiis factors weigh in the Plaintiff's favor:

- Unlike the special commission mentioned above when the Plaintiff was investigating the theft of the marijuana in 2003, there is nothing that has been commissioned here. This was information received, unsolicited, from an informant in 2015 during an operation with the Plaintiff which had nothing to do with the operation the informant and Plaintiff were involved in, and which occurred years earlier.  See **Pl's SOF, 78**;

**Ex. 1**, Jakuttis Dep., at 151:15 to 158:9.  The information also had nothing to do with any undercover operations the Plaintiff had been involved in.  See **Ex. 3**, Jakuttis Aff., ¶25.

- The Plaintiff did not go up the chain of command within the Dracut police department.  In fact, the Defendants' correctly point out that it was over a month before Defendant Chartrand (the Deputy Chief) was called to the CBI office.  **Pl's SOF, 74**.  The Plaintiff never told the Chief of Police!  **Id.**  The Plaintiff, while still employed (albeit out on disability after being discharged from the CBI and demoted) also contacted the Middlesex County DA's office about the corruption.  **Pl's SOF, 75**. He also went to the Massachusetts Attorney General with a Town Official.  **Pl's SOF, 76**.

- Did the speech occur at the place of employment?  No.  It did not occur in Dracut or at a Dracut facility, building or in a Dracut police vehicle.  After all, the Defendants are saying that the Plaintiff wasn't doing work for Dracut.  **Defs.' SOF 70**.

- Would an "objective observer" have the impression that the Plaintiff was representing Dracut when he spoke?  No. According to the Defendants' own words, "While assigned to the CBI, the Plaintiff did not do any patrol work for the Dracut PD, nor did he do any detective work for the Dracut PD.  **Defs.' SOF 70**.  Although the Plaintiff says that he was performing detective work for Dracut, that is in regard to specific cases he was working on, he is not claiming he was performing detective work for Dracut in revealing the unsolicited information that was revealed to him by the CS.  A clear distinction.

- The information did not come to the Plaintiff during the course of his work as a Dracut detective because (as demonstrated above by the Defendants' own words in **Defs.' SOF 70**) the Plaintiff was not performing work as a Dracut detective while working with the CBI.  Again, the work he was doing for Dracut had to do with other totally unrelated cases, but the Defendants don't even acknowledge that, they say he wasn't doing detective work.  They have to be held to their words.

- There are plenty of citizen analogs. Going to federal agencies (the DEA), the District Attorney, and the Attorney General are clearly things that a citizen would do in reporting police misconduct, especially to avoid going to the police in the same town because of fear of retaliation or retribution by police officers within that very police department.  It is that exact fear, and more, that the Plaintiff had and still has.  See **Ex. 3**, Jakuttis Aff., ¶26.   See also, Stuart v. City of Gloucester, Civil Action No. 18-cv-11877-ADB, at *14 (D. Mass. Jul. 15, 2019) ("[T]he criminal complaint Officer Stuart filed with the Office of the Attorney General is likely to have fallen outside of his regular responsibilities as a police officer and to be more akin to citizen speech.").

Making the reasonable inferences in favor of the Plaintiff, the legal conclusion must be that the speech (revealing the unsolicited information of serious police corruption) was not part of the Plaintiff's "ordinary job duties."  This was anything but "ordinary."  Even the Deputy Chief (Defendant Chartrand) went to outside agencies initially - the DEA and the FBI.  **Defs.' SOFs 55 and 59**.

What the Plaintiff did *NOT* do, was what he "ordinarily" would have done if he was performing his "normal job duties:" He would have *investigated*. He did not.  He would have

*opened a case file*.  He did not.  He would have *interviewed other witnesses*. He did not. Simply put - his ordinary duties were not to report police corruption occurring in the very department that was employing him.[2]

### b.  The employee's interest in communicating the matter outweighs the defendant's interest in the efficient performance of its public service.

The Defendants do not argue that the Plaintiff's interest in speaking about the corruption that was revealed to him is outweighed by the Town of Dracut's "efficient performance of its public service."   Nor should they.  The nature of the matters brought forward by the Plaintiff involve serious corruption of significant magnitude.  Suffice it to say, the type of corruption revealed shows public service at its worst - law enforcement officers violating controlled substance laws and tampering with and stealing evidence.  Silencing the Plaintiff by taking adverse employment action against him for coming forward with the information does nothing to "promote efficiency" in public service performance - it *perpetuates* the chaos and inefficiency.

"In cases involving allegations of official misconduct and public corruption, 'the employer's side of the *Pickering* scale is entirely empty.'" <u>Barrow v. City of Hillview</u>, U.S. Ct.

---

[2] Of interest here is the question of whether the disclosure was part of his duty as a "Dracut" employee.  If he was not a Dracut detective when the disclosure occurred, as the Defendants contend, but the retaliation for the speech occurred when he was a Dracut employee (i.e., after he was fired from the CBI and no longer on detail), then the retaliation is for speech that did not occur as an "ordinary duty" of a <u>Dracut</u> officer.  The *Garcetti* rational was to distinguish speech coming from an employee that disrupts the effectiveness of the services rendered by the municipality.  If the speech was while he was employed as a federal employee, then there is no *Garcetti* problem, it is retaliation for speech outside of his employment as a Dracut employee.

Additionally, this court has dismissed the 42 U.S.C. § 1983 claim against Defendant Poirier because the court considers him a "federal" employee since he was deputized and on detail to the Feds (<u>as was the Plaintiff</u>) and did not allow a *Bivens* claim against Poirier (or Defendant O'Hanlon).  If Defendant Poirier is a Federal employee and cannot be sued under Section 1983, then why is the Plaintiff a town employee when on detail to the CBI?  Federal employee if your being sued, but not a federal employee if you're suing?  Unreconcilable.

App., No. 18-5045, slip op. at 20 (6th Cir. May 31, 2019) (citing Lane v. Franks, 573 U.S. at

242, 134 S. Ct. at 2381 (2014)).

**c. The protected expression was a substantial or motivating factor in the adverse employment action (preventing the Plaintiff from continuing as a detective).**

This factor is a question of motive, which is a jury question. See Williams v. City of

Brockton, 146 F. Supp. 3d 290, 303 (D. Mass. 2015) (citing Wagner v. City of Holyoke , 241

F.Supp.2d 78, 90 (D. Mass. 2003), aff'd , 404 F.3d 504 (1st Cir.2005))."  The Plaintiff has

produced an abundance of facts which (when viewed in a light favorable to the non-moving

party (the Plaintiff)) require that a jury decide *why* the Plaintiff was prevented from being a

detective on the Dracut police force after being discharged from the DEA's CBI unit, particularly

since the Plaintiff had been doing detective work almost his entire career with Dracut.  He had

been doing detective work from the time he became a detective (less than a year after he was

hired in 1998 (**Ex. 1**, Jakuttis Dep., at 21:20-23)) until he went out injured in 2006, excepting a

few months when he was disciplined and taken off of detective work and put back on patrol

(**Ex.1**, Jakuttis Dep., at 65:10-14), and shortly (a few months) after he came back to work in

2012 (**Pl's SOF, 20**), and during the time he was on detail to the CBI (**Pl's SOF, 21-33**).

At the time the Plaintiff was fired from the CBI, Defendant Mellonakos was the one with

the most experience in narcotic investigations (other than the Plaintiff) in the detective bureau

and was a sergeant, but he was out injured.  **Pl's SOF, 68**.  That would leave the detective bureau

without any detective with narcotic experience.  **Id**.  Of the other two detectives in the bureau at

that time, they had little, if any, narcotic experience.  **Id**.

14

Since the Plaintiff was doing detective work for Dracut even during the time he was assigned to the CBI (*See argument, supra.*), it would only make sense to allow the Plaintiff to continue with detective work.

The motive (a jury question) as to why Mellonakos didn't want the Plaintiff doing detective work in the detective bureau can reasonably be inferred from the fact that the Plaintiff brought forward the evidence from the CS of the criminal activity of Mellonakos. What greater motive can there be than keeping an officer who does the right thing from being able to actually do investigations, especially if it is now going to be solely in Dracut with 100% of office time in Dracut, able to see what nefarious things may transpire.

Putting the Plaintiff back to patrol with no detective work would keep the Plaintiff from interfering with any unlawful or unethical conduct by Mellonakos and Byam, *and*, it certainly would get back at him for what he did. What greater retaliation than preventing the Plaintiff from doing the job at which he not only excelled but loved doing. Resolving these reasonable inferences in favor of the non-moving party (the Plaintiff), this must go to the jury.

The disputed fact of whether Chartrand told the Plaintiff that Mellonakos didn't want the Plaintiff as a detective and that he (Chartrand) can't kick sand in his face (or something to that effect) is a material factual dispute which a jury could reasonably infer that it was in retaliation for coming forward with the information of corruption, with Chartrand and Mellonakos conspiring to prevent the Plaintiff's return. See **Pl's SOF, 61**; **Ex. 1**, Jakuttis Dep., at 267-268.

Also, allowing the Plaintiff to return, with his extensive experience, would most likely reduce the ability of the other two detectives to make an advancement within the detective unit and neither of them would most likely take command in Mellonakos' absence. This would more explain their opinion that they did not want to work with the Plaintiff. Both of those detectives,

however, said that they would respect whatever decision was made with respect to Jakuttis continuing as a detective.  **Defs.' SOF - 82-83**.

The Plaintiff was never told that people did not want to work with him or that he was difficult to work with, and he was never spoken to by any supervisors or other employees about difficulty working with him.   The only people who would have had issues that the Plaintiff knew of were the officers that were being investigated when the Plaintiff was investigating the theft of the marijuana in 2003. The only time the Plaintiff heard of any problems people had with working with him was during discovery in this litigation.  Issue with the Plaintiff working as a detective was only after the matter was brought forward. See **Ex. 3,** Jakuttis Aff., ¶27

> **d.  The action taken against the Plaintiff by placing him on patrol and preventing him from being a detective was an adverse employment action by Chartrand and Mellonakos, as was the hostility and intimidating actions of Mellonakos.**

The plaintiff has produced sufficient evidence to show that the action taken was indeed adverse.  Major factors in the Plaintiff's favor are summarized as follows:

1. The Plaintiff, regardless of his "rank" and regardless of his "assignment," was doing detective work for the Town of Dracut <u>before he left work</u> in 2006 because of a serious injury, <u>shortly after he came back</u> to work in 2012, and <u>while he was assigned to the DEA's CBI unit</u> in 2013.
2. Deposition testimony and other evidence establish that going from patrol to detective is an advancement.
3. Deposition testimony and other evidence show that in the past there was a disciplinary action taken against the Plaintiff in which the punishment (adverse employment action) was taking him off of detective work and placing him back on patrol.
4. The Plaintiff's affidavit explains the difference in the type of overtime available to a detective and a patrol officer and objectively raises a question as to the objective desirability of being a detective.
5. The Plaintiff's affidavit explains the greater availability of detectives to earn overtime than a patrolman.
6. Shortly after the Plaintiff came forward with the corruption information, a vehicle seized by Dracut was to become available, which the Plaintiff could have use while

> on assignment to the CBI, but in a hostile and intimidating manner Defendant Mellonakos made it clear the Plaintiff would not get that vehicle, and when a vehicle was provided to the Plaintiff months later, it was an unsafe, vehicle with a multitude of problems and even mice living inside the vehicle.

"[A]n action taken by an employer is an 'adverse employment action' where it is 'substantial enough to have materially disadvantaged an employee.' 'Material disadvantage for this purpose arises when objective aspects of the work environment are affected.' The disadvantage must be objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment' will not suffice. Because we focus on a reasonable person in the employee's position, we examine whether an employee has suffered an 'adverse employment action' on a <u>case-by-case</u> basis. <u>Yee v. Mass. State Police</u>, 481 Mass. 290, 296-97, 121 N.E.3d 155 (Mass. 2019) (citations omitted) (emphasis added).

Although <u>Yee</u> is a case under the anti-discrimination statute, such remedial statutes are read broadly, and the description of "adverse employment action" in <u>Yee</u> is equally applicable here because "[a]s the First Circuit has pointed out, section 1983 is a remedial statute and should be read broadly:" <u>Figueroa v. Molina</u>, 725 F. Supp. 651, 655 (D.P.R. 1989). Additionally, "adverse employment action . . . is defined more broadly in the context of Section 1983 actions than in the context of employment discrimination cases. <u>See</u> <u>Stuart v. City of Gloucester</u>, Civil Action No. 18-cv-11877-ADB, at *12 (D. Mass. Jul. 15, 2019) (citing <u>McGunigle v. City of Quincy</u>, 132 F. Supp. 3d 155, 174 (D. Mass. 2015)).

In <u>Yee</u>, a Massachusetts state trooper contended that the denial of a lateral transfer was nevertheless an adverse employment action because the transfer to Troop F would have allowed him "more opportunities for overtime and paid details than Troop H and therefore offered him a

greater opportunity to increase his overall compensation, <u>even though his base salary and benefits would be unaffected by the transfer</u>."  <u>Yee</u> at 297 (emphasis added).

The Supreme Judicial Court agreed.  "We thus conclude that where an employee can show that there are material differences between two positions in the opportunity for compensation, or in the terms, <u>conditions</u>, or <u>privileges</u> of employment, the failure to grant a lateral transfer to the preferred position may constitute an adverse employment action. . . ."  <u>Id</u>. (emphasis added).

In the present case, the Plaintiff has produced evidence that the denial has a retaliatory animus (a question for the jury), and he has demonstrated ample evidence that when he was working as a detective he in essence doubled his base pay and earn upward of $1,000.00 per week in overtime (**See Ex. 18,** Payroll Records, highlighted).

Also, there is evidence that the <u>conditions</u> and <u>privileges</u> of being a detective are very different with greater responsibility and skills than a patrolman.  They investigate a wider variety of crimes, including complex matters, murder and narcotic investigations.  They can travel to different states to interview witness where a patrol officer is limited to the jurisdiction of the town. (**See Ex. 5**, Chartrand Dep., at 24:9 to 27:1).  Furthermore, the experience they develop and must possess are certainly an advancement in the career of a police officer from patrol to detective.  Defendant Chartrand, responding to the question of the difference between the work a detective does compared to a patrolman, answered as follows:

> The types of cases they handle are typically more complex, require further investigation, require very effective interview skills, very effective report-writing skills. They have to be very diligent, as far as the amount of followup they dedicate to a case.  They have to be cognizant of evidence issues, such as the proper collection of evidence, proper submission of evidence. They have to be confident with their testimony. They have to have the ability to understand parameters of the law, as far as search and seizure, so that they would have the

ability to draft an affidavit for a search warrant, which is something typically Patrol wouldn't get involved in.

**Ex. 5**, Chartrand Dep., at 24:9 to 25:8

The Defendants are fixated on the terms "assignment" and "rank," with respect to the official title they gave to the Plaintiff.  What is really at issue is what the Plaintiff was actually doing.  The Plaintiff has demonstrated that he was doing detective work (*See Argument, supra.*).  In any evet, even if the "assignment" to detectives was a discretionary action by the Deputy Chief or even the Chief, if the failure to allow the Plaintiff to continue doing detective work had a retaliatory animus to it, that is what makes that decision actionable.

In <u>Yee</u>, the same discretion lied with the Superintendent of the State Police, and he had "broad discretion in nominating a candidate for transfer."  <u>Yee</u>, at 292-93.  Yet despite that broad discretion, summary judgment was inappropriate because the trial court didn't address whether there was a genuine issue of material fact as to whether the denial was motivated by discriminatory animus.  <u>Id</u>. at 301.  In other words, the employer can have tremendous discretion in assigning duties, but if an employee is seeking an assignment the employer does not have carte blanche to discriminate unlawfully in making that decision, or to retaliate against an employee exercising his constitutional rights when the decision is made.  There is certainly ample evidence to bring this question to the jury.

And even if Dracut can articulate a valid, non-retaliatory reason for not letting the Plaintiff continue detective work (which the Plaintiff says it has not), the Plaintiff has certainly produced evidence that the reason is a pretext, and that the real reason was to retaliate against him, silence him further ,and keep him from any further work which could possibly expose more wrongdoing.  The Plaintiff has met the burden to show pretext because the evidence, which must

be "viewed in the light most favorable to [the Plaintiff]," <u>Yee</u> at 302,  is "sufficient to convince a reasonable jury that the reasons . . . offered for [preventing him from continuing as a detective] were not the real reasons, thereby inviting the inference that retaliation was the motivating reason." <u>Id</u>.

In addition to the potential for unlimited overtime, the evidence shows that regardless of the official "rank" being the same for an officer assigned to patrol vs. detective, the position of detective is an advancement, and that a form of punishment for disciplinary purposes is being sent back down to patrol from the detective bureau.  <u>See</u> **Pl's SOF, 14**; **Ex. 5**, Chartrand Dep., at 21:24 to 22:3.  That's what happened to the Plaintiff when he was disciplined in 2006. Defendant Chartrand even acknowledged that going from patrol to detectives is an advancement and that it is a position of greater responsibility.  <u>See</u> **Pl's SOF,6**; **Ex. 5**, Chartrand Dep., at 15:19 to 16:4.

The Plaintiff's affidavit explains the situation with the unsafe vehicle provide to him and the denial of another vehicle prior to that.  **Ex. 3**, Jakuttis Aff., ¶28.

The Plaintiff has adequately shown a genuine material factual dispute as to a retaliatory motive behind the denial of his ability to continue detective work after being fired from the CBI, and has demonstrated that the position of detective is an advancement in the police force so that the denial to continue with such work is an adverse employment action.

### 3. Monell Claim - Municipal Liability - TOWN OF DRACUT

A municipality can be seen as having caused a constitutional violation "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Monell v. Dept. of Soc.</u>

Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  See also, Stuart v. Town of Framingham & Brian Simoneau, 301 F. Supp. 3d 234, 242 (D. Mass. 2018).

The plaintiff must show either: 1) the existence of a policy or custom "so persistent and widespread as to practically have the force of law," Connick v. Thompson, 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ; or 2) "that a person with final policy making authority caused the supposed constitutional injury." Rodriguez v. Municipality of San Juan, 659 F.3d 168, 181 (1st Cir. 2011) (internal citations and quotations omitted). Town of Framingham, at 242.  A single decision by a municipal policymaker constitutes official policy "'where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ).

In the present case, the evidence shows that Defendant Chartrand, the Deputy Chief, was the final policy maker within the Dracut police department.  Defendant Chartrand says that the Chief was the one that decided not to let the Plaintiff be a detective when he was fired from the CBI.  **Defs' SOF 84**.  This is in dispute. See **Pl's SOF, 61-68.**  Defendant Chartrand sent a memo to the interim Chief (Neil Ouellette) on or about September 30, 2016.  See **Ex. 14,** Deposition Exhibit #5 from Chartrand Deposition.  That memo mentions nothing about the then Chief "having no intentions" of letting the Plaintiff continue with detective work.

More important and raising serious questions as to who was running the ship, are the findings in an October 2015 report, commissioned by the Town of Dracut - "The MRI Report."[3]

---

[3] The MRI Report was a report commissioned by the Town of Dracut for the purpose of completing an organizational risk assessment of the Dracut Police Department.  It reviewed the manner in which law enforcement services were provided within the town from a risk management, as well as operational perspective.  Over a period of several months, an MRI team of police consultants met with staff, reviewed documents, analyzed data, and conducted on-site inspections.  They also conducted an internal survey by written instrument and one-on-one interviews with various personnel.  The company conducting the assessment and providing the report was Municipal Resources, Inc., 120 Daniel Webster Highway, Meredith, NH 03253.  The report is titled: Risk Assessment Study,

At the helm of the Dracut police department, cracking the whip, was Defendant David

Chartrand. Deputy Chief in name, Chief in reality.

After onsite inspections, data analysis, and written surveys and in-person interviews of

Dracut police personnel (See **Pl's SOF Exhibit 2, p. 1 MRI Report**), the MRI Report concluded

the following:

1. *The deputy chief was the principal force behind the day-to-day operations of the department, with only scant indications of meaningful direction and leadership from the chief.* ***MRI Report, p. 5.***
2. *The chief is largely absent from the day-to-day operations of the department.* ***MRI Report, p. 5.***
3. *[T]he deputy chief has responsibility for . . . budgeting, staffing, and performance reviews, and general administrative duties related to all of the above.* ***MRI Report, p. 6.***
4. *[A]ll effective operational control of the department was found to be exercised by the deputy chief of police.* ***MRI Report, p. 13.***
5. *Most disturbing, the team identified evidence of mistrust, if not antipathy and antagonism, between most rank and file and the administration; principally the deputy chief.* ***MRI Report, p. 5.***
6. *[E]mployees who disagree with the deputy chief or object in any way **fear retribution**. . . . **MRI Report, p. 5.***
7. *[L]ack of training.* ***MRI Report, p. 5.***
8. *The perceived draconian management philosophy allegedly espoused by the deputy chief and failure of the chief . . . to intercede when appropriate, combined with short staffing, lack of advancement opportunities; **lack of training**. . .; vacuum of vision, leadership, and collaboration; has created the perception of a **toxic mix of fear and intimidation within the department that produced a risk-averse atmosphere. . . .** MRI Report, p. 5.*
9. *[A]ll effective operational control of the department was found to be exercised by the deputy chief of police.* ***MRI Report, p. 13.***
10. *Throughout the comments written by the respondents, inconsistency was a common theme in regards to discipline, accountability, expectations, support, feedback, and standards.  Many respondents equated these inconsistencies to favoritism and personal bias by command staff using such references to a particular group of people as "cronies, friends, favorites, the team, or the palace guards."  It was perceived by several that these employees are treated differently due to their "friend status," **most notably with the deputy chief.***

---

Dracut Police Department, Dracut, MA, October 2014.  Excerpts are attached to the Plaintiff's Statement of Material Facts in Dispute as **Exhibit 2.**

> *Some respondents went as far to say that those not in this group are **ruled by fear and intimidation**. **MRI Report, p. 32.***

(Emphasis added).

The report is a result of a survey of many individuals, and the fact that a large number of persons come to the same conclusion about the hierarchy, the role of the deputy chief as being the one in control and decision maker, coupled with the testimony of the Plaintiff that it was Defendant Chartrand at the behest of Defendant Mellonakos (**Pl's SOF, 61; Ex. 1**, Jakuttis Dep., at 267-268) that made the decision to derail the Plaintiff's successful narcotic detective career, points directly to the Deputy Chief as the final policy maker.  Motives for such action abound and will be discussed below.

If the Chief delegated his duties to the deputy, and the deputy was running the show, then the deputy is the final policy maker for such personnel decisions as staffing and whether or not the Plaintiff could be a detective.

Additionally, simply because there is a Chief in the building from time to time, or sitting in a chair like a potted plant, making few (if any) decisions, then a municipality could avoid *Monell* liability by simply putting a figure head in there with a "title" of what appears to be a final policy maker, but then have a subordinate run the ship and make all the decisions with the anomalous result of decisions being made with nobody responsible, leaving victims of constitutional violations without relief for true municipal actions.  The policy maker able to say, "I didn't make the decision," and the subordinate who made the decision saying, "I'm not a final policy maker," and the victim chasing his tail.

Finally, even if the Chief made the decision, then if he was the final policy maker as far as the fate of the Plaintiff, the Plaintiff would still be entitled to proceed to trial on the issue of

motive.  No issues with the Plaintiff's work product arose until after he came forward with the corruption evidence.

> **4.   The Plaintiff's exercise of his right to come forward with corruption information was clearly established and a reasonable officer in the position of Chartrand and Mellonakos would have known their action was a constitutional violation.**

Defendants cite <u>Dirrane v. Brookline Police Dep't</u>, 315 F.3d 65 (1st Cir. 2002), a pre-*Lane* case.  <u>Dirrand</u>, even without the application of *Lane,* actually supports Plaintiff Jakuttis' case. Dirrane was a police officer working within the "ID Unit" of the Detective Division of the Brookline police department.  The ID unit involved fingerprinting, photographs and the like. Id. at 67. Dirrane had complained about various things, some minor, to his superiors, but later included some more serious allegations charging that others were "falsifying fingerprint reports and destroying fingerprint evidence." <u>Id</u>. at 67.  Most notably, in spite of the fact that Dirrane worked within the ID Unit dealing with fingerprinting and the speech involved that very process, the Dirrane court still found that "we conclude that **Dirrane's version of facts makes out a colorable First Amendment violation. Whatever the doubts about his judgment, Dirrane had made several extremely serious and specific charges of criminal misconduct**. . . ." <u>Id</u>. at 70 (emphasis added).

The <u>Dirrane</u> court found, quite specific and similar to the Plaintiff's case here, that Dirrane had made out a colorable First Amendment claim.  And this was even before the Supreme Court's *Lane v. Franks* case.  The <u>Dirrane</u> court, however, did grant qualified immunity because *until then* such actions were not clearly established.  But because the court there did declare that those facts create a colorable First Amendment claim, <u>subsequent </u>similar cases, as

the present case, are put on notice that such actions will give rise to liability.  Coupled with the *Lane* case (discussed *supra*), the Defendant's cannot now avoid liability.

### B.  G.L. c. 149, § 185 - Whistleblower Statute - TOWN OF DRACUT

**The Plaintiff has established that adverse action was taken against him in violation of G.L. c. 149, § 185**. ("MWA" - Massachusetts Whistleblower Act)

The Plaintiff brings his whistleblower claim against the Defendant Town of Dracut pursuant to G.L. c. 149, § 185.[4]

The Plaintiff has established that he engaged in protected activity, that the protected activity was a substantial or motivating factor in the retaliation (prevention from continuing as a detective), and that he suffered harm as a result (both economic and emotional).

The retaliatory action taken against the Plaintiff by either the Chief or the Deputy Chief are actions that are attributable to the Town.  The employer obviously acts through its supervisory employees when disciplinary or adverse employment actions are taken against subordinates.  If a supervisor's retaliatory actions for protected activity of the MWA could not be attributable to the employer, then there would

---

[4] G.L. c. 149, § 185 prohibits retaliation against an employee because the employee does any of the following:
(1) Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer with whom the employee's employer has a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment;
(2) Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law, or activity, policy or practice which the employee reasonably believes poses a risk to public health, safety or the environment by the employer, or by another employer with whom the employee's employer has a business relationship; or
(3) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

virtually be no claims actionable against the employer.  The bigger question is whether

there is a claim under parts (1), (2) or (3) (or all three) of Section 185 (b).

**Section (b) (1): Disclosing to a supervisor _or public body_ an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of law, or a rule or regulation promulgated pursuant to law, of which the employee reasonable believes poses a risk to public health, safety or the environment.**

In the instant case, the information the Plaintiff disclosed (the corruption within the

Dracut police department by way of illegal drug use and stealing drug evidence, among other

things) was an activity and practice which was a violation of law.  The practice and activity were

widespread.  The beginnings were in 2003 with the theft of the marijuana from the Dracut police

evidence trailer, with evidence that there was police involvement. **Ex. 17**, NEMLEC Report, p.

11.  There is a question about an additional marijuana operation in 2010 which raises questions

about theft by police officers and the weight of the marijuana when it arrived at Dracut being less

than what was reportedly shipped, after two Defendants (Mellonakos and Poirier) were involved

in the operation.  **Pl's SOF, 71**.

The sealed affidavit of CS (the "CS" in the Complaint) submitted with the Plaintiff's

Memorandum (**Ex. 19**, Affidavit of CS - Sealed Document) shows that there is a material factual

dispute as to the involvement of Defendant Mellonakos in a variety of state and federal

controlled substance laws violations on numerous occasions, and coupled with the previous theft

of marijuana in 2003, and the possible additional theft of marijuana in or about 2010, raise

serious questions about a "practice" so widespread within the Dracut police department that it

can be said to be a practice of the employer.  The information is clearly one involving a

"violation of law."

The disclosure was ultimately to a supervisor, Chartrand, when he was called to the CBI to receive the information, but the information was certainly disclosed by the Plaintiff to a "public body," which is defined in the statute as, inter alia, "any federal, state or local law enforcement agency, prosecutorial office, or police or peace officer. . . ."  G.L. c. 149, § 185 (a) (3) (C) (D).  He disclosed it to the DEA.

The Town of Dracut says that the practice has to be "of the employer," and that it cannot be a practice of an "employee."  First of all, an "employer" (if the employer is not an individual) does not actually engage in an "activity" or "practice."  The acts themselves are carried out by individuals employed by the entity employer.  The employer can have a policy, which of course is drafted by an individual, but as far as actual unlawful acts committed, those are actually committed by individuals.  So, the fact that the complained of acts which form the basis of the whistleblower claim were done by employees should not defeat the Section (1) claim under the MWA.  This issue was argued before the First Circuit but was not addressed because of dismissal on other grounds.  See Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014) ("The parties spend some time debating whether Chief Olsen qualifies as an "employer" or merely a "supervisor" under the MWA, and subsequently whether Pierce's October 2, 2009 letter to the Board disclosed an unlawful "practice of the employer" under section 185(b)(1).").

**Section (b) (2):** ***Provides information to*, or testifies before, *any public body conducting an investigation,* hearing *or inquiry into any violation of law*, or a rule or regulation promulgated pursuant to law, or activity, policy or practice which the employee reasonably believes poses a risk to public health, safety or the environment by the employer.**

Again, the Plaintiff certainly provided information to a public body (the DEA) which was conducting an investigation or making inquiry into a violation of law (the narcotics violations of

Dracut police officers).  Clearly this section does not require that the violation of law be "by the employer."

**Section (b) (3): Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.**

By reporting the information regarding corruption within the police department the Plaintiff was actually objecting to such activity and practice.  Whichever section, or combination thereof, is applicable, the next question is whether or not the Plaintiff was required to notify his supervisor in writing.  He was not.

**Plaintiff Exempt from the Written Notification Requirement of G.L. c. 149, § 185 (c) (1)**

Subpart (c)(1) of Section 185 of G.L. c. 149 requires that an employee who makes a disclosure to a public body bring the activity or practice in violation of law to the attention of a supervisor of the employee <u>by written notice</u>, which would give the employer a reasonable opportunity to correct the activity or practice.  That requirement, however, only applies to Section 185 (b)(1), not sections (b)(2) or (b)(3).  Furthermore, that requirement does not apply if the employee "reasonably fears physical harm as a result of the disclosure provided," § 185 (c)(2)(B), or discloses the information to a federal or state law enforcement agency or police officer, § 185 (c)(2)(C), *for the purpose of providing evidence of what the employee reasonably believes to be a crime*. Section 185 (c)(2).   Clearly the Plaintiff was providing information under at least Section (b)(2) which would avoid the writing requirement, and if under (b)(1), then the writing requirement is exempted because of both (c)(2)(b) [reasonable fear of physical harm] and (c)(2)(c) [disclosure to law enforcement for providing evidence of a crime].

As to the fear of physical harm, the Plaintiff was aware of the threat made against the CS when the CS was approached and forced into a car shortly after informing Defendant Poirier of his location, with the perpetrators placing a gun in the face of the CS telling him not to rat on cops, or something substantially to that effect.  See **Ex. 19**, CS Aff., at ¶63.  See also **Ex. 3**, Jakuttis Aff., ¶26; See also, **Pl's SOF, 80**.  The Plaintiff's affidavit regarding his fears about coming forward and the Affidavit of CS regarding the gun to the face and being told not to rat on cops, demonstrate a reasonable fear for safety as to why no written document was produced by the Plaintiff.  As the Plaintiff states in his affidavit, revealing the information he obtained by CS was difficult enough, and the thoughts of writing any report that would have his signature on would, in the Plaintiff's judgment, only more infuriate the corrupt cops and make things more difficult and dangerous for him.  As it is, the Plaintiff is still in fear for his safety.  **Ex. 3**, Jakuttis Aff., ¶26.

The Plaintiff has engaged in protected activity and he is exempt from the written notification requirement.  As far as adverse employment action is concerned, this has been addressed, *supra*,  and under the Whistleblower statute the language is quite broad in defining "retaliatory action," defining it as: "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."  G.L. c. 149, § 185 (a)(5) (emphasis added).  The Plaintiff has clearly met his burden of showing retaliatory action.

The Plaintiff has demonstrated the requisite elements with credible evidence of material factual issues to proceed to a jury trial on the Whistleblower claim.

## C.  Massachusetts Civil Rights Act ("MCRA") - G.L. c. 12, §§ 11H, 11I

To establish a claim under the MCRA a plaintiff must prove that (1) his/her exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion." Buster, v. Moore, Inc., 438 Mass. 635, 644 (Mass. 2003) (citing Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 564, cert. denied, 516 U.S. 931 (1995)). "Because the act, 'like other civil rights statutes, is remedial,' it is 'entitled to a liberal construction of its terms.'" Buster, at 645 (citing Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985).

The right secured has been discussed earlier - the constitutional right of free speech.  We have also discussed the interference of that right -retaliation for exercising that right by removing the Plaintiff from his role as a detective and demoting him back to patrol, with details of why that was an adverse employment action.  *See Supra.*  The focus by the defendants is on the third element - "threats, intimidation or coercion."

The Buster court stated that "we have recognized that coercion may take various forms, and we have not limited its scope to actual or attempted physical force" Buster, at 646-47. Additionally, "[t]he statute imposes no express or implied requirement that an actor specifically intend to deprive a person of a secured right in order to be liable under the statute. Nor does the language of the statute admit of any express or implied exemption for conduct undertaken in response to third-party pressure." Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 99 (Mass. 1987).  G.L. c. 12, §§ 11H and 11I, "contain no state of mind prerequisite for recovery. Like § 1983, c. 12, §§ 11H and 11I, do not require that the defendant's action be willful." Id., at 99.

In the present case, the Plaintiff was "an extremely dedicated detective who functioned very well and did his job well," **Ex. 5**, Chartrand Dep., 19:7-9, with little disciplinary issues. **Id**. He was charged with and willing to investigate fellow officers in the past (the 2003 marijuana theft from the Dracut evidence trailer). **Pl's SOF,5**.  Mellonakos was one of only a couple of Dracut officers on duty when the theft occurred, with most other officers being at a police function at a restaurant. **Ex. 11**, Mellonakos Dep., 46:3-6; **Ex. 17**, NEMLEC Report., p.5.

With the exposure the corruption and illegal drug use by Mellonakos and another officer in charge of the evidence room (Byam), and the prospects of the Plaintiff now spending 100% of his time at the Dracut police department because of his departure from the DEA's CBI unit, what better way to prevent any prying eye of the Plaintiff into what Defendant Mellonakos had done or was doing than preventing the Plaintiff from doing any detective work.  The Plaintiff has testified that he was told by Chartrand that Mellonakos didn't want the Plaintiff as a detective, and that he (Chartrand) can't kick sand in his face.  Mellonakos and Chartrand dispute this, placing this issue squarely in the jury's hands.  Resolving those factual disputes in favor of the Plaintiff, those statements clearly give rise to a reasonable inference that the purpose was to inhibit any further pursuit by the Plaintiff into the allegations of corruption.  It is also the type of "coercion" and "threat" contemplated by Redgrave where there does not have to be a threat of physical force.  It also gives rise to a reasonable inference that "but for" the Plaintiff coming forward with allegations against fellow officers, breaking the *blue code-of-silence*, he would have been continuing with detective work.  The Defendants cite "grumblings" of detectives Buote and Pike of not wanting to work with the Plaintiff, but they were willing to abide by whatever decision was made.  This buttresses the Plaintiffs argument that Chartrand and Mellonakos were standing side by side in getting back at the Plaintiff for exposing the

corruption. Of course, the MCRA and Section 1983 don't require a specific intent to interfere with the Plaintiff's constitutional rights - it's enough that they did.


### D.  <u>Intentional Interference with Advantageous Economic Relationship</u>

"To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  <u>Blackstone v. Cashman</u>, 448 Mass. 255, 260 (Mass. 2007).

When the defendant is a "corporate official," the standard in proving the element of "improper motive or means" includes a showing of "actual malice."  <u>Id</u>., at 260-61.  "We have further defined 'actual malice' in these circumstances as 'a spiteful, malignant purpose, unrelated to the <u>legitimate corporate interest</u>.'"  <u>Blackstone</u>, at 261 (citation omitted) (emphasis added).

In the present case, we have two actors to consider.  Mellonakos and Chartrand. Chartrand is arguably a "corporate official."  He was the deputy chief.  Mellonakos, says that he was not the Plaintiff's supervisor because he was out on injured leave when the Plaintiff was fired from the CBI and about to spend all his office time at Dracut.  <u>See</u> **Ex. 11**, Mellonakos Dep., at 71:

```
3 Q. When he returned from the CBI unit, if he
4 was assigned to the Detective Bureau, you
5 would have been his supervisor; correct?
6 MR. SILVERFINE: What year are we
7 talking about?
8 Q. 2015, when he got fired from the CBI and
9 was back with Dracut, if he was assigned to
10 the Detective Bureau, you would have been
```

11 his supervisor; correct?
12 A. Yeah, yeah, I would have been. However, I
13 was out on injury.

So, we will discuss Chartrand with the "actual malice" standard, but the Plaintiff should not have the burden of proving "actual malice" to prove Mellonakos' actions were by "improper motive or means."  Although, in discussing the "actual malice" standard for Chartrand, the Plaintiff's position is that the proof of actual malice for Chartrand is equally applicable to Mellonakos and does fit the description of Mellonakos' actions, in the event that the Court finds that Mellonakos was a "corporate official."

Mellonakos' hostility toward the Plaintiff began shortly after the Plaintiff came forward with the corruption information that he received from CS.  The Plaintiff was at lunch at a restaurant with some CBI officers, and Poirier told the hostess or waitress that "there's two more coming." **Ex. 3**, Jakuttis Aff., ¶28.  This was shortly after Defendant O'Hanlon had told the CBI officers, including Poirier, to avoid lunches with Byam and Mellonakos and to stay away from them while the corruption matter was pending.  See **Ex. 3**, Jakuttis Aff., ¶28; **Ex. 1**, Jakuttis Dep., 168:1-13.  Those "two others" were Byam and Mellonakos, which Poirier obviously had been in touch with to inform them of the lunch.  It was at that lunch that hostilities began. Mellonakos and Poirier were glaring at the Plaintiff in an intimidating and hostile manner, and when the topic of a vehicle that had just been seized and may be available for the Plaintiff to use while assigned to the CBI[5] came up, Mellonakos in a hostile manner said to the Plaintiff, "you'll never get that car," or "you'll never get a car," or something substantially to that effect.  **Ex. 3**, Jakuttis Aff., ¶28, **Ex. 1**, Jakuttis Dep., 308.

---

[5] Local officers assigned to the CBI were supposed to be provided a vehicle from their local department.  The Plaintiff had a vehicle at one point that was no longer useable, and he was using his own vehicle, borrowing vehicles from various other agencies, and riding along with other CBI officers.  See **Ex. 1**, Jakuttis Aff., at 308-309.

"[A]ctual malice" is defined as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest," Blackstone, at 261.  In the present case, there is a genuine factual dispute as to whether or not the decision to prevent the seasoned, dedicated and high performing detective (Jakuttis) from continuing as a detective when it was apparent that he was going to be at the Dracut office more frequently was truly a "legitimate" corporate interest.  As discussed *supra*, there is a question as to what the real reason was for not letting the Plaintiff continue as a detective.  Conflicting reasons were given.  The interim Chief was told in a memo from Chartrand that it was because of "low staffing issues" that he would be in patrol.  **Ex. 14**.  Yet Chartrand says that a major contributing factor was because there were some "grumblings" of other detectives. **Ex. 5**, Chartrand Dep., 66:5-16.  Yet it was clear that there was a "low staffing issue" right within the detective unit itself because the primary narcotics detective, Defendant Mellonakos, by his very own deposition testimony and by the Defendants' SOF, went out on disability.  **Defs.' SOF - 81**, **Ex. 11**, Mellonakos Dep., 71:8-13.  And according to Chartrand, the Plaintiff "definitely had the skillset to do the job." **Ex. 5**, Chartrand Dep., 67:22-23.

The Plaintiff isn't saying that there are corporate interest reasons given, just that those reasons are not "legitimate" because they are a "pretext" for the actual reason.  This is a factual question for the jury.  It the "legitimacy" of the corporate decision turns on determining actual motives or reasons for the decision itself, and there is credible, conflicting evidence on both sides of that issue, then it must go to the jury.

If Mellonakos said he doesn't want the Plaintiff as a detective (and that factual dispute and the inference therefrom has to be resolved in the Plaintiff's favor), and Mellonakos was out on disability leaving no seasoned narcotics detective, and Chartrand says the Plaintiff is a

dedicated detective and with the skillset to do detective work, then there is clearly not only an improper motive, but there is no "legitimate" corporate interest.


### E.  Intentional Infliction of Emotional Distress

"Massachusetts courts are fairly liberal about allowing emotional distress claims to go to the jury. Although 'hurt feelings resulting from bad manners, or relatively minor annoyances do not justify recovery for intentional or reckless infliction of emotional distress,' claims should go to the jury 'if reasonable people could differ on whether the conduct is "extreme and outrageous." ' " Columbus v. Biggio, 76 F. Supp. 2d 43, 56-57 (D. Mass. 1999) (citing Boyle v. Wenk , 378 Mass. 592, 595-97, 392 N.E.2d 1053 (1979).

In Columbus v. Biggio, 76 F. Supp. 2d 43 (D. Mass. 1999), the plaintiff was a building inspector for the Town Stonham. He sued the Town, the Town Counsel, a board of selectmen member (Mr. Biggio) and the Town Administrator (Mr. Nutting).  From November of 1996 through October of 1997, three of the defendants, including Nutting, engaged in a campaign of harassment and threats against the Plaintiff aimed, ultimately, at the Donovan family. Id.  The Donovans were a family who owned property that Biggio wanted to purchase in order to gain access to property that he owned and wanted to develop.  Id.   When the Donovans refused to sell, Biggio engaged Nutting and the Town Counsel to "help him pressure Mr. Columbus to cite the Donovans for frivolous and pretextual violations of the Building Code."  Id. Various tactics were used to pressure Columbus to assist, but he refused. "Nutting, by pressuring Columbus to persecute the Donovans and by imposing onerous job requirements and suspending him when he refused to participate, . . ." engaged in conduct actionable under the Intentional Infliction of Emotional Distress claim.  Id. at 57.

Punishing the Plaintiff by taking away the job he thrived on, loved doing and was good at, and which allowed him to protect the citizens of the community from some of the serious narcotic activity and associated crimes, all because he did the right thing by coming forward with information about corruption in the police department, is certainly on par with, if not more severe, than pressuring a town employee to improperly issue a citation to a land owner and taking adverse employment action against him for his refusal to follow that order.  The Plaintiff has met his burden.

### F.  Civil Conspiracy

"Under Massachusetts law, either of two possible causes of action may be called 'civil conspiracy.' *First.* There is precedent supporting a 'very limited cause of action in Massachusetts' for 'civil conspiracy' of a coercive type.  'In order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'" Aetna Cas. Sur. Co. v. P B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994) (citing Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D.Mass. 1985).

The Plaintiff is not claiming this type of conspiracy between Mellonakos and Chartrand.

The Plaintiff is claiming under the second type of "civil conspiracy" actionable in Massachusetts.  "For liability to attach on this basis, there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  Aetna Cas. Sur. Co. v. P B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994) (citing *Restatement (Second) of Torts* § 876 cmt. b.) (emphasis added).

In the present case, viewing the evidence in a light most favorable to the Plaintiff, there is ample evidence to show, at a minimum, a tacit agreement between Defendants Mellonakos and Chartrand to keep the Plaintiff from working as a detective after being fired from the CBI unit. Chartrand told the Plaintiff that "Demetri doesn't want you there," or something to that effect, and "I can't kick sand in his face."  **Pl's SOF, 61**; See **Ex. 1**, Jakuttis Dep., at 267-268.  A reasonable jury could conclude that this was, if not an express agreement, an implied one.  This was also certainly a "common design," to wit, preventing the Plaintiff from continuing detective work.  The wrongful/tortious act is, of course, the retaliation against the Plaintiff for exercising his Constitutional Free Speech rights, and his rights under the Whistleblower statute to relay information to a public body about something that he reasonably believed to be a crime.  The harm is evident.  Loss of his career as a detective, loss of income (i.e., unlimited overtime for detectives and a history of the Plaintiff *actually* earning overtime at will, with no limitation placed on him by his employer). **Pl's SOF, 34-50**.

## G.  Civil R.I.C.O. (Racketeering Influenced Corrupt Organization Act)

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 527-28 (1st Cir. 2015); See 18 U.S.C. § 1962(c).

### The Enterprise

The Defendants attack the Plaintiff's claim that there is an "enterprise."  To begin with, a police department can be the "enterprise," as the Boston Police Department was found to be in

U.S. v. Boylan, 898 F.2d 230, 236 (1st Cir. 1990) ("The indictment charged the defendants with violating the Racketeer Influenced and Corrupt Organizations Act (RICO), by participating in the affairs of an enterprise, the BPD, through a pattern of racketeering activity").

In the instant case, the Plaintiff has alleged alternative enterprises, which he is allowed to do. See Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740 (5th Cir. 1989). Compl. ¶ 409:  The enterprises alleged are one of, or a combination of:

> **(A)** an association-in-fact enterprise consisting of either (i) Defendant John Doe l (Mellonakos), Defendant John Doe 2 (Poirier), Defendant Chartrand, Defendant O'Hanlon, and DO3 (Officer Byam), or (ii) Defendant John Doe l (Mellonakos), John Doe 2 (Poirier), and DO3 (Officer Byam), and

> **(B)** either one of the association-in-fact enterprises stated in parts (A) (i) or (ii) of this paragraph and the Town of Dracut Police Department, as an association-in-fact enterprise between the Town of Dracut Police Department and either of (A)(i) or (A)(ii); and

> **(C)** the Town of Dracut Police Department.

In any event, the allegations are that Mellonakos and Byam were engaged in illegal narcotic activity.  There evidence supporting these allegations.  The evidence supporting the allegations in the Complaint as to the illegal drug activity of the Dracut police officers (Mellonakos and Byam) are: (1) The affidavit of CS, **Ex. 19**, signed under the pains and penalties of perjury, (2) **Ex. 20**, Report of Investigation, interview of CS (CS in Complaint) interview at DEA's CBI office in Lowell, and (3) **Ex. 21**, Report of Investigation, interview of BCS (Boston Confidential Source "BCS" in Complaint), a proffer hearing in Boston on a separate case**.**  The Reports were made in the ordinary course of business following the interview of the confidential sources which revealed an abundance of evidence of illegal drug activity.  The 2010 NEMLEC Report (**Ex. 17**) shows police involvement in the theft of the marijuana from the Dracut police evidence trailer in 2003, stating that it was "beyond any

'reasonable doubt' that the information regarding the location and security of the stolen evidence (drugs) had to originate from within the Dracut Police Department." **Ex. 17**, at p. 11, first full para., underlined section.

Even after the 2003 theft of marijuana and the scathing NEMLEC Report in 2010, the Dracut police department still had major security problems with the evidence room, and an outside company, Pomeroy Resources, Inc., was retained in 2016 to conduct an on-site evidence and property review and inventory of the Dracut, Massachusetts Police Department. Following that report, the interim Chief sent a letter to Marian Ryan, the Middlesex County District Attorney, outlining many of his concerns following the report. Those concerns, among others, included that Mellonakos, Chartrand and Byam had unfettered access to the evidence room; evidence remained in temporary lockers for months and in some cases years prior to transfer to the evidence room; while two detectives were compiling spreadsheets officer Byam attempted to dispose of a syringe and some drugs believed to be a small amount of heroin in the trash but was convinced not to do so.

The evidence available thus far creates a clear picture of people using their position as police officers employed by the Dracut police department to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Chartrand retaliated against the Plaintiff by acquiescing to Mellonakos telling Chartrand to keep the Plaintiff from doing detective work, in violation 18 U.S.C. § 1513 (e), which is a predicate act under § 1961 (1) (B). Defendant Chartrand argues that the Plaintiff in his deposition said that Chartrand never committed any criminal act. That answer came on the heels of a lengthy colloquy about the drug related activities of Byam and Mellonakos. **Pl's**

**SOF, 54-57**; **Ex. 1**, Jakuttis Dep., 153-165.  He was not thinking about the complex, intricate legal definitions of predicate acts under the *civil* RICO claim that is brought.  See Id.  In fact, nowhere in the deposition were the words "RICO," "racketeering" or "predicate act" used by any lawyer questioning him or in any answer.  See **Ex. 13**, Laurence E. Sweeney (Plaintiff's Counsel) Affidavit as to absence of any reference to RICO in Jakuttis' deposition).  The Plaintiff does claim that a crime was committed by Chartrand: the Sarbanes-Oxley Act violation under § 1513 (e).  Of course, proof of predicate acts in a civil RICO case only requires proof by a preponderance of the evidence, and failure of any charges being brought does not defeat a civil RICO cause of action.

The Defendants also claim that the enterprise's activity (either the police department or the alternate enterprises that the Plaintiff has alleged) did not affect interstate commerce. It clearly did.

### Enterprise's Activity Affecting Interstate Commerce

The numerous accounts of drug use by Mellonakos and Byam, including while on duty (CS Affidavit) allege activities of the enterprise (any one of the alternate enterprises) that affects interstate commerce - controlled substance violations.  Additionally, the enterprise of the Dracut police department engages in interstate commerce by virtue of its *legal* confiscation, possession, control and use (in testing and as evidence) of controlled substances from arrests and seizures.

Even if the illegal possession, handling, distribution, or other violation of the Controlled Substance Act (21 U.S.C. § 801 et seq. ("CSA")) by Mellonakos and Byam, or the legal possession and handling of controlled substance by the department, occurs entirely within the

state, such violations and legal possession after confiscation, affects interstate commerce because in passing the CSA, Congress itself has declared that CSA violations, regardless of occurring entirely within a state, do nevertheless affect interstate commerce.[6]  The Dracut police department, handling and confiscating illegal narcotics, is, *as a matter of law*, an enterprise whose activities affect interstate commerce.  It is important to recognize that the Dracut police department, as an enterprise, is a victim itself of the illegal activity of the officers.   But it is still one of the alternately alleged enterprises, the conduct and affairs of which Mellonakos and Byam were participating in through a pattern of racketeering activity.

### The Pattern of Racketeering Activity

The predicates acts which form the pattern or racketeering activity include the controlled substance violations (See **Ex. 19**, Aff. of CS; **Ex. 20**, Report of Investigation, Interview of CS; **Ex. 21**, Report of Investigation, Interview of BCS; the theft of marijuana from the evidence Dracut police evidence trailer in 2003 with police involvement)  18 U.S.C. § 1961 (A) and (D) [state and federal controlled substance violations], and the retaliatory acts by Chartrand and Mellonakos of interfering with the Plaintiffs livelihood by preventing him from continuing as a detective and placing him back on patrol in retaliation for providing

---

[6] In passing the Comprehensive Drug Abuse Prevention and Control Act of 1970 (The Controlled Substance Act, 21 U.S.C. § 801 et seq.), Congress made the following findings: (A) Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because (i) after manufacture, many controlled substances are transported in interstate commerce, (ii) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and (iii) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession; (B) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances; (C) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate; (D) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic. See 21 U.S.C. § 801

information to law enforcement (18 U.S.C. § 1513(e)0 and 18 U.S.C. § 1512(b)(3); § 1512(d), relating to obstruction of justice.  In addition to the information that the Plaintiff obtained from CS, the Plaintiff also received additional information regarding the possible theft of marijuana in an operation involving Defendants Mellonakos and Poirier.  The retaliation and harassment against the Plaintiff was to intimidate him so that he would stop pursuing or bringing to light the corruption (long, ongoing corruption) within the Dracut police department involving illegal narcotics.  (See **Pl's SOF, 69-71**).  A predicate act violation occurred under 18 U.S.C. § 1513(e) ("Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, <u>including interference with the lawful employment or livelihood</u> of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both") (emphasis added)).

The predicate acts must be related (i.e., the controlled substance violations and the obstruction of justice violations, including the interference with the lawful employment under § 1513(e)).  They are.  <u>See</u> <u>DeGuelle v. Camilli</u>, 664 F.3d 192 (7th Cir. 2011) (holding that an employee's retaliatory discharge in violation of 18 U.S.C. § 1513(e) was sufficiently related to the underlying acts of racketeering that the employee had reported to federal agencies).  "When an employer retaliates against an employee, there is always an underlying motivation. . . . Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower. Although there may not be the same victims or results, in most cases retaliatory acts and the underlying scheme 'are interrelated by distinguishing characteristics and are not isolated events.'" <u>DeGuelle v. Camilli</u>, 664 F.3d 192, 201 (7th Cir.

42

2011) (citing <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S.229 at 240, 109 S.Ct. 2893 (1989)).  The Sarbanes-Oxley act in 2002 added § 1513(e) to the obstruction of justice statutes, bringing within the arm of the RICO statue interference with the lawful employment or livelihood of a person in retaliation for giving information to law enforcement officials about the commission or *possible* commission of a federal offense.  The Plaintiff was not investigating the internal corruption within his own police department - he was revealing it. Section 1513(e) was added to combat the corporate culture of silence, and in this case - the *Blue Code of Silence*.  It was intended to combat the retaliation against whistleblowers and others.

But the allegations of RICO predicate act violations do not stop at the discharge and the demotion, it was continuing.  Officer Boute (after being promoted!) now says that he was not "harassed" by Mellonakos, Byam and Poirier for associating with the Plaintiff, but the Plaintiff disputes that, **Ex. 3**, Jakuttis Aff., ¶20.  We also have the CS having a gun put in his face and told not to rat on cop.  (**See Ex. 19**, CS Aff., ¶63).

There clearly is a pattern and ongoing and related continuity.


**<u>Loss to Business or Property</u>**

In the present case, the Plaintiff has suffered a loss to his property (ability to earn income) specifically caused by the predicate act of retaliation, in violation of 18 U.S.C. § 1513 (e).  Employment is a property interest and interference with that, whether by discharge or by a demotion which diminishes the ability to earn, is the exact type of harm and damages that the Sarbanes-Oxley Act contemplated in including § 1513(e) as part of the RICO statute.  Otherwise, there would be no damages available to the employee whistleblower who was retaliated in his or

her work.  An anomalous result. However, Sarbanes-Oxley conferred standing on the employee

to bring a RICO conspiracy claim against the individuals who engaged in the retaliatory actions.

The Plaintiff was earning unlimited overtime when he was working as a detective.  <u>See</u>

**Pl's SOF, 34-51**; <u>See also</u> **Ex. 18** (payroll records of the Plaintiff showing income prior to being

taken off detective work and his base pay since).  Although the Plaintiff is out on disability, the

amount that he would be able to earn without working as a detective is substantially less than

what he can earn as a patrolman.  **Pl's SOF, 50**.


### H.  <u>R.I.C.O. Conspiracy (18 U.S.C. § 1962 (d)</u>

 "If conspirators have a plan which calls for some conspirators to perpetrate the crime and

others to provide support, the supporters are as guilty as the perpetrators." <u>Salinas v. United</u>

<u>States</u>, 522 U.S. 52, 64 (1997).

Conspiracy liability under section 1962 (d) is broader than under 1962 (c). A conspirator

must simply intend to further an endeavor which, if completed, would satisfy all elements of a

civil RICO claim.  <u>Id</u>. at 65; <u>see also</u> <u>CGC Holding Co., LLC v. Broad and Cassel</u>, 773 F.3d

1076, 1088 (10th Cir. 2014) ("one conspires to violate RICO by adopting the goal of furthering

the enterprise, "even if the conspirator does not commit a predicate act").

Chartrand has clearly conspired and furthered the goal of Mellonakos preventing the

Plaintiff from continuing as a detective which would have placed the Plaintiff in a position to

interfere with and further expose the corruption and controlled substance violations occurring at

the Dracut police department.

The Plaintiff has sufficiently shown an agreement, express or otherwise, between

Chartrand and Mellonakos to keep the Plaintiff out of detective work.

***Conclusion***

For the foregoing reasons, this Court should *deny* all the Defendants' Motions for Summary Judgment in their entirety and allow this case to proceed to a jury trial.

***Request for Oral Argument***

The Plaintiff respectfully requests a hearing for oral argument on this matter.

Respectfully submitted, Plaintiff,
Joseph Jakuttis, by his attorney,
**LAW OFFICES OF LAURENCE E. SWEENEY**

Dated: August 28, 2019

*/s/ Laurence E. Sweeney*
Laurence E. Sweeney, BBO# 559208
9 Lynn Ave.
North Chelmsford, MA 01863
Tel: 978-884-2140
Fax: 978-418-8255
Email: lsweeneyrph@comcast.net

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, Laurence E. Sweeney, Esq., do hereby certify that the foregoing document, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants, if any. A copy of this document was also filed as a courtesy copy for the Court along with the materials that were filed under seal.

Dated: August 28, 2019

*/s/ Laurence E. Sweeney, Esq.*
Laurence E. Sweeney, Esq.
