UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
JOSEPH A. JAKUTTIS,              )
                                )
                                )
            Plaintiff,          )        CIVIL ACTION NO.
                                )        16-12643-DPW
v.                              )
                                )
TOWN OF DRACUT, MASSACHUSETTS,  )
DAVID J. CHARTRAND, JR.,        )
MICHAEL V. O'HANLON,            )
DEMETRI MELLONAKOS,             )
RICHARD P. POIRIER, JR.,        )
and UNITED STATES OF AMERICA,   )
                                )
            Defendants.         )
```

MEMORANDUM AND ORDERS
February 14, 2023

<u>TABLE OF CONTENTS</u>

I. BACKGROUND................................................... 5

  A.   The Parties ............................................. 5

    1.  The Plaintiff ........................................ 5

    2.  The Defendants ....................................... 5

      a.  The Dracut Defendants ............................. 5

        i.  The Town of Dracut (the "Town" or "Dracut") ........ 5

        ii.  David J. Chartrand, Jr ............................ 5

        iii. Demetri Mellonakos [John Doe 1] ................... 5

      b.  The Federal Defendants ............................ 6

        i.  Michael V. O'Hanlon ............................... 6

        ii. Richard P. Poirier, Jr. [John Doe 2] .............. 6

        iii. United States ..................................... 7

  B.   The Procedural Posture ................................. 7

    1.  Travel of the Case ................................... 7

    2.  Procedural Approach .................................. 10

      a.  The Doctrine of Qualified Immunity ................. 11

      b.  Summary Judgment and Qualified Immunity ............ 13

      c.  Motion to Dismiss and Qualified Immunity ........... 14

      d.  District Court's Procedural Control over Discovery .. 16

  C.  Mr. Jakuttis's Professional Background ................. 17

  D.  Duties Associated with Dracut Police Department Roles Held by Mr. Jakuttis, and Information about the Dracut Police Department ................................................. 18

  E.  The 2002 Marijuana Theft .............................. 21

  F.  2006-2012: Mr. Jakuttis's Medical Leave and Return to Dracut Police Department ................................. 22

  G.  Mr. Jakuttis at the DEA Task Force .................... 23

  H.  CS's Disclosure to Mr. Jakuttis and Related ..............
Circumstances ............................................. 24

  I.  Events Following Mr. Jakuttis's Report of CS's ...........
Disclosure ................................................ 26

  J.  Mr. Jakuttis's Removal from the DEA Task Force ..........
and Return to Dracut Police Department Patrol Assignment .... 28

  K.  Mr. Jakuttis's Departure from the Dracut Police ..........
Department ................................................ 29

II. MOTION TO STRIKE.......................................... 30

   A.   Nature of Work During DEA Assignment ................... 31

   B.   Threats, Intimidation, and Coercion ................... 32

III. SUMMARY JUDGMENT MOTIONS APART FROM RICO CLAIMS.......... 34

   A.   Count I: 42 U.S.C. § 1983, First Amendment Claim as to Dracut, Mr. Chartrand, and Mr. Mellonakos ................... 35

      1.   Matter of Public Concern ............................ 37

      2.   Speaking as a Citizen ............................... 38

   B.   Count II: MASS. GEN. LAWS ch. 12, §§ 11H and 11I, Massachusetts Civil Rights Act Free Speech Claim as to Mr. Chartrand and Mr. Mellonakos ............................... 44

   C.   Count III: MASS. GEN. LAWS ch. 149, § 185, Massachusetts Whistleblower Act as to Dracut ............................ 50

      1.   Section 185(b)(1) ................................... 52

      2.   Section 185(b)(3) ................................... 54

      3.   Section 185(b)(2) ................................... 55

   D.   Count IV: Intentional Interference with Advantageous Economic Relationship as to Mr. Chartrand and Mr. Mellonakos 60

      1.   Mr. Jakuttis' Claim Against Mr. Chartrand ............ 61

      2.   Mr. Jakuttis' Claim Against Mr. Mellonakos ............ 63

   E.   Count VI: Intentional Infliction of Emotional Distress as to Mr. Chartrand and Mr. Mellonakos ........................ 64

   F.   Count VII: Civil Conspiracy as to Mr. Chartrand and Mr. Mellonakos ............................................... 66

IV. FEDERAL RICO CLAIMS...................................... 68

   A.   Motion to Dismiss Standard ............................ 69

   B.   Count VIII: 18 U.S.C. §§ 1962(c) and 1964(c), Civil RICO as to All Defendants Except Dracut ........................ 71

      1.   Racketeering Activity ............................... 73

      2.   Enterprise .......................................... 74

      3.   Conduct ............................................. 79

      4.   Requisite Injury .................................... 82

      5.   Pattern of Activity ................................. 83

   C.   Count IX: 18 U.S.C. §§ 1962(d) and 1964(c) Civil RICO Conspiracy as to All Defendants Except Dracut .............. 88

V. PUBLIC DISCLOSURE......................................... 90

VI. CONCLUSION.............................................. 95

Joseph A. Jakuttis, a quondam member of the Dracut Police Department, says a confidential source made him aware of potential illegal theft and use of controlled substances by other members of the Dracut Police Department.  Shortly after Mr. Jakuttis brought these allegations to the attention of members of the United States Drug Enforcement Agency ("DEA") and the Dracut Police Department itself, he was removed from the DEA Task Force to which he had been assigned and placed back in the Dracut Police Department patrol unit, despite years of experience with the detective unit.  Mr. Jakuttis contends that his efforts to expose misconduct by those sworn to uphold the law resulted in harassment from fellow officers and a demotion. He has since taken an indefinite leave from the Department.

This case has been pleaded with a broad brush and in a less than rigorous fashion, but after discovery as to claims against certain of the Defendants and upon careful examination of the operative First Amended Complaint (the "operative Complaint") in light of the summary judgment record developed, I am satisfied that no genuine issues as to material facts have been identified to prevent entry of final judgment for all remaining Defendants left after the travel of the case to date.

## I. BACKGROUND

### A. *The Parties*

#### 1.   The Plaintiff

**Joseph A. Jakuttis** is a resident of Deerfield, New Hampshire.  At the time he filed this action, and as alleged in the operative Complaint in this matter, Mr. Jakuttis was a police officer for the Town of Dracut, Massachusetts.

#### 2.   The Defendants

##### a.   *The Dracut Defendants*

###### i.  **The Town of Dracut (the "Town" or "Dracut")** is a municipal corporation duly incorporated under the laws of Massachusetts.  During all relevant periods described in the operative Complaint, the Town was Mr. Jakuttis's employer.

###### ii.  **David J. Chartrand, Jr.** is an individual residing in Dracut, Massachusetts.  At all material times referenced in the operative Complaint, Mr. Chartrand was employed by the Dracut Police Department.  He served as the Deputy Chief of the Dracut Police Department.

###### iii. **Demetri Mellonakos [John Doe 1]**,[1] is an

---

[1] Although I allowed [Dkt. No. 116] a joint motion [Dkt. No. 115] to file under seal submitted by Defendants Town of Dracut, Mellonakos and Chartrand, Mr. Mellonakos, who was identified as John Doe 1 in Mr. Jakuttis' original Complaint did not file his separate Motion for Summary Judgment [Dkt. No. 121] under seal. Mr. Chartrand, who was not identified by pseudonym, also did not file his motion for summary judgment under seal.  Thus, Mr.

individual residing in Dracut, Massachusetts.  At all times material to the operative Complaint, he was employed as a member of the Dracut Police Department.

        **b.**   ***The Federal Defendants***[2]

        **i.**  **Michael V. O'Hanlon** is an individual residing in Andover, Massachusetts.  At all times material to the operative Complaint, he was employed by the United States Department of Justice as a DEA agent.

        **ii. Richard P. Poirier, Jr. [John Doe 2],**[3] is an

---

Mellonakos, who was identified as John Doe 1 in the original Complaint, will no longer be identified by pseudonym in this Memorandum, or in the docket caption.  I note, however, Dracut did file its own motion [Dkt. No. 117] under seal.  The Town of Dracut, Mr. Mellonakos, and Mr. Chartrand are each represented by different counsel, which may explain the disparate sealed and unsealed filings by each Defendant.  I will treat all the Dracut Defendants in the same fashion, identified by name in this Memorandum and in the docket's caption.

[2] The Amended Notice of Removal filed by the United States Department of Justice [Dkt. No. 5] submitted on behalf of these Defendants, stated that both Mr. O'Hanlon and Mr. Poirier "were at all relevant times employed by the Drug Enforcement Agency, an agency of the United States," and "[t]he acts complained of, if they occurred at all, were acts by Defendants O'Hanlon and Poirier within the scope of their employment as employees of the United States."  [*Id.* at ¶¶ 3-4]  The operative Complaint, which gave rise to the removal of the case, also identifies Mr. Poirier by name as a member of the DEA Cross-Borders Initiative unit in Lowell.  [Dkt. No. 70 at 30]  In my Order of Substitution of the United States as Defendant [Dkt. No. 50], I dismissed several claims against these Defendants, "having been apprised that the Attorney General's designee has certified that the individual defendants Michael V. O'Hanlon and Richard Poirier ('John Doe 2') were acting within the scope of their federal employment at the time of the incident(s) alleged in this action."

individual residing in Lowell, Massachusetts.  At all times material to the operative Complaint, he was formally employed by the Massachusetts State Police and also served on detail to the DEA Task Force.

> **iii. United States.**  As a result of certification pursuant to 28 U.S.C. § 2679(d) in connection with removal of the case to this Court [Dkt. No. 5], this lawsuit became in relevant part an action against the United States and the United States was substituted as the formal party defendant for the federal Defendants.  Following the lead of counsel for the United States and in the interest of clarity, I have identified the claims against the United States as involving conduct of the individual named federal Defendants.  Thus, the discussion of claims against the United States specifically addresses the actions of the relevant certified employees of the United States — Messrs. O'Hanlon and Poirier — whose conduct provides the basis for the claims against the United States.

**B.** ***The Procedural Posture***

   1.   Travel of the Case

This litigation began its journey to this court after Mr.

---

[3] The motion to dismiss before me [Dkt. No. 51] submitted on behalf of Mr. Poirier and Mr. O'Hanlon was not filed under seal. Consequently, although identified as John Doe 2 in the original Complaint, as with the individual Dracut Defendants, Mr. Poirier will be identified by name in this Memorandum and in the docket's caption.

Jakuttis filed the operative Complaint on December 19, 2016 in Middlesex Superior Court and thereafter on December 30, 2016, the United States removed the case on the basis that certain of the claims concerned acts by federal employees acting within the scope of their employment as such.  *See* 28 U.S.C. §§ 1442(a)(1); 1443; 2679(d)(2).  [Dkt. No. 5 at ¶¶ 8-10]

Following removal, Mr. Jakuttis voluntarily dismissed his Massachusetts state civil rights act claim, said to be "cognizable through the Federal Tort Claims Act," as to the federal Defendants (included in Count II) and other Federal Tort Claims Act claims (included in Counts IV, V, VI, and VII) [Dkt. Nos. 48 and 49].  I, in turn, ordered [Dkt. No. 50] all such claims dismissed as to the federal Defendants (Counts II, IV-VII) certified pursuant to 28 U.S.C. § 2679(d).

Messrs. O'Hanlon and Poirier, the individual certified federal Defendants, then moved to dismiss [Dkt. No. 51] Mr. Jakuttis's remaining civil rights claims and his civil Racketeer Influenced and Corrupt Organizations ("RICO") Act claims against them.  I dismissed Mr. Jakuttis's 42 U.S.C. § 1983 civil rights and *Bivens* claims against the federal Defendants.  But I took under advisement the federal Defendants' motion [Dkt. No. 51] to dismiss Mr. Jakuttis's remaining federal civil RICO and RICO conspiracy claims under 18 U.S.C. §§ 1962(c) and (d) and 1964(c).  Meanwhile, I granted a motion to stay discovery as to

8

the federal Defendants pending the resolution of their motion to dismiss. [Dkt. No. 82]

For their part, following completion of discovery, the Dracut Defendants — Messrs. Chartrand and Mellonakos, and the Town of Dracut — moved for summary judgment on the remaining counts naming those Defendants. [Dkt. Nos. 117, 121, 123]  A Joint Statement of Undisputed Material Facts was filed by these Defendants [Dkt. No. 119] and Mr. Jakuttis responded with a Statement of Disputed Material Facts [Dkt. No. 126].

Consequently, now before me are the motions of Mr. Chartrand, Mr. Mellonakos, and the Town of Dracut for summary judgment variously as to Mr. Jakuttis's First Amendment retaliation claims, free speech claims, whistleblower claims, Massachusetts tort claims, civil conspiracy claims, and civil RICO and RICO conspiracy claims.[4]

---

[4] Mr. Jakuttis's remaining claims as to the individual Dracut Defendants Mr. Chartrand and Mr. Mellonakos include: a 42 U.S.C. § 1983 claim for violation of his First Amendment right to free speech (Count I), a claim under the Massachusetts Civil Rights Act also on free speech grounds (Count II), claims regarding Intentional Interference with Advantageous Economic Relationship (Count IV) and Intentional Infliction of Emotional Distress (Count VI), a Civil Conspiracy claim (Count VII), a Civil RICO claim pursuant to 18 U.S.C. §§ 1962(c) and 1964(c) (Count VIII), and a Civil RICO Conspiracy claim pursuant to 18 U.S.C. §§ 1962(d) and 1964(c) (Count IX).

The remaining counts as to the Town of Dracut include: a 42 U.S.C. § 1983 claim for violation of Mr. Jakuttis's First Amendment right to free speech (Count I) and a claim under the

I also take up at this time the joint motion of the individual federal Defendants O'Hanlon and Poirier to dismiss Mr. Jakuttis's federal civil RICO claims, further consideration of which had been stayed pending development of the summary judgment record with respect to Mr. Chartrand, Mr. Mellonakos, and the Town of Dracut.

### 2.   Procedural Approach

As is evident from the complex and circuitous narrative of the travel of the case concisely recited *supra* Section I.B.1, this matter has been structured as a matter of case management in a layered procedural posture.  That layering juxtaposes claims against state Defendants and federal Defendants, a context requiring at this point, respectively, analysis under summary judgment standards regarding the state Defendants and under motion to dismiss standards regarding the federal Defendants.

The respective claims arrived at this point for consideration because the procedural posture of the case is overlaid with recognized principles of qualified immunity that shape how and why claims against official actors should be taken up.  After summarizing qualified immunity principles, *infra* Section I.B.2.a., I will outline, *infra* Section I.B.2.b.,

---

Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185 (Count III).

summary judgment standards in light of those immunity principles and then, *infra* Section I.B.2.c., I will outline the motion to dismiss standards in light of those principles.  Finally, in Section I.B.2.d., I will address the sequencing of consideration of the respective claims, which the procedural standards and qualified immunity principles caused me to address in connection with the particularities of this case.

a.   *The Doctrine of Qualified Immunity*

Qualified immunity provides public officials with an affirmative defense to liability and a means of avoiding the "'costs of trial or . . . the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time." *Mitchell* v. *Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 817-18 (1982)).  The doctrine provides "immunity from suit rather than a mere defense to liability, meaning it is effectively lost if a case is erroneously permitted to go to trial." *Justiniano* v. *Walker*, 986 F.3d 11, 27 (1st Cir. 2021) (internal quotations and citations omitted).  Accordingly, the Supreme Court and the First Circuit have often emphasized the importance of addressing issues of qualified immunity "at the earliest possible stage in litigation," to protect officials from unnecessary litigation burdens. *Haley* v. *City of Boston*, 657 F.3d 39, 47 (1st Cir.

2011) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

To evaluate a claim of qualified immunity, "[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado* v. *Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (citing *Pearson* v. *Callahan*, 555 U.S. 223, 232 (2009)). Unless both questions are answered in the affirmative, the defendant is immune from suit. A district court has considerable discretion to address these questions however "best facilitate[s] the fair and efficient disposition of each case." *See Pearson*, 555 U.S. at 242.

Where the court can conclude at the outset that the right allegedly violated was not clearly established at the time of the violation, it may grant a motion to dismiss or motion for summary judgment on qualified immunity grounds, sparing the court and the parties the "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Eldredge* v. *Town of Falmouth*, 662 F.3d 100, 106 (1st Cir. 2011) (quoting *Pearson*, 555 U.S. at 236-37). In other cases, the court will need to decide the objective reasonableness of a defendant's conduct, based on the information in the defendant's possession at the time, to

resolve the issue of qualified immunity.  *Kelley* v. *LaForce*, 288
F.3d 1, 7 (1st Cir. 2002).  Factual disputes or undeveloped
facts relevant to qualified immunity may preclude an early
decision in such cases.  *Id.*

However, courts must maintain a balance between a
defendant-official's interest in the early dismissal of claims
as to which he is immune, and a plaintiff's interest in
benefiting from the favorable standards afforded to him on a
motion to dismiss or a motion for summary judgment.  *See
Chamberlain Est. of Chamberlain* v. *City of White Plains*, 960
F.3d 100, 110 (2d Cir. 2020) ("To be sure, qualified immunity
should be resolved at the earliest possible stage in litigation.
But there is an obvious, if rarely expressed, corollary to that
principle: The immunity question cannot be resolved *before* the
earliest possible stage, i.e., prior to ascertainment of the
truth of the plausible factual allegations on which a finding of
qualified immunity is premised." (internal citations and
quotations omitted)); *see also Morelli* v. *Webster*, 552 F.3d 12,
18-19 (1st Cir. 2009) (describing an "inherent tension" between
the summary judgment and qualified immunity standards);
*Justiniano*, 986 F.3d at 27.

b.  *Summary Judgment and Qualified Immunity*

When a defendant moves for summary judgment on qualified
immunity grounds, a "tug-of-war" ensues, "between who gets the

benefit of the doubt: summary judgment 'requires absolute
deference to the nonmovant's factual assertions,' while
qualified immunity 'demands deference to the reasonable, if
mistaken, actions of the movant.'"  *Justiniano*, 986 F.3d at 27
(quoting *Morelli*, 552 F.3d at 18-19).  "Plotting" the "doctrinal
intersection" between summary judgment and qualified immunity
"can present thorny analytic problems — problems that are
magnified because of the desire to resolve claims of qualified
immunity at the earliest practicable stage of litigation."
*Morelli*, 552 F.3d at 18.  The First Circuit has held that a
district court deciding such a motion for summary judgment
should (1) "identify[] the version of events that best comports
with the summary judgment standard," and then (2) determine,
"whether, given that set of facts, a reasonable officer should
have known that his actions were unlawful."  *Id.* at 19; *see
Justiniano*, 986 F.3d at 27; *Mlodzinski* v. *Lewis*, 648 F.3d 24, 28
(1st Cir. 2011).

     *c.   Motion to Dismiss and Qualified Immunity*

When a defendant moves to dismiss a complaint on qualified
immunity grounds, the court faces even greater tension created
by the Rule 12(b)(6) plausibility standard: that between the
need to "develop[] the requisite facts for a well-informed
qualified immunity determination and [the need to] preserv[e] a
government official's right to avoid the burdens of pretrial

matters, including discovery." *Brown* v. *Cumberland Cnty.*, 557 F. Supp. 3d 169, 177 (D. Me. 2021) (quoting *Reed* v. *Palmer*, 906 F.3d 540, 548 (7th Cir. 2018)).  As a result, "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch," *Chamberlain Est. of Chamberlain*, 960 F.3d at 111 (citing *Jacobs* v. *City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring)), and the court will often lack the "robust factual record" it needs to decide whether an official is entitled to qualified immunity at this stage, *Reed*, 906 F.3d at 548.  The Second Circuit has gone so far as to caution that generally, "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion." *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (alteration in original) (quoting *Green* v. *Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)).

The First Circuit has acknowledged, however, that a qualified immunity claim "can be raised and evaluated on a motion to dismiss," *Haley*, 657 F.3d at 47, when it is clear on the face of the complaint, accepting all of the plaintiff's well-pleaded factual allegations, that either the right allegedly violated was not clearly established or the

defendant's alleged actions were objectively reasonable under the circumstances.  *See id.*; *Brown*, 557 F. Supp. 3d at 176-77.[5]

> ### d.   District Court's Procedural Control over Discovery

The Supreme Court suggested in *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982) and again in *Crawford-El v. Britton* that "the district court should resolve th[e] threshold question [of qualified immunity] before permitting discovery."  *Crawford-El* v. *Britton*, 523 U.S. 574, 598 (1998) (citing *Harlow*, 457 U.S. at 818).

Pursuant to FED. R. CIV. P. 26, a district court has "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery" to resolve the qualified immunity issue without subjecting the defendant-official to the burdens of

---

[5] Although I address the competing summary judgment, motion to dismiss, and qualified immunity standards at the onset of this Memorandum to situate the doctrines governing the matter now before me, where a plaintiff fails to state a claim or identify an issue of material fact in dispute, courts have determined that reaching the question of qualified immunity is unnecessary. *See Thomas* v. *Harrington*, 909 F.3d 483, 493 n.18 (1st Cir. 2018) (stating that a court need not address qualified immunity where summary judgment affirmed on Massachusetts Civil Rights Act claim); *Cruz-Erazo* v. *Rivera-Montañez*, 212 F.3d 617, 624 (1st Cir. 2000) (explaining that a court need not reach the question of qualified immunity because it determined that plaintiff failed to plead a violation of Section 1983).  I take the same approach here.  As explained in the forthcoming Sections, Mr. Jakuttis has not adequately pleaded his claims as to the federal Defendants, nor has he raised an issue of material fact as to the state Defendants.  As a result, I need not discuss whether Defendants are entitled to qualified immunity.

discovery when he may ultimately be found immune from suit. *Crawford-El*, 523 U.S. at 598-99. The court may "set the timing and sequence of discovery," and may "postpone all inquiry regarding [qualified immunity] until discovery has been had on objective factual questions such as whether the plaintiff suffered any injury or whether the plaintiff actually engaged in protected conduct that could be the object of unlawful retaliation." *Id.* at 599; *see also Mihos* v. *Swift*, 358 F.3d 91, 105 (1st Cir. 2004).

I have, broadly stated, permitted the travel of the litigation of the claims against the state Dracut Defendants and those against the federal Defendants to proceed along parallel tracks. Developing the railhead metaphor further, I would characterize my exercise of discretion as a choice to permit necessary discovery regarding the state claims to proceed unimpeded to their destination for purposes of summary judgment practice. I also chose to place claims against the federal Defendants on a siding before bringing them to their destination as a matter of motion to dismiss practice; I am able to do that now as well with this Memorandum.

## C.   *Mr. Jakuttis's Professional Background*

The Dracut Police Department hired Mr. Jakuttis as a patrolman in 1998. Within the year, he was assigned to the detective unit, though he was still ranked as a patrolman.

Detective assignments are made at the discretion of the Chief of Police.

Mr. Jakuttis served in the detective unit until 2006. In January of 2006, he was disciplined regarding at least one incident of misconduct, for which he was returned to a patrol assignment.

### D.  *Duties Associated with Dracut Police Department Roles Held by Mr. Jakuttis, and Information about the Dracut Police Department*

I briefly summarize evidence, derived from the summary judgment record before me, regarding the organizational structure of the Dracut Police Department and the roles available to its officers during the relevant time period.

The officers in the Dracut Police Department appear to have been organized by their rank (e.g. patrolman, sergeant, lieutenant, deputy chief, chief) and their assignment to a specific functional unit (e.g. patrol unit, detective unit). Officers advanced in rank by passing a Civil Service exam and obtaining a formal promotion, but they received assignments at the discretion of the Chief of the Department. An officer's duties appear to have been determined both by his rank and his assignment. Officers with the rank of patrolman, like Mr. Jakuttis, could be assigned to various duties, such as the patrol division or the detective division.

As described by Mr. Jakuttis, the professional
responsibilities of a patrolman assigned to the patrol unit
included "answering calls for service and patrolling the
streets; maintaining public safety;" as well as
"[e]stablish[ing] crime scenes; [conducting] field interview[s
of] individuals; interview[ing] suspects; arrest[ing]
individuals for various crimes against the Commonwealth; a lot
of motor vehicle, speeding, registrations and so forth; [and]
transporting prisoners to different locations."

The responsibilities of an officer assigned to the
detective unit, again according to Mr. Jakuttis, included
"investigat[ing] various crimes committed against the
Commonwealth; . . . investigat[ing] crime scenes; interview[ing]
suspects; prepar[ing] and execut[ing] search warrants; [and]
perform[ing] mobile and stationary surveillance."  For his part,
Deputy Chief Chartrand has described the cases that a detective
works as more complex than those of a patrol officer.

How and how much an officer was paid depended on his
assignment.  Apart from the base pay associated with the rank of
patrolman, those assigned as detectives could receive as much as
a $50 weekly stipend.[6]  Mr. Jakuttis also contends, and supports

---

[6] In an affidavit of record, Deputy Chief Chartrand reports that
detectives earned a weekly stipend of $40 per week from 2012 to
2014.  This stipend increased to $50 per week in 2015.  Had he

with payroll records, that there is more overtime available to
detectives.

According to an organizational assessment of the Dracut
Police Department conducted by Municipal Resources, Inc. ("MRI
Report") and completed in October 2015,[7] "all effective
operational control of the department was found to be exercised"
by Deputy Chief Chartrand[8].  The report found that, as a
practical matter, Mr. Chartrand "was the principal force behind
the day-to-day operations of the department" while "the chief
[Kevin Richardson] [was] largely absent . . . having abrogated
many of his duties and responsibilities to the deputy chief."
The MRI Report found as a formal matter that the duties of the

_____

been assigned to the detective unit upon his return from the
Task Force in 2015, Mr. Jakuttis could have received the $50
stipend.  Mr. Jakuttis, however, apparently never received this
stipend, at either rate.
[7] The operative Complaint at ¶¶ 39-40, recites that the Town of
Dracut commissioned a risk assessment of the Dracut Police
Department, which was conducted by Municipal Resources, Inc. and
completed in October of 2015.  Initially, Mr. Jakuttis filed
four of the narrative pages of the report in an Exhibit to his
brief opposing summary judgment.  I directed Defendant Dracut to
submit the entirety of the 166 pages of the report to complete
the summary judgment record, which I have reviewed in resolving
the motions for summary judgment now before me.  [*See* Dkt. No.
137]  I afforded Defendant Dracut, in response to certain
security concerns unrelated to Mr. Jakuttis's claims, to present
an unredacted version of the MRI Report under seal and a public
redacted version, which they have filed with a publicly
available explanatory memorandum [Dkt. No. 136] as Dkt. Nos.
136-1 (unredacted report) and 136-2 (redacted report).
[8] At the time of the MRI Report, Kevin Richardson was the Dracut
Police Chief and David Chartrand was the Deputy Chief.  [Dkt.
No. 136-2 at 10-11]

deputy chief included "budgeting, *staffing*, performance reviews, and general administrative duties" (emphasis added) and "the chief and deputy chief essentially share the role of administering all program areas."  Mr. Chartrand's operational control appears to have extended to the assignment of officers to each unit.

The MRI Report found that "employees who disagree with the deputy chief or object in any way fear retribution."  In its analysis of reasons for departures from Police Department employment, the MRI Report reported that 76% of survey respondents felt that the Dracut Police Department was not well managed and that there were inconsistencies "in regards to discipline, accountability, expectations, support, feedback, and standards."  The MRI Report reported that "[m]any respondents equated these inconsistencies to favoritism and personal bias by command staff using such references to a particular group of people as 'cronies, friends, favorites, the team, or the palace guards.'"

**E.    The 2002 Marijuana Theft**

In May 2002, Mr. Chartrand and Mr. Jakuttis assisted the State Police with a narcotics seizure of thirty-five pounds of marijuana.  The seized marijuana was stored in an outside evidence trailer behind the Dracut Police Department.  In April 2003, Mr. Chartrand discovered that the padlocks on that outside

storage container had been cut and the marijuana seized the year before was missing.  Mr. Chartrand told Mr. Jakuttis, which led them to turn the area into a crime scene and call upon the State Police to take over, at least preliminarily, the investigation into the missing marijuana.  Mr. Jakuttis and Mr. Chartrand were tasked to assist the State Police in this investigation, as the only two officers who volunteered to take and pass a lie detector test.

**F.   *2006-2012: Mr. Jakuttis's Medical Leave and Return to Dracut Police Department***

On or about November 2006, Mr. Jakuttis suffered an injury, which placed him on injured-on-duty leave.  In 2009, he was involuntarily retired at the request of Chief of Police Richardson.  By 2012, Mr. Jakuttis had recovered sufficiently to return to duty, a return which Mr. Chartrand supported. Meanwhile, during Mr. Jakuttis's absence, Mr. Mellonakos had achieved the rank of lieutenant and was therefore a superior to Mr. Jakuttis.  Mr. Mellonakos was assigned to the detective unit.

When he returned to work, Mr. Jakuttis was assigned to the patrol unit.  The parties disagree about the timing, but at some point within a year of his return, Mr. Jakuttis began working with the detective unit on evenings and on his days off, although he was never formally assigned there.  Following his

return from medical leave, Mr. Jakuttis was never rostered as a detective and never received the $40 weekly stipend due at that time to a patrolman in the detective unit.[9]  Statements in the evidence, however, do describe him as "Detective Jakuttis," and he had alarm code and key access to the detective area within the Dracut Police Department.

### G.    Mr. Jakuttis at the DEA Task Force

In August of 2013, Mr. Jakuttis was assigned to the Cross Borders Initiative unit, a task force which operated through the DEA.  He was assigned as a "non-funded task force officer."

Though the formalities of employment associated with a Dracut police officer's assignment to the DEA Task Force are difficult to discern from the record before me, the following appears to be undisputed.

When assigned to the DEA Task Force, Mr. Jakuttis remained rostered as a Dracut Police Department patrolman and collected wages from the Town of Dracut.  As Mr. Jakuttis characterized that arrangement, "[t]hat means that I basically worked for the DEA.  On loan from the Dracut police."  Mr. Jakuttis and Mr. Chartrand both considered Mr. Jakuttis to fall under the DEA chain of command, not that of the Dracut Police Department. Within the DEA, Mr. Jakuttis reported to DEA Agent O'Hanlon as

---

[9] *See supra* note 6.

his supervisor.  Mr. Jakuttis did report outside of the chain of command to Mr. Chartrand on occasion.

Funded and non-funded members of the DEA Task Force had the same duties, which included, by Mr. Jakuttis's description, "investigat[ion of] high-level narcotics trafficking and drug distribution organizations in the area."  The difference between the two types of officers lay in who controlled and paid their overtime.  A non-funded Task Force officer could not receive overtime compensation from the DEA, except when the work was for specific Organized Crime Drug Enforcement Task Force overtime.  In all other cases, the officer's Police Department would determine whether the officer would be paid overtime and set all limitations on that overtime.  A funded Task Force officer, by contrast, was eligible for $18,000 of overtime compensation from the DEA.  As a non-funded officer, Mr. Jakuttis's overtime appears to have been paid by the Dracut Police Department, though the parties dispute who, if anyone, controlled his eligibility for overtime during this period.

**H.   CS's Disclosure to Mr. Jakuttis and Related Circumstances**

During his assignment to the DEA Task Force, Mr. Jakuttis worked with a confidential informant, CS, who had also worked with various law enforcement personnel on prior occasions. Sometime around January 16, 2015, CS disclosed to Mr. Jakuttis a

series of events that CS claims occurred while Mr. Jakuttis had been on medical leave.  CS said that between 2006 and 2012, CS would use illegal drugs with Mr. Mellonakos, who had been one of CS's former handlers.  On some occasions, Mr. Mellonakos would bring other officers with him, but assured CS that they were "safe."  One of those officers was DO3 [Officer Gregg Byam[10]].

CS offered two reasons for belatedly providing this information to Mr. Jakuttis: (1) retribution — CS was arrested by another police department for an unrelated crime, and CS believed Mr. Mellonakos provided the basis for that arrest; and (2) remorse — CS felt badly for Mr. Jakuttis because CS believed that Mr. Mellonakos had been involved with the marijuana theft that Mr. Jakuttis had been investigating prior to his medical leave.  CS believed Mr. Mellonakos had been steering Mr. Jakuttis away from discovery of Mr. Mellonakos's involvement in the theft.  CS's desire for retribution weighed much more heavily (95%) in his decision than his remorse.

After CS's disclosure, Mr. Jakuttis first confided in his colleague and fellow DEA Task Force officer, Ray Cormier.  Mr.

---

[10] Mr. Jakuttis chose not to name Dracut Police Officer Gregg Byam as a party defendant in this litigation.  He did, however, name Officer Byam as "DO3" in his unsealed Consolidated Memorandum of Law in Opposition to the Defendants' Several Motions for Summary Judgment, Dkt. No. 125.  [*See* Dkt. No. 125 at 38]  As explained in greater detail *infra* Section V., I see no reason to continue to use a pseudonym to mask Officer Byam's identity in this matter.

Jakuttis and Mr. Cormier ultimately agreed that they should tell their DEA supervisor, Mr. O'Hanlon, of CS's allegations; they did so a couple days later.  Mr. Jakuttis did not prepare any written report or other formal submission, he says, because he was not asked to and it "wasn't [his] investigation."  Following Mr. Jakuttis's disclosure, Mr. O'Hanlon informed Mr. Poirier, another member of the DEA Task Force and former handler of CS, of CS's allegations.  Mr. Poirier and Mr. Jakuttis then scheduled a formal interview with CS for February 18, 2015.

## I.   Events Following Mr. Jakuttis's Report of CS's Disclosure

At some point after his disclosure to Mr. Jakuttis, CS received a phone call from Mr. Poirier, asking him where he was located at that moment.  CS gave Mr. Poirier his location and approximately fifteen minutes later three individuals with badges approached him, pulled him into their vehicle, put a gun in his face and told him not to "rat on cops."

On January 30, 2015, Mr. Jakuttis attended a proffer session at the United States Attorney's Office.  There he heard another individual allege illegal drug use by Dracut Police Officer Gregg Byam.  Mr. Jakuttis reported these allegations to Mr. O'Hanlon as well.  CS appeared for his formal interview with the Task Force on February 18, 2015, and repeated the substance of his allegations to Mr. Jakuttis, Mr. Poirier, and DEA Special

Agent Gregg Willoughby.  Though all three officers were present throughout the interview, Mr. Poirier alone drafted the Report of the interview.[11]  In that Report, Mr. Jakuttis was generally described by Mr. Poirier in the following passage: "[Agent note: TFO Jakuttis and D[e]mitri Mellonakos are both police officers that work for Dracut Police Department and prior to TFO Jakuttis's injury both were detectives utilizing CS as a confidential informant]."  When Mr. Poirier asked CS why he had waited for years to come forward with this information, CS stated that he had not told Mr. Poirier because he believed him to be a friend of Mr. Mellonakos.

On or about February 18, 2015, Mr. Chartrand met with Mr. O'Hanlon to discuss the allegations.  They decided to forward the information to a DEA unit tasked with investigating allegations of public corruption.  The DEA special investigative unit declined to open an investigation.  Thereafter, Mr. Chartrand forwarded the information to the FBI, and it also declined to open an investigation, though the agency offered support should the Dracut Police Department investigate the allegations.  Mr. Chartrand attempted his own investigation but was unsuccessful because CS refused to meet with him or be interviewed.

---

[11] According to Mr. Jakuttis, Mr. Poirier demanded that he be the only person in the room to take notes.

**J.     Mr. Jakuttis's Removal from the DEA Task Force
        and Return to Dracut Police Department Patrol Assignment**

Some eight months later, on October 20, 2015, Mr. Jakuttis was removed from the DEA Task Force and returned to the Dracut Police Department.  Upon that return, Mr. Chartrand informed Mr. Jakuttis that he was assigned to patrol, not detective, detail.

The parties dispute the reason for Mr. Jakuttis's assignment to patrol.  Mr. Chartrand maintains that he based his recommendation that Mr. Jakuttis not be assigned to the detective unit on reports from the only two detectives in the unit at that time, Detectives Buote and Pike.  Mr. Chartrand, at the suggestion of Mr. Mellonakos — who was out on medical leave at the time — asked those detectives how they thought Mr. Jakuttis would fit into the detective unit.  Both Detectives Buote and Pike expressed a preference not to work with Mr. Jakuttis because they felt he did not value their work and contributions to the unit.  According to Deputy Chief Chartrand, when he advised Police Chief Richardson regarding Detectives Buote and Pike's preference, "[Chief Richardson] said 'Dave, I have no intention of *authorizing* [Mr. Jakuttis] back into the Detective Bureau,' and [Mr. Chartrand] left it at that." (emphasis added).

By contrast, Mr. Jakuttis claims that Mr. Chartrand told him that Mr. Mellonakos did not want Mr. Jakuttis back in the

detective unit, and that this was the reason for Mr. Chartrand's decision.  Mr. Jakuttis claims that Mr. Chartrand told him that he did not "want to kick sand in [Mr. Mellonakos'] face" by putting Mr. Jakuttis in the detective unit.

Mr. Chartrand testified that Mr. Jakuttis "definitely had the skillset to do the job" of a detective.  In fact, he was a more experienced narcotics investigator than either Detectives Buote or Pike.  The only more experienced officer in the detective unit at the time, Mr. Mellonakos, was out on medical leave from September or October of 2015 to April or May of 2016. In a September 30, 2016 memorandum about Mr. Jakuttis, Mr. Chartrand cited "current low staffing issues" as the reason for assigning Mr. Jakuttis to patrol.

After his return to the Dracut Police Department, Mr. Jakuttis was assigned a department car that had previously been used by Mr. Mellonakos and Mr. Buote.  It was the department's only undercover vehicle at the time.  There is some dispute as to how severe the issues were with the car, but it is undisputed there were at least HVAC and electrical issues.  Mr. Jakuttis used the car for less than a week.

## K.    *Mr. Jakuttis's Departure from the Dracut Police Department*

Mr. Jakuttis took leave from the Dracut Police Department shortly following his assignment back to patrol.  Thereafter, he

met with the Town Manager for the Town of Dracut, Jim Duggan, who decided to forward the information he received from Mr. Jakuttis about illegal drug use by Dracut police officers to the Massachusetts Attorney General's Office.  Mr. Duggan and Mr. Jakuttis met with officials at the Attorney General's Office at some point prior to the filing of this action.  Mr. Jakuttis also states he took the claims to the District Attorney.  Mr. Jakuttis has remained on leave since 2015.

## II. MOTION TO STRIKE

Defendants Dracut, O'Hanlon, and Mellonakos move to strike [Dkt. No. 128] portions of Mr. Jakuttis's opposition to their motions for summary judgment and his corresponding affidavit, because they say it is derived from materials contradicting evidence Mr. Jakuttis had earlier provided in discovery.  The allegedly conflicting statements at issue here concern (1) the nature of Mr. Jakuttis's work during his DEA assignment; and (2) whether he was threatened, intimidated, or coerced.

Courts must be vigilant to guard against a party attempting to evade summary judgment by filing an affidavit that contradicts his prior statement given under oath, at least unless there is a sufficient explanation provided for the contradiction.  *See Pena* v. *Honeywell Int'l, Inc.*, 923 F.3d 18, 30 (1st Cir. 2019) (citing *Cleveland* v. *Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)).  Genuine disputes of material fact,

for example, may not be created through later developed contradictory testimony. *See id.* (citing *Colantuoni* v. *Alfred Calcagni & Sons*, 44 F.3d 1, 4–5 (1st Cir. 1994)).

I turn now to whether any of these statements must be stricken.

### A.   *Nature of Work During DEA Assignment*

As I discuss more fully, *infra*, there is arguably a factual dispute presented in the record before me regarding the formalities and relevant logistics associated with Mr. Jakuttis's employment – particularly while he was assigned as a DEA Task Force Officer – apart from consideration of Mr. Jakuttis's affidavit.  However, I do not find Mr. Jakuttis's affidavit and prior deposition testimony (as a whole, rather than in the one statement cherry-picked by Defendants) directly contradictory regarding the dispute.  In fact, the only conclusion I can reasonably draw from either is that Mr. Jakuttis did work for both the DEA Task Force and the Dracut Police Department, and that he did not completely understand the complicated administrative formalities associated with his assignment.  This conclusion is supported by other documents in the record as well.

In addition, the person for whom Mr. Jakuttis "considered" he was working at relevant times is not a material fact.  His subjective interpretation does not change the outcome of any of

31

his pending claims.  Accordingly, I find no need to strike paragraphs 8 and 10 of his affidavit, nor the corresponding narrative in his opposition to the motions for summary judgment.

**B.    *Threats, Intimidation, and Coercion***

The question whether Defendants' actions were threatening, intimidating, or coercive is relevant as to Count II of the operative Complaint, the Massachusetts Civil Rights Act Claim under Mass. Gen. Laws ch. 12, §§ 11H and 11I.  As discussed more fully, *infra* Part III.B., I will grant the moving Defendants' motion for summary judgment on that Count, ultimately making the motion to strike moot.  I would do so regardless of the outcome of the motion to strike.  In the interest of completeness, I briefly address the merits of the pending motion to strike.

At the hearing in May 2019, I granted Defendants' motion to strike Mr. Jakuttis's deposition errata sheet.  Inexplicably, Mr. Jakuttis thereafter resubmitted the stricken errata sheet as an exhibit to his opposition to the current motion to strike.  I reiterate that the errata sheet is no longer a part of the record in this case, and I do not rely on it as such in making these findings.

However, many of the explanations contained in the errata sheet were separately repeated in Mr. Jakuttis's affidavit and opposition memorandum.  At the May 2019 hearing, I told the parties that Mr. Jakuttis could not testify on these subjects

32

again unless specifically asked to do so by Defendants.
Defendants decided thereafter to ask Mr. Jakuttis about whether
he was threatened.  Having chosen to pursue the matter,
Defendants cannot now have stricken the affidavit paragraph
summarizing Mr. Jakuttis's deposition testimony because they did
not like the answers they received.  Given defense counsel's
decision to re-open the door by asking further questions about
threats on the second day of Mr. Jakuttis's deposition
testimony, I find his affidavit not to be, in the context of the
developed record before me, directly contradictory of prior
statements he made under oath.

That said, I also observe I do not find his testimony on
this topic to be material to the remaining issues in this case.
Defense counsel attempted to use the deposition to corner Mr.
Jakuttis into making a statement about a legal element of one of
his claims.  Mr. Jakuttis is not a lawyer.  Although it might be
interesting to explore what Mr. Jakuttis, to the degree he might
be considered a reasonable police officer, perceived about the
actions taken against him, his subjective perception is not the
kind of evidence to which significant weight would be given on
that topic.  Consequently, I find no need to strike paragraph 19
of Mr. Jakuttis's affidavit or the corresponding section of his
opposition to the motions for summary judgment.

### III. SUMMARY JUDGMENT MOTIONS APART FROM RICO CLAIMS

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] FED. R. CIV. P. 56(a).  "An issue is genuine if a reasonable jury could resolve the point in favor of the nonmoving party.  A fact is material if its existence or nonexistence has the potential to change the outcome of the suit."  *Tropigas de Puerto Rico, Inc.* v. *Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (internal citations and quotations omitted).

In evaluating a motion for summary judgment, a court "must construe the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor while safely ignoring conclusory allegations, improbable inferences, and unsupported speculation."  *Collins* v. *Univ. of N.H.*, 664 F.3d 8, 14 (1st Cir. 2011) (alteration in original) (internal quotations and citation omitted).  To oppose a motion for summary judgment successfully, "the nonmoving party must set forth specific facts showing that there is a genuine issue for

---

[12] Counts VIII and IX against Defendants O'Hanlon and Poirier are governed by a different standard of review since they are contested at the motion to dismiss stage of litigation.  I discuss the proper standard of review for those Counts specifically in greater detail *infra* Section IV.

trial."  *Barry* v. *Moran*, 661 F.3d 696, 703 (1st Cir. 2011)

(internal quotations and citation omitted).

**A.   Count I: 42 U.S.C. § 1983, First Amendment Claim as to Dracut, Mr. Chartrand, and Mr. Mellonakos**

Section 1983 allows individuals to bring claims for money

damages against government actors who violate the United States

Constitution or a federal statute.  42 U.S.C. § 1983.  In his

Section 1983 claim, Mr. Jakuttis alleges that Mr. Chartrand, Mr.

Mellonakos, and the Town of Dracut violated his First Amendment

rights by effectively demoting him in retaliation for his

reporting the drug use of his colleagues.  Defendants contend

there was no violation of the First Amendment.  Defendants

Chartrand and Mellonakos contend that even if there were,

qualified immunity standards would prevent Mr. Jakuttis from

recovering any damages.

Section 1983 provides that any person who, under color of

state law, "subjects, or causes to be subjected, any . . .

person within the jurisdiction [of the United States] to the

deprivation of any rights, privileges, or immunities secured by

the Constitution and laws" is liable to the injured party.  *Id.*

The statute "creates no independent substantive rights, but

rather provides a cause of action by which individuals may seek

money damages for governmental violations of rights protected by

federal law."  *Cruz-Erazo* v. *Rivera-Montañez*, 212 F.3d 617, 621

(1st Cir. 2000) (citing *Albright* v. *Oliver*, 510 U.S. 266, 271 (1994)).

The First Amendment has been read to prohibit government officials from retaliating against an employee for constitutionally protected speech. *See Decotiis* v. *Whittemore*, 635 F.3d 22, 29-30 (1st Cir. 2011). The First Circuit has developed a three-part inquiry to determine whether a First Amendment retaliation claim alleges a constitutional violation:

> The first part concerns whether the public employee "spoke as a citizen on a matter of public concern." The second part concerns whether, if the employee did so, "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." The third part concerns whether, if that government entity did not have an adequate justification, "the protected expression was a substantial or motivating factor in the adverse employment decision." Even then, "the employer must have the opportunity to prove that it would have made the same decision regardless of the protected expression."

*Bruce* v. *Worcester Reg'l Transit Auth.*, 34 F.4th 129, 135 (1st Cir. 2022) (citations omitted). The first two inquiries present questions of law; the third presents a question for the factfinder. *Lewis* v. *City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003).

If a plaintiff meets his prima facie burden on all three elements, defendants are nevertheless entitled to summary judgment if they can establish a "so-called *Mt. Healthy*

defense," *Rodríguez-García* v. *Miranda-Marín*, 610 F.3d 756, 765-66 (1st Cir. 2010)(citing *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 287 (1977)), by demonstrating to a preponderance of the evidence that they "would have reached the same decision regardless of [plaintiff]'s speech," *Lewis*, 321 F.3d at 220. When the employer provides "a non-retaliatory reason for the action," the burden then returns to plaintiff to demonstrate that retaliation "was more likely than not a motivating factor." *Salmon* v. *Lang*, 57 F.4th 296, 309 (1st Cir. 2022) (citations and internal quotations omitted).

This settled analytical approach directs me at the outset to determine whether Mr. Jakuttis was speaking on (1) a matter of public concern as (2) a citizen. *See Decotiis*, 635 F.3d at 29 (citing *Garcetti* v. *Ceballos*, 547 U.S. 410, 418 (2006)).

### 1. Matter of Public Concern

The *Decotiis* court characterized speech about "official malfeasance or the neglect of duties" as "speech relate[d] to a matter of inherent public concern." *Id.* at 30. Certainly, an allegation that members of law enforcement are misappropriating and using illegal narcotics is a matter falling squarely within the realm of official malfeasance and is, therefore, a matter of inherent public concern. This dimension of the first element is met as to all moving Defendants.

2.   Speaking as a Citizen

The more difficult question is whether Mr. Jakuttis spoke as a citizen in reporting the alleged misconduct of his fellow officers.  When public employees speak regarding matters within their official duties, their speech is not specially protected by the First Amendment "and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.  "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22.  Moreover, "[r]efusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate.  The employees retain the prospect of constitutional protection for their [personal] contributions to civic discourse." *Id.* at 422.  Thus, public employees are to receive First Amendment protection when they partake in "the kind of activity engaged in by citizens who do not work for the government," but not when they "speak[] pursuant to employment responsibilities." *Id.* at 423-24.

The First Circuit has identified a non-exhaustive list of factors to guide analysis of whether a public employee was speaking as a citizen or pursuant to official duties:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

*Decotiis*, 635 F.3d at 32 (internal citations omitted).  By applying these factors, a court will essentially be answering two questions that reside at the core of the inquiry, "both of which are highly context-sensitive": "(1) what are the employee's official responsibilities? and (2) was the speech at issue made pursuant to those responsibilities?"  *Mercado-Berrios* v. *Cancel-Alegría*, 611 F.3d 18, 26 (1st Cir. 2010) (citing *Foley* v. *Town of Randolph*, 598 F.3d 1, 7, 9 (1st Cir. 2010)).  In answering these questions, courts must keep in mind that employers cannot "restrict employees' rights by creating excessively broad job descriptions."  *Garcetti*, 546 U.S. at 424. Rather, "[t]he proper inquiry is a practical one," focused on the "duties an employee actually is expected to perform." *Id.* at 424-25; *see Lane* v. *Franks*, 573 U.S. 228, 240 (2014) ("The

critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

Mr. Jakuttis contends, citing language from decisions issued by two of my colleagues, that he should not be stripped of his First Amendment protections "just because a garden-variety rule requires him to tell a supervisor" of fellow officers' misconduct. *Taylor* v. *Town of Freetown*, 479 F. Supp. 2d 227, 237 (D. Mass. 2007); *see Stuart* v. *Town of Framingham*, 301 F. Supp. 3d 234, 240 (D. Mass. 2018) (quoting *Taylor*, 479 F. Supp. 2d at 237).[13]  The First Circuit has more recently clarified, however, that reporting concerns up the chain of command "is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment." *Gilbert* v. *City of Chicopee*, 915 F.3d 74, 83 (1st Cir. 2019); *cf. Decotiis*, 635 F.3d at 32 (observing that plaintiff was "not literally authorized or instructed to make the speech at issue," and accordingly, the speech was "not made pursuant to her job duties

---

[13] *Stuart* v. *Town of Framingham* traveled further both before Judge Talwani and then in the First Circuit in years following the opinions cited in the text above. *See, e.g., Stuart* v. *City of Framingham*, No. 1:16-cv-12559-IT, 2020 WL 360552, at *5 (D. Mass. Jan. 22, 2020), *aff'd*, 989 F.3d 29 (1st Cir. 2021).  None of that subsequent case law, however, provides guidance as to the motions now before me.

in the most literal sense" (internal quotations omitted)

(quoting *Mercado-Berrios*, 611 F.3d at 27)).[14]

In finding that the officer in *Gilbert* was speaking

pursuant to his official duties, the First Circuit observed that

the subject matter of the speech was work-related, his knowledge

of the subject was obtained through his employment, the speech

occurred at work, the speech was made up the chain of command,

and the communications were internal, not public.  915 F.3d at

83-84.  The same can be said of Mr. Jakuttis's speech at issue

here.

As an initial matter, Mr. Jakuttis was duty-bound to

disclose CS's allegations in his role as a Dracut Police

investigator assigned to the DEA Task Force.  Generally, the

purpose of Mr. Jakuttis's job as a law enforcement officer was

---

[14] Setting aside the fact that *Gilbert* was decided more recently,
the facts of *Stuart* v. *Town of Framingham*, 301 F. Supp. 3d 234
(D. Mass. 2018) and *Taylor* v. *Town of Freetown*, 479 F. Supp. 2d
227 (D. Mass. 2007) provide no refuge for Mr. Jakuttis.  In
*Stuart*, Judge Talwani explained that the at-issue speech
included a letter signed by plaintiff and his union, which "was
not paid or commissioned by [p]laintiff's employer," "was not
internal speech," and "could in no way be viewed as speech made
representing [p]laintiff's employer."  301 F. Supp. 3d at 240–
41.  Likewise, in *Taylor*, plaintiff's allegations touched upon
the actions of a union, and Judge Saris explained that the
plaintiff "who was not a supervisor, lack[ed] broad official
responsibilities for ensuring that other officers are not
engaged in misconduct," though a department manual directed
officers to report misconduct.  479 F. Supp. 2d at 237.  In the
matter before me, officers testified that reporting misconduct
was within the known duties of the Dracut police.

to respond to criminal activity to stop or reduce it.  Mr. Jakuttis summarized his official responsibilities as a non-funded DEA Task Force officer as the "investigat[ion of] high-level narcotics trafficking and drug distribution organizations in the area."  Although he was not a member of an internal affairs unit charged with investigating fellow law enforcement officers, he appears to have been required to report misconduct of fellow officers as part of his official duties.[15]

Even if he was not specifically required to report officer misconduct, the subject matter of the speech — illegal drug use and distribution by fellow officers — was certainly related to Mr. Jakuttis's work as a narcotics investigator.  Mr. Jakuttis acknowledges that he learned of CS's allegations through that work.  Though this alone does not decide the question, it certainly demonstrates that Mr. Jakuttis's disclosure arose out of his law enforcement duties.  Mr. Jakuttis's speech appears to fall squarely within the scope of his duties as a Dracut Police investigator and DEA Task Force officer.

Mr. Jakuttis claims that he spoke as a citizen because, he contends, he did not report the information up the chain of command.  That is not so.  Though he did not immediately notify

---

[15] Multiple officers, including Mr. Jakuttis, testified that DEA Task Force officers and Dracut police investigators should report informant allegations of police corruption.

his Dracut police shift supervisor or Mr. Chartrand, Mr.
Jakuttis did report the drug use to his DEA Task Force
supervisor Mr. O'Hanlon and participated in related interviews
in his capacity as a Task Force officer.  Mr. Jakuttis testified
that in his DEA work he reported to Mr. O'Hanlon and was
"outside of the chain of command" of the Dracut Police
Department.  Moreover, Mr. Jakuttis did not prepare a written
report or widely publicize the information from CS.  Because the
disclosures were internal to the police department and DEA,
where Mr. Jakuttis worked on assignment, I find that he reported
his concerns up the relevant chain of command.[16]  There is no
citizen speech analogue here; Mr. Jakuttis's speech was internal
to the police department, a forum out of reach for most
citizens.

These factors all weigh in favor of classifying Mr.
Jakuttis's speech as pursuant to his official duties.  Because
Mr. Jakuttis was required to disclose misconduct by other
officers, the misconduct he reported involved illegal drug use
that he learned about in his work as a narcotics investigator,

---

[16] Mr. Jakuttis also contends that he went outside the chain of
command by communicating with the District Attorney and the
Massachusetts Attorney General's Office.  But Mr. Jakuttis did
not take his concerns outside the DEA and Dracut Police
Department chain of command until after the alleged adverse
employment action in 2015.  These later conversations thus could
not have influenced any retaliatory employment action and are
not relevant to whether Mr. Jakuttis was speaking as a citizen.

and he only disclosed the misconduct internally prior to the alleged demotion, I conclude as a matter of law that Mr. Jakuttis was speaking pursuant to his official duties instead of as a citizen.  His speech is therefore not protected by the First Amendment and Messrs. Chartrand and Mellonakos are entitled to summary judgment.

As to Defendant Dracut, Mr. Jakuttis brings his claim under *Monell* v. *Department of Social Services*, 436 U.S. 658, 692 (1978), which "imposes liability on a government" when its "official policy . . . 'causes' an employee to violate another's constitutional rights."  Foundational to a *Monell* claim is a violation of a constitutional right.  *See Monell*, 436 U.S. at 692.  Mr. Jakuttis bases his claim against Dracut on the same conduct alleged against Messrs. Chartrand and Mellonakos, namely retaliation following protected First Amendment conduct. Given the summary judgment record now before me, Mr. Jakuttis has failed to demonstrate a violation of a constitutional right, let alone one caused by an "official policy" of Dracut. Accordingly, I will grant Defendant Dracut's motion [Dkt. No. 117] on this Count.

**B.    Count II: Mass. Gen. Laws ch. 12, §§ 11H and 11I, Massachusetts Civil Rights Act Free Speech Claim as to Mr. Chartrand and Mr. Mellonakos**

The Massachusetts Civil Rights Act ("MCRA") provides a cause of action to redress circumstances where "any person or

persons, whether or not acting under color of law, interfere [or attempt to interfere] by threats, intimidation or coercion . . . with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States" or Massachusetts.  MASS. GEN. LAWS ch. 12, § 11H(a)(1); *see also id.* § 11I (providing cause of action).  The Massachusetts legislature passed the MCRA "to provide a State remedy for deprivations of civil rights . . . . coextensive with 42 U.S.C. § 1983."  *Batchelder* v. *Allied Stores Corp.*, 473 N.E.2d 1128, 1131 (Mass. 1985).  Although § 1983 and the MCRA provide coextensive relief, the MCRA is in fact broader substantively insofar as it reaches private conduct; it is also narrower substantively insofar as it only reaches constitutional deprivation caused by threats, intimidation, or coercion.  *See id.*

MCRA liability attaches when the following two conditions are met: "(1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that [he] has the constitutional right to do."  *McLeod* v. *Fessenden Sch.*, 113 Fed. R. Serv. 3d 1299, 1306 (D. Mass. 2022); *see* MASS. GEN. LAWS ch. 12, § 11H(a)(1).  As my discussion of Count I concluded, there was no underlying free speech

violation.[17]   Even if there had been, however, Mr. Jakuttis's

MCRA claim fails on the merits because there is no evidence in

the record that either Mr. Chartrand or Mr. Mellonakos

threatened, intimidated, or coerced Mr. Jakuttis within the

statutory definitions of those terms.   *See Turkowitz* v. *Town of

Provincetown*, 914 F. Supp. 2d 62, 76 (D. Mass. 2012) ("The

direct violation of a constitutional right does not establish a

MCRA violation because it is not an attempt to force someone to

do something the person is not lawfully required to do."

(internal quotations and citation omitted)).

---

[17] Massachusetts courts have not identified any substantive
difference between free speech protection under the Federal
constitution and the Massachusetts constitution.   The
Massachusetts Supreme Judicial Court ("SJC") has observed in the
past that "the criteria which have been established by the
United States Supreme Court for judging claims arising under the
First Amendment . . . are equally appropriate to claims brought
under cognate provisions of the Massachusetts [c]onstitution."
*Smith* v. *Comm'r of Mental Retardation*, 567 N.E.2d 924, 928-29
(Mass. 1991)(quoting, in the context of free speech claims, *Colo*
v. *Treasurer & Receiver Gen.*, 392 N.E.2d 1195, 1200 (Mass.
1979)).   Further, Massachusetts courts have not held that
article 16 of the Massachusetts Declaration of Rights offers
broader protection than the First Amendment in this context.
*See Cristo* v. *Evangelidis*, 62 N.E.3d 94, 101 n.6 (Mass. App. Ct.
2016) ("We have no occasion and decline to express an opinion
whether under the Massachusetts Declaration of Rights a public
employee's right to be protected against discipline by his
public employer that is based on the employee's workplace speech
is broader than the protections recognized by the Supreme Court
in *Garcetti*.").   To that end, Mr. Mellonakos also asserts
qualified immunity as to this count.   [Dkt. No. 122 at 14 n.11]

The Massachusetts Supreme Judicial Court ("SJC") has provided the following definitions for threat, intimidation, and coercion:

> "Threat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. [And coercion involves] "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

*Planned Parenthood League of Mass., Inc.* v. *Blake*, 631 N.E.2d 985, 990 (Mass. 1994) (citations omitted).  "Whether conduct constitutes coercion is examined from an objective, reasonable person standard."  *Currier* v. *Nat'l Bd. of Med. Exam'rs*, 965 N.E.2d 829, 838 (Mass. 2012).  The statute does not require proof of a  "specific intent to threaten, intimidate, or coerce for the purpose of interfering with [the] secured right" at issue.  *Sarvis* v. *Bos. Safe Deposit & Tr. Co.*, 711 N.E.2d 911, 918 (Mass. App. Ct. 1999) (citing *Redgrave* v. *Bos. Symphony Orchestra, Inc.*, 502 N.E.2d 1375, 1378 (Mass. 1987)); *see also O'Connell* v. *Chasdi*, 511 N.E.2d 349, 353-54 (Mass. 1987).

The MCRA should be liberally construed, and in certain circumstances certain types of economic coercion may be sufficient to establish the threats, intimidation, or coercion required by the statute.  *Buster* v. *George W. Moore, Inc.*, 783 N.E.2d 399, 409-11 (Mass. 2003); *see Redgrave*, 502 N.E.2d at

1379 (determining, in context of certified question from the
First Circuit, that cancelling an employment contract based upon
third-party pressure regarding  plaintiff's political views
could be illegal conduct under the MCRA).  Even so, "the
exception for claims based on non-physical coercion remains a
narrow one."  *Thomas* v. *Harrington*, 909 F.3d 483, 492-93 (1st
Cir. 2018) (quoting *Nolan* v. *CN8*, 656 F.3d 71, 77-78 (1st Cir.
2011)).  The SJC has held that threatening the loss of an at-
will employment position is not coercive conduct actionable
under the MCRA.  *Webster* v. *Motorola, Inc.*, 637 N.E.2d 203, 206
(Mass. 1994); *Nolan*, 656 F.3d at 77-78 (describing the
differences between the SJC's treatment of contractual and at-
will employees under the MCRA).

The SJC has yet to address explicitly the issue of when, if
ever, adverse employment actions can be coercive under the MCRA.
*Nolan*, 656 F.3d at 78.  At the very least, however,
"Massachusetts courts have required 'a pattern of harassment and
intimidation' to support a finding of non-physical coercion
under the MCRA."  *Thomas*, 909 F.3d at 493 (quoting *Howcroft* v.
*City of Peabody*, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001)); *see*
*Mason* v. *Cent. Mass Transit Mgmt./Worcester Reg'l Transit Auth.*,
394 F. Supp. 3d 166, 174 (D. Mass. 2019).  Those rare cases in
which termination of or changes to employment have led to MCRA
liability involved "the sort of physical, moral, or economic

48

pressure" that could induce the plaintiff to do something against his will.  *See Meuser* v. *Fed. Express Corp.*, 564 F.3d 507, 519 (1st Cir. 2009)(quoting *Meuser* v. *Fed. Express Corp.*, 524 F. Supp. 2d 142, 147 (D. Mass. 2007), *aff'd*, 564 F.3d 507 (1st Cir. 2009)).[18]

Here, neither Mr. Chartrand nor Mr. Mellonakos terminated or threatened to terminate Mr. Jakuttis's employment with the Dracut Police Department.  Nor were they responsible for Mr. Jakuttis's prior removal from the DEA Task Force.  Rather, pursuant to his discretion (or discretion delegated to him by the Chief of Police), Mr. Chartrand decided where to assign Mr. Jakuttis upon his full-time return — Mr. Jakuttis was not entitled to his position in the detective unit.  *See Amirault* v.

---

[18] The SJC's responses to certified questions in *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 502 N.E.2d 1375, 1378-79 (Mass. 1987) "ha[ve] generally been accepted as establishing a foundation for the proposition that actual or prospective 'breach of contract' constitutes 'coercion' under the act." *Buster* v. *George W. Moore, Inc.*, 783 N.E.2d 399, 410 n.17 (Mass. 2003).   The SJC found liability where pervasive sexual harassment against a plaintiff made continuing her employment impossible.  *See O'Connell* v. *Chasdi*, 511 N.E.2d 349, 353-54 (Mass. 1987).  Other forms of non-physical harassment have been found sufficient for liability, too.  *See Howcroft* v. *City of Peabody*, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001) (evidence that defendants deliberately exposed the plaintiff to second-hand smoke at work, reassigned him, and attempted to suspend him without pay raised a sufficient evidentiary basis to demonstrate a pattern of harassment and intimidation); *Broderick* v. *Roache*, 803 F. Supp. 480, 485-87 (D. Mass. 1992) (a campaign of harassment and retaliation against a police officer, involving disciplining him without cause, could satisfy requirement of threats, intimidation, or coercion).

*City of Malden*, 241 F. Supp. 3d 288, 304-05 (D. Mass. 2017) (officer's reassignment, from detective unit to administrative position, "was [not] coercive within the meaning of the MCRA").

Even if it was Mr. Chartrand's hope or intent in refusing Mr. Jakuttis's return to the detective unit that Mr. Jakuttis would abandon his pursuit of the claims CS made regarding Mr. Mellonakos — a theory that is not adequately supported by the record before me — the subjective intent of a defendant is not strictly part of the inquiry I must conduct.  Likewise, if a jury were to credit Mr. Jakuttis's claims that Mr. Chartrand wrongfully "demoted" him at Mr. Mellonakos's insistence, the behavior was not of the relentless and pervasive nature found in those rare instances of MCRA liability based on harassment.  *Cf. O'Connell*, 511 N.E.2d at 353-54; *Howcroft*, 747 N.E.2d at 746. Consequently, I will grant Mr. Chartrand and Mr. Mellonakos summary judgment on Mr. Jakuttis's MCRA claim against them.

**C.    Count III: MASS. GEN. LAWS ch. 149, § 185, Massachusetts Whistleblower Act as to Dracut**

The Massachusetts Whistleblower Act prohibits an employer from retaliating against an employee for engaging in certain whistleblowing activities.  MASS. GEN. LAWS ch. 149, § 185.  "In the summary judgment context," a "burden shifting approach" applies to evaluation of claims under § 185.  *Smith* v. *Town of West Bridgewater*, 184 N.E.3d 805 (Table), 2022 WL 727045, at *5

(Mass. App. Ct. Mar. 11, 2022).  Mr. Jakuttis "ha[s] the initial burden of proof as to all elements of his retaliation claim"; only after he "make[s] a prima facie showing" will the burden shift to Dracut to demonstrate a nonretaliatory purpose for its actions.  *Id.*  To meet his burden, Mr. Jakuttis must show that (1) he "engaged in an activity protected by the act; (2) the protected activity was the cause of an adverse employment action, such that the employment action was retaliatory; and (3) the retaliatory action caused [Mr. Jakuttis] damages."  *Edwards* v. *Commonwealth*, 174 N.E.3d 1153, 1166 (Mass. 2021).

An employer is proscribed from taking retaliatory action against an employee who does any of the following:

(1)   Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice *of the employer* . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment;

(2)   Provides information to . . . any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law, or activity, policy or practice which the employee reasonably believes poses a risk to public health, safety or the environment by the employer . . .;

(3)   Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

MASS. GEN. LAWS ch. 149, § 185(b) (emphasis added).  Mr. Jakuttis
contends that his disclosure of CS's allegations and his
involvement in the subsequent DEA Task Force investigation
constitutes all three forms of protected activity set forth in §
185(b).

### 1.   Section 185(b)(1)

Section 185(b)(1) protects the employee who discloses or
threatens to disclose the misconduct of his employer.  The
statute defines an employer as "the commonwealth, and its
agencies or political subdivisions, including, but not limited
to, cities, towns, counties and regional school districts, or
any authority, commission, board or instrumentality thereof."
MASS. GEN. LAWS ch. 149, § 185(a)(2).  By defining an employer as
the Commonwealth and its agencies, the statute effectively
directs that actions of a plaintiff's fellow employees should
not be attributed to the employer.  *See Tyron* v. *Mass. Bay
Transp. Auth.*, No. SUCV201402654, 2016 WL 5874408, at *3 (Mass.
Super. Ct. Aug. 17, 2016) (holding that plaintiff failed to
state a claim under § 185(b)(1) because he blew the whistle on
fellow employees, not employer); *Felix* v. *Town of Kingston*, No.
15-CV-14022-DLC, 2019 WL 7565449, at *7 (D. Mass. July 8, 2019)
(finding no employer action when employer did not know about
employee misconduct before plaintiff's disclosure), *aff'd*, No.
19-1774, 2021 WL 6102085 (1st Cir. Dec. 23, 2021).  This narrow

definition stands in contrast to a broader definition adopted in other sections within the same chapter. *Compare* Mass. Gen. Laws ch. 149, § 185(a)(2), *with id.* § 1 (defining "employer" in certain sections as "any person acting in the interest of an employer directly or indirectly").

Here, Mr. Jakuttis disclosed CS's allegations to his then-supervisor, Mr. O'Hanlon, who also qualifies as a public body through his employment at the DEA. *See* Mass. Gen. Laws ch. 149, § 185(a)(3). Eventually Mr. Jakuttis's Dracut Police Department supervisor, Mr. Chartrand, became aware of the allegations. However, the allegations do not fit squarely within the statutory text of § 185(b)(1) because the violations were alleged to have been committed by his fellow *employees*, rather than by his *employer*. *See Estock* v. *City of Westfield*, 806 F. Supp. 2d 294, 309 (D. Mass. 2011) ("The only defendants who could be liable under the statute [as plaintiff's employers] are the City of Westfield and the School Board, yet [p]laintiff alleged no facts pertaining to any conduct, wrongful or otherwise, on the part of the City or any Board members.").

Although it is the case, as Plaintiff argues, that entities act through individuals, I cannot conclude, as a matter of law, that the potential illegal actions of one individual, even if coupled with the complicity of a handful of others, is enough to qualify as illegal activity by the employing entity. *Cf.*

*Edwards*, 174 N.E.3d at 1162 (holding that the actions of the Governor of Massachusetts are attributable to the employing entity of the Commonwealth when he exercised "a power conferred on his office" as the "supreme executive magistrate" (citations omitted)).[19]  Accordingly, I conclude that there was no protected activity under subsection (b)(1).[20]

### 2.   Section 185(b)(3)

Mr. Jakuttis's disclosure also does not meet the requirements of subsection (b)(3).  This subsection protects a plaintiff's conduct when he "[o]bjects to, or refuses to participate in" the illegal activity.  MASS. GEN. LAWS ch. 149, § 185(b)(3).  Though Section 185(b)(3) does not contain language

---

[19] I observe that, even if Mr. Jakuttis could be found to have engaged in conduct protected under subsection b(1) of the Massachusetts Whistleblower Act, he has not demonstrated, as he must to preclude summary judgment, that his protected conduct could be found to be the determinative cause of his patrol assignment, "even if it was not the only cause."  *See Edwards* v. *Commonwealth*, 174 N.E.3d 1153, 1168 (Mass. 2021) (internal quotations and citation omitted).  As more fully discussed *infra*, Mr. Jakuttis raises only conclusory allegations and his own self-serving testimony as evidence that he was assigned to the patrol unit because of his whistleblowing activity.

[20] This conclusion is not based on lack of written notice.  Although § 185(c)(1) requires an employee to provide written notice to their supervisor of a possible violation of § 185(b)(1), here no written notice was required because Mr. Jakuttis disclosed the drug use "for the purpose of providing evidence of what [he] reasonably believe[d] to be a crime." MASS. GEN. LAWS ch. 149, § 185(c)(2)(C).  His actions thus fit within the exception to the written notice requirement for disclosures to a public body under subsection (b)(1).  I do not reach Mr. Jakuttis's claims that he feared for his safety and did not file a written report for that reason.

limiting claims to those against an employee's employer, *Tyron*, 2016 WL 5874408, at \*3, courts have interpreted mere disclosure as not constituting objection for purposes of this Section, *see Stuart* v. *City of Gloucester*, No. 18-cv-11877-ADB, 2021 WL 4477476, at \*12 (D. Mass. Sept. 30, 2021).  In any event, a plaintiff must have some level of personal involvement to state a claim under Section 185(b)(3).  *Stuart*, 2021 WL 4477476, at \*12.  Because Mr. Jakuttis does not allege he was ever personally involved with (or "asked to participate" in) the misappropriation and use of illegal drugs, he cannot claim protection under (b)(3).  *Id.* (citation omitted).

### 3.   Section 185(b)(2)

Section 185(b)(2) protects, in relevant part, employees who "[p]rovide[] information to, or testif[y] before, any public body conducting an investigation, hearing or inquiry into any violation of law."  Mass. Gen. Laws ch. 149, § 185(b)(2).  Mr. Jakuttis's initial report of CS's allegations to Mr. O'Hanlon cannot be the basis for a whistleblower action under § 185(b)(2); the report predated any DEA or other investigation into the officers' drug activity.[21]  However, Mr. Jakuttis's

---

[21] Reaching further back, I note that Mr. Jakuttis has not alleged that the 2003 marijuana theft investigation was still ongoing at the time he made his disclosure, or that Mr. Chartrand or the DEA had any remaining role in that case.  Any potential connection to the 2003 theft investigation is far too

later participation in the DEA investigation of CS's allegations may constitute protected action as defined by subsection (b)(2).[22]

Mr. Jakuttis's subsequent participation in the DEA investigation of Dracut Police Officers' drug use, limited though it may have been, did occur within the scope of a current investigation.  *See Edwards*, 174 N.E.3d at 1166 (explaining, in (b)(3) context, that there is "no reason why even a single event could not constitute [protected] 'activity' for purposes of the

---

attenuated to provide a foundation for a whistleblower claim.
[22] I find no evidence in the record before me to suggest that the DEA Task Force was investigating drug use by Dracut police officers *before* Mr. Jakuttis first reported CS's allegations to Mr. O'Hanlon.  It was Mr. Jakuttis's initial disclosure that initiated the public body's investigation.  If Mr. Jakuttis is found to have participated in the DEA Task Force's investigation *after* his initial disclosure, however, he may be found to have provided information to a public body conducting an investigation.

According to the operative Complaint, Mr. Jakuttis "revealed the information that CS had told him" to Mr. O'Hanlon, Special Agent Willoughby, and Mr. Poirier on February 2, 2015.  [Dkt. No. 70 at 31 at ¶ 98]  A review of the full record on summary judgment before me, however, reveals the undisputed fact that Mr. Jakuttis first reported CS's allegations to Mr. O'Hanlon within a few days of hearing the allegations on January 16, 2015.  *See* Dkt. No. 119 (Defs.' Joint Rule 56 Statements of Undisputed Material Facts at ¶ 48).  Making all reasonable factual inferences in favor of Mr. Jakuttis as the nonmoving party, I can conclude that the DEA Task Force investigation of Dracut police officers' drug use began within days of January 16, 2015, when Mr. Jakuttis first disclosed CS's allegations to Mr. O'Hanlon.  Mr. Jakuttis's subsequent participation in the Task Force investigation on February 2 and February 18, therefore, may constitute protected activities.

act"). Mr. Jakuttis testified that on January 30, 2015, during a proffer session with the United States Attorney's Office, he heard another individual allege that DO3 (Dracut Police Officer Gregg Byam) was involved in the use and sale of narcotics, in an allegation mirroring that of CS. Mr. Jakuttis then provided this information to Mr. O'Hanlon and the DEA Task Force members as part of their then-ongoing investigation into illicit narcotics activity in the Dracut Police Department. This continued involvement in the DEA Task Force investigation may be found to be protected activity under subsection (b)(2).

A showing of protected activity alone, however, will not allow Mr. Jakuttis to proceed on his whistleblower claim. Mr. Jakuttis must make some showing of a causal connection between his involvement in the DEA Task Force investigation and his assignment to the patrol unit. *See Smith*, 2022 WL 727045, at *5 (explaining that, to prevail on summary judgment, plaintiff "must . . . present facts that raise a genuine issue as to whether he can show causation").

The SJC recently clarified in *Edwards* that the causation standard applicable to claims for retaliation under the whistleblower act is the "determinative cause" standard used to evaluate employment discrimination claims. 174 N.E.3d at 1168. In *Edwards*, the SJC differentiated the determinative cause standard applied to Mass. Gen. Laws ch. 149, § 185(b) claims from

57

the causation standard utilized in First Amendment retaliation claims brought under 42 U.S.C. § 1983, articulated in *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 286-287.  *See* 174 N.E.3d at 1168.  Protected activity must be a determinative cause — in other words a "but for" cause — of the employer's decision to take adverse employment action against the plaintiff, although the protected activity "need not be 'the only cause'" of the employer's decision.  *Id.* at 1169 (quoting *Lipchitz* v. *Raytheon Co.*, 751 N.E.2d 360, 371 n.19 (Mass. 2001) (protected activity may be a determinative cause when "it was a material and important ingredient in causing [retaliation] to happen," even if it was not "the only cause of that action")).

To survive the Defendant's motion for summary judgment, Mr. Jakuttis must make a showing that "is more than merely colorable."  *Faiella* v. *Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 145 (1st Cir. 2019) (internal quotations and citations omitted).  Even as to issues of motive or intent, Mr. Jakuttis cannot "rest[] merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Medina-Munoz* v. *R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Here, Mr. Jakuttis does not make a colorable prima facie showing that he was assigned to the patrol unit for a retaliatory purpose – in other words, he cannot show that his

protected conduct was a "but for" cause of his patrol assignment.  *See Edwards*, 174 N.E.3d at 1169.

Mr. Jakuttis offers no evidence beyond his own speculative testimony and the timing of his assignment to patrol to support his contention that, but for his role in the DEA Task Force investigation into police drug use, he would have been assigned as a detective.  Mr. Jakuttis has not satisfied his burden with his own testimony that Mr. Chartrand mentioned a desire not to "kick sand" in Mr. Mellonakos's face when Mr. Chartrand assigned him to the patrol unit.  *See Irobe* v. *U.S. Dep't of Agric.*, 890 F.3d 371, 381 (1st Cir. 2018) ("A court need not 'take at face value' a party's 'subjective beliefs,' even if offered in the form of testimony, if those subjective beliefs are 'conclusory,' 'self-serving,' and lack factual support in the record" (quoting *Torrech-Hernández* v. *Gen. Elec. Co.*, 519 F.3d 41, 47 n.1 (1st Cir. 2008)).

Even if Mr. Jakuttis could make a prima facie showing of retaliation, the Town of Dracut has "proferr[ed] a legitimate, nonretaliatory reason for [his reassignment]."  *Stuart*, 2021 WL 4477476, at *13 (citation omitted).  The Town of Dracut contends that Mr. Jakuttis was assigned to the patrol unit because of specific personnel challenges.  Mr. Chartrand testified that he recommended against assigning Mr. Jakuttis to the detective unit because Detectives Buote and Pike, the only other officers

assigned to the detective unit at the time, expressed reluctance

to work with Mr. Jakuttis due to his on-the-job behavior.  Mr.

Chartrand's testimony is corroborated by consistent testimony

from Detectives Buote and Pike, as well as from Mr. Mellonakos.

Detectives Buote and Pike confirmed that they told Mr. Chartrand

that they preferred not to work with Mr. Jakuttis.  Neither

suggested that it was Mr. Jakuttis's role in investigating Mr.

Mellonakos or other officers that made Mr. Jakuttis an

undesirable colleague.  Instead, both testified that they found

Mr. Jakuttis difficult to work with, dismissive of fellow

officers' concerns, and demeaning of others' work.  Mr.

Mellonakos, too, testified that he never expressed the view that

Mr. Jakuttis should be excluded from the detective unit.

Consequently, Mr. Jakuttis cannot sustain a whistleblower

claim on this basis, and I will grant the Town of Dracut's

motion for summary judgment.[23]

**D.    *Count IV: Intentional Interference with Advantageous Economic Relationship as to Mr. Chartrand and Mr. Mellonakos***

Massachusetts courts have articulated four elements

---

[23] Because Mr. Jakuttis fails to show that his protected conduct
was a determinative factor in his assignment to patrol, I need
not decide whether assigning Mr. Jakuttis to the same unit to
which he was assigned before joining the DEA Task Force could
constitute damaging retaliatory action.  I also need not decide
if his assignment to a vehicle with electrical issues was
retaliatory.

necessary to prove intentional interference with advantageous economic relations: "(1) [the plaintiff] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Blackstone* v. *Cashman*, 860 N.E.2d 7, 12–13 (Mass. 2007). When a plaintiff brings a claim against an employer, he "must satisfy an additional element: that the supervisor acted with actual malice." *Gregg* v. *Northeastern Univ.*, 599 F. Supp. 3d 9, 16 (D. Mass. 2022) (internal quotations and citations omitted). Actual malice requires "a spiteful, malignant purpose unrelated to a legitimate corporate interest" of the employer. *Blackstone*, 860 N.E.2d at 19; *see also Kelleher* v. *Lowell Gen. Hosp.*, 152 N.E.3d 126, 133 (Mass. App. Ct. 2020) ("[T]he plaintiff needed to show that the defendant's purpose was unrelated to <u>any</u> corporate interest. . . ." (internal quotations and citation omitted)).

Mr. Jakuttis's claim at summary judgment is separately against Mr. Chartrand and Mr. Mellonakos.

### 1.   Mr. Jakuttis' Claim Against Mr. Chartrand

As to Mr. Chartrand, an individual official of the Dracut Police Department acting within the scope of his

responsibilities,[24] Mr. Jakuttis must show that he acted with improper motive or means driven by actual malice. *Weber*, 752 N.E.2d at 715 (citing *Gram* v. *Liberty Mut. Ins. Co.*, 429 N.E.2d 21, 24 (Mass. 1981)). Mr. Jakuttis contends Mr. Chartrand improperly acquiesced to or was motivated by Mr. Mellonakos's malicious urging when he assigned Mr. Jakuttis to the patrol unit. Mr. Jakuttis also contends that summary judgment should be denied on the grounds that Mr. Chartrand's intent in "demoting" him is a question for the trier of fact.

"Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the

---

[24] Mr. Jakuttis does not meaningfully dispute that Mr. Chartrand is entitled to be considered under the actual malice standard. The parties do, however, seem to dispute whether the actual malice standard applies to Mr. Mellonakos. Mr. Mellonakos appears to assert that it does. *See* Dkt. No. 122 at 18 ("[N]othing in the discovery record supports the notion that Mellonakos acted with actual malice."). To contest this assertion, Mr. Jakuttis points to Mr. Mellonakos' deposition testimony stating he "would have been [Mr. Jakuttis'] supervisor" but was not because he "was out on injury," showing, Mr. Jakuttis contends, that the malice standard does *not* apply. Dkt. No. 125 at 32–33; *see* Mellonakos Dep. Tr. at 71:8–19, Dkt. No. 119 at 126. Actual malice is required only "when an employee is claiming a *supervisor* has intentionally interfered with the employee's advantageous relationship with the employer or a corporate official is acting in an official capacity." *Fountain* v. *City of Methuen*, __F. Supp. 3d__, No. 21-CV-11046-AK, 2022 WL 4382386, at *9 n.4 (D. Mass. Sept. 22, 2022) (emphasis added). Here, the record does not suggest that Mr. Mellonakos was Mr. Jakuttis' supervisor. In any event, the application of the malice standard is inconsequential to the motion for summary judgment now before me because Mr. Jakuttis has not provided facts sufficient to show causation.

nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz*, 896 F.2d at 8.  Mr. Jakuttis presents no facts sufficient to allow a reasonable inference that Mr. Chartrand acted by improper means or motive, let alone malice, in assigning Mr. Jakuttis to the patrol unit.

Beyond his own speculation, Mr. Jakuttis proffers no evidence to suggest he was placed in the patrol unit to punish him for his disclosure of CS's allegations.  *See Stonewood Cap. Mgmt., Inc.* v. *Giner*, Nos. 11-11422-RWZ, 12-11271-RWZ, 2013 WL 49771, at *5 (D. Mass. Jan. 3, 2013) (summary judgment proper when plaintiff failed to show any evidence of the official's requisite ill-will or improper means).  At most, Mr. Jakuttis raises evidence of the type of "sloppy and unfair business practices" which do not constitute improper means motivated by actual malice.  *Gram*, 429 N.E.2d at 25 (describing malice in context of tortious interference with employment contract).

### 2.   Mr. Jakuttis' Claim Against Mr. Mellonakos

As to Mr. Mellonakos, Mr. Jakuttis fails to proffer sufficient facts to support a reasonable inference that Mr. Mellonakos caused or was even involved in Mr. Jakuttis's removal from the DEA Task Force or assignment to the patrol unit. According to Mr. Chartrand's testimony, Chief Richardson stated that he "ha[d] no intention of authorizing" Mr. Jakuttis to work

63

in the detective unit.  There is no evidence before me that Mr. Mellonakos's preferences played any role in the assignment decision.  Moreover, the record contains no testimony, beyond Mr. Jakuttis's own speculation, that Mr. Mellonakos demanded Mr. Jakuttis's exclusion from the detective unit or pressured others to punish Mr. Jakuttis for investigating CS's allegations.  Consequently, I can find no triable issue as to this count.

**E.   *Count VI: Intentional Infliction of Emotional Distress as to Mr. Chartrand and Mr. Mellonakos***

Massachusetts courts have imposed a "very high" standard for plaintiffs bringing claims for intentional infliction of emotional distress.  *Doyle* v. *Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996) (citing *Agis* v. *Howard Johnson Co.*, 355 N.E.2d 315, 319 (Mass. 1976)).

> To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress.

*Sena* v. *Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994) (citing *Agis*, 355 N.E.2d at 318-19).

The "extreme and outrageous" conduct element requires more than a showing of tortious or even malicious intent and conduct. *Doyle*, 103 F.3d at 195.  As outlined in the Restatement (Second) of Torts § 46 and frequently reiterated by the SJC, the

plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley* v. *Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. *d* (AM. L. INST. 1965)). Whether the defendant's conduct can be deemed extreme and outrageous may be decided as a matter of law when the record is sufficiently developed. *See Sena*, 629 N.E.2d at 994.

Even crediting each of Mr. Jakuttis's factual allegations against Messrs. Chartrand and Mellonakos, their alleged conduct does not rise to the level of atrocious behavior required to support a claim for intentional infliction of emotional distress. Assigning Mr. Jakuttis to the patrol unit of the Dracut Police Department, the same unit to which he was assigned before he joined the DEA Task Force, does not amount to extreme and outrageous conduct under the circumstances. Accordingly, summary judgment is appropriate on this count.[25]

---

[25] Even if Messrs. Chartrand and Mellonakos had engaged in extreme and outrageous behavior, Mr. Jakuttis' claim could also be barred by the Worker's Compensation Act, MASS. GEN. LAWS ch. 152, § 24. That provision "bars the use of [intentional infliction of emotional distress] by an employee (or former employee) against coworkers or employers acting within the scope of their employment." *McArdle* v. *Town of Dracut/Dracut Pub. Schs.*, 732 F.3d 29, 37 (1st Cir. 2013).

**F.   Count VII: Civil Conspiracy as to Mr. Chartrand and Mr.
     Mellonakos**

Massachusetts law recognizes two forms of civil conspiracy:
(1) joint agreement  "based on the defendants' allegedly unique
ability to exert a peculiar power of coercion when acting in
unison," *Snyder* v. *Collura*, 812 F.3d 46, 52 (1st Cir. 2016)
(citation and internal quotations omitted); and (2) joint
agreement anticipating concerted action by defendants, "whereby
liability is imposed on one individual for the tort of another,"
*Kurker* v. *Hill*, 689 N.E.2d 833, 836–37 (Mass. App. Ct. 1998).
Mr. Jakuttis asserts the second form of civil conspiracy.

Under the second approach, also outlined in the Restatement
(Second) of Torts § 876, liability is imposed on a defendant for
tortious actions of another when the defendant substantially
assists the other in accordance with a common plan. *See Kurker*,
689 N.E.2d at 837 ("Though not explicitly adopted in
Massachusetts, this section of the Restatement has been cited in
appellate decisions and, in some instances, has provided the
basis for recovery.").  To prove this type of conspiracy,
"plaintiff must show that defendants either (1) acted in concert
with or pursuant to a common design with the tortfeasor or (2)
gave substantial assistance to the tortfeasor's conduct."
*Thomas*, 909 F.3d at 490 (internal quotations, footnote, and
citations omitted).  The common plan or agreement need not be

66

express when "an inference of an implied agreement c[an] properly be drawn from the conduct of two or more parties." *Kyte* v. *Philip Morris Inc.*, 556 N.E.2d 1025, 1028 (Mass. 1990); *see Att'y Gen.* v. *Tufts*, 132 N.E. 322, 328 (Mass. 1921) ("Common purpose may be inferred from concerted action converging to a definite end.").

I leave to one side the inquiry whether the conduct at issue is, in fact, tortious in nature.  The summary judgment record does not support finding the kind of concerted action involving a common design or agreement sufficient for liability under common law civil conspiracy against either Mr. Mellonakos or Mr. Chartrand.  Even if Mr. Chartrand were found to have expressed the sentiment that he did not want to "kick sand" in Mr. Mellonakos's face, this statement does not evidence an express or implied agreement between Mr. Mellonakos and Mr. Chartrand or any kind of "common plan."  *Bettencourt* v. *Town of Mendon*, 334 F. Supp. 3d 468, 487 (D. Mass. 2018) ("[P]laintiff must establish a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." (quoting *Grant* v. *John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 363 (D. Mass. 2002)).

To the extent that Mr. Chartrand may have felt social pressure to act according to Mr. Mellonakos's preferences, there

67

is no evidence in the record connecting Mr. Mellonakos to that
action.  Mr. Mellonakos was on indefinite medical leave at the
time Mr. Jakuttis was assigned to the patrol unit.  Mr.
Chartrand and Mr. Mellonakos testified that Mr. Mellonakos never
asked that Mr. Jakuttis be excluded from the detective unit.
Even if Mr. Mellonakos believed Mr. Jakuttis should be excluded
from the detective unit, that two officers in the same unit came
to the same conclusion regarding a discretionary personnel
decision is not the kind of concerted action covered by common
law civil conspiracy liability.  Summary judgment will also
enter as to this count.

### IV. FEDERAL RICO CLAIMS

Mr. Jakuttis alleges that all Defendants except the Town of
Dracut violated RICO (Count VIII) and engaged in a federal civil
RICO conspiracy (Count IX).  Mr. Chartrand and Mr. Mellonakos,
move for summary judgment on these counts.  [Dkt. Nos. 121, 123]
The individual federal Defendants, Mr. O'Hanlon and Mr. Poirier,
move to dismiss these counts for lack of subject matter
jurisdiction and failure to state a claim.[26]  [Dkt. No. 51]
Because the counts against each Defendant arise from the same

---

[26] As explained *supra* note 5, I need not address Messrs. O'Hanlon
and Poirier's qualified immunity argument, because Mr. Jakuttis
has failed to plead his RICO claims adequately.

facts as alleged, I outline the relevant standards of review
before turning to the substance of the underlying contentions.

The standard of review for the RICO counts against
Defendants Chartrand and Mellonakos is the summary judgment
standard, described *supra* Section III.  Relevant elements of the
standard of review for the joint motion to dismiss brought by
the federal Defendants Messrs. O'Hanlon and Poirier are set
forth below in Subsection IV.A.  I begin by evaluating the
pleadings as to the RICO counts under the motion to dismiss
standard before moving on to the claims separately considered as
to all Defendants.

**A.    *Motion to Dismiss Standard***

Pursuant to Federal Rule of Civil Procedure 12(b)(1), to
survive dismissal, a claim must be presented to a court having
jurisdiction to adjudicate such a claim.  Federal courts have
limited jurisdiction and "possess only that power authorized by
Constitution and statute."  *Kokkonen* v. *Guardian Life Ins. Co.
of Am.*, 511 U.S. 375, 377 (1994).  Messrs. O'Hanlon and Poirier
do not seem to argue that Mr. Jakuttis lacks Article III
Constitutional standing in their 12(b)(1) motion; rather, they
appear to argue that Mr. Jakuttis fails to establish statutory
RICO standing.  *See HCB Fin. Corp.* v. *McPherson*, 8 F.4th 335,
339 (5th Cir. 2021) ("Although statutory standing involves an
inquiry into alleged injury, it is not synonymous with Article

III standing."). To establish standing under RICO, a plaintiff must "demonstrate (1) a violation of section 1962, and (2) harm 'by reason of' the violation." *Willis* v. *Lipton*, 947 F.2d 998, 1000 (1st Cir. 1991) (quoting *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 495-96 (1985)).

As noted, Messrs. O'Hanlon and Poirier have not contested Article III standing and "the question of statutory standing is to be resolved under Rule 12(b)(6), once Article III standing has been established." *Canyon Cnty.* v. *Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008). Accordingly, both the 12(b)(1) and 12(b)(6) motions to dismiss are evaluated under the 12(b)(6) standard.

To resolve a 12(b)(6) motion to dismiss, a court must follow a two-step process: first, the factual allegations must be separated from the legal conclusions; factual allegations are entitled the presumption of truth, while legal conclusions are not. *Ocasio-Hernández* v. *Fortuño-Burset*, 640 F.3d 1, 10 (1st Cir. 2011) (citing *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)). Second, the remaining factual allegations in the complaint must be evaluated to determine "whether, taken as a whole, they state a facially plausible legal claim." *Id.* at 10-11 (citing *Iqbal*, 556 U.S. at 679). A legal claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

70

misconduct alleged." *Id.* at 11 (quoting *Iqbal*, 556 U.S. at 678).  In sum, a complaint is adequate when it "provide[s] fair notice to the defendants and states a facially plausible legal claim." *See id.* at 12.

## B.   Count VIII: 18 U.S.C. §§ 1962(c) and 1964(c), Civil RICO as to All Defendants Except Dracut

Mr. Jakuttis' operative Complaint alleges [Dkt. No. 70 at 84 at ¶ 408] that the federal Defendants and individual Dracut Defendants violated 18 U.S.C.§ 1962(c), which prohibits: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Doyle*, 103 F.3d at 190 (quoting *Sedima*, 473 U.S. at 496 ).  Additionally, as explained *supra*, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.  Section 1964(c), which Mr. Jakuttis also cites, provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).

Congress adopted RICO for the purpose of "seek[ing] the eradication of organized crime in the United States." *Beck* v. *Prupis*, 529 U.S. 494, 496 (2000) (quoting Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 923) (alteration in original)).  To further this purpose, Congress used

"expansive language" and expressly directed that the statute be "liberally construed." *Sedima*, 473 U.S. at 497-98 (citation omitted). Although the RICO legislation was principally passed to combat organized crime, "Congress for cogent reasons chose to enact a more general statute, one which . . . was not limited in application to organized crime." *Nat'l Org. for Women, Inc.* v. *Scheidler*, 510 U.S. 249, 260 (1994) (quoting *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989)).

However, "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Miranda* v. *Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991), *abrogated on other grounds by United States* v. *Velazquez-Fontanez*, 6 F.4th 205, 213 n.2 (1st Cir. 2021)). Accordingly, "it would be unjust if a RICO plaintiff could defeat a motion to dismiss simply by asserting an inequity attributable to a defendant's conduct and tacking on the self-serving conclusion that the conduct amounted to racketeering." *Id.* at 44. It is against this backdrop that I outline each of the requisite elements of a well-pleaded and supported RICO claim.

For sake of clarity in analysis, I address the RICO elements out of order, starting with the elements that concern the underlying activities and entities in this matter before expanding my scope to consider how these components interact. Mr. Jakuttis stretches the fabric of RICO but manages to plead

and develop facts sufficient to satisfy certain elements. However, as to all Defendants, he fails to set out the pattern of racketeering, which is at "the heart of any RICO complaint." *Agency Holding Corp.* v. *Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987).  In addition, he fails to satisfy the injury element as to all individual Defendants.  He also fails to satisfy the conduct element as to the individual Dracut Defendants.

1.  Racketeering Activity

As relevant here, the racketeering activity targeted by RICO includes acts "indictable" under enumerated federal criminal laws, "or drug-related activities. . . 'punishable' under federal law."  *Sedima*, 473 U.S. at 481-82 (quoting 18 U.S.C.§ 1961(1)).  The racketeering activity need not have been criminally charged or resulted in conviction to satisfy the statutory civil RICO requirements.  *See Sedima*, 473 U.S. at 481-88 (citing S. Rep. No. 91-617, at 158 (1969)).  The racketeering activity provision requires only "a failure to adhere to legal requirements," and "[the Supreme Court is] not at all convinced that the predicate acts must be established beyond a reasonable doubt in a proceeding under § 1964(c)."  *Id.* at 489, 491.  They simply must be indictable, chargeable, or punishable.  *See id.* at 488.

73

The conduct Mr. Jakuttis has pleaded could be "racketeering activity," because it involves acts potentially indictable under (1) 18 U.S.C. § 1513(e), which "provide[s] criminal sanctions for retaliation against anyone giving truthful information to law enforcement officers relating to the commission of any federal offense." *Carnero* v. *Bos. Sci. Corp.*, 433 F.3d 1, 10 (1st Cir. 2006). The same acts could also plausibly support an indictment under (2) 18 U.S.C. § 1512(b)(3), which criminalizes conduct of those who act or attempt to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." And given the allegations of illicit drug use, the facts alleged could support (3) an indictment under the Controlled Substances Act, 21 U.S.C. § 801, et seq.

### 2.   Enterprise

Section 1961 defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise under RICO must have three characteristics: (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient

74

to permit th[o]se associates to pursue the enterprise's
purpose." *Boyle* v. *United States*, 556 U.S. 938, 946 (2009).

Unlike a legal entity, which may be a legitimate
organization, an association-in-fact must have "a common illegal
purpose." *Ezell* v. *Lexington Ins. Co.*, 335 F. Supp. 3d 91, 96-
97 (D. Mass. 2018) (dismissing complaint where plaintiffs
"failed to plead adequately that the defendants and non-party
brokers associated together for a common illegal purpose"),
*aff'd*, 926 F.3d 48 (1st Cir. 2019).[27]  Where the association-in-

---

[27] As noted by my colleague Judge Saris, "[t]here has been
considerable confusion as to whether [the association-in-fact's]
common purpose needs to be illegal," which "[t]he First Circuit
has not yet squarely addressed," *In re Neurontin Mktg., Sales
Pracs., & Prods.*, 433 F. Supp. 2d 172, 179, 180 (D. Mass. 2006),
though in passing it has suggested the purpose must be illegal,
*see United States* v. *Connolly*, 341 F.3d 16, 25 (1st Cir. 2003)
(explaining that an enterprise must "only be a group of persons
associated together for a common purpose of engaging in a
criminal course of conduct" (internal quotations and citation
omitted)).  However, other Circuits have answered the question
in the affirmative. *See Al-Rayes* v. *Willingham*, 914 F.3d 1302,
1308 (11th Cir. 2019) ("[T]he relevant 'purpose' in an
association-in-fact enterprise is the members' shared purpose of
engaging in illegal activity—not the purpose for which they
initially became acquainted."); *Cruz* v. *FXDirectDealer, LLC*, 720
F.3d 115, 120 (2d Cir. 2013) ("[F]or an association of
individuals to constitute an enterprise, the individuals must
share a common purpose to engage in a particular fraudulent
course of conduct and work together to achieve such purposes."
(alteration in original) (quoting *First Cap. Asset Mgmt., Inc.*
v. *Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)).  Here,
Mr. Jakuttis alleges that the purpose of the association-in-fact
is to "perpetuate the predicate acts" and cover them up as
alleged in the operative Complaint, which appears to indicate a
common illegal purpose.  [Dkt. No. 70 at 85 at ¶ 410]  In the
final analysis, however, whether Mr. Jakuttis has pleaded

fact "animated by an illicit common purpose" includes both individuals and a municipal entity, it is sufficient for the plaintiff to show that the individual members "exploit[]" the entity "to carry out that purpose." *United States* v. *Cianci*, 378 F.3d 71, 83 (1st Cir. 2004).

Further, "the same entity cannot do 'double duty' as both the RICO defendant and the RICO enterprise," *Libertad* v. *Welch*, 53 F.3d 428, 442 (1st Cir. 1995), *abrogated on other grounds by Velazquez-Fontanez*, 6 F.4th at 213 n.2, meaning a defendant alleged to be engaged in racketeering activity must be "distinct from the 'enterprise.'" *Odishelidze* v. *Aetna Life & Cas. Co.*, 853 F.2d 21, 23 (1st Cir. 1988) (per curiam).

The enterprise must also be "engaged in, or [include] activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c). However, this requirement can be sustained "without [the enterprise] having its own profit-seeking motives," because it "surely can have a detrimental influence on interstate . . . commerce" in other ways. *Scheidler*, 510 U.S. at 258.

---

sufficiently (or the summary judgment record reflects) a common illegal purpose is immaterial because, as explained *infra* Section I.V. B.5, Mr. Jakuttis has not demonstrated a pattern of racketeering activity, as required by 18 U.S.C. § 1962(c).

Here, Mr. Jakuttis pleaded, and summarized in opposition to summary judgment, three alternative groupings that could constitute the RICO enterprise:

> (A) . . . (i) Defendant John Doe 1 (Mellonakos), Defendant John Doe 2 (Poirier), Defendant Chartrand, Defendant O'Hanlon, and DO3 (Officer Byam), or (ii) Defendant John Doe 1 (Mellonakos), [Defendant] John Doe 2 (Poirier), and DO3 (Officer Byam), and (B) either one of the association-in-fact enterprises stated in parts (A)(i) or (ii) . . . _and_ the Town of Dracut Police Department . . . ; and (C) the Town of Dracut Police Department.

[Dkt. No. 125 at 38] (emphasis added).  The latter two options (Groups B and C), as pleaded and substantiated in the record, are sufficient for RICO purposes, while the first option (Group A) presents a closer question that I address last in taking up the groupings in reverse order.

Group C comprises the Dracut Police Department, as distinct from the Town of Dracut, and is an entity that satisfies the text of the RICO statute on its face.  _See_ 18 U.S.C. § 1961(4) (defining "enterprise" to include "any individual, partnership, corporation, association, or other legal entity").

Groups B and C are specifically "association-in-fact" enterprises.  Mr. Jakuttis pleaded that the "purpose" of the association-in-fact enterprises "is to perpetuate the predicate acts of engaging in the unlawful distribution, sale, use, buying, handling, or otherwise dealing in a controlled

substance" and/or to "cover[] up" the predicate acts and their investigation or disclosure; both these alleged purposes are unlawful and are sufficient.  Group B comprises the Dracut Police Department with some combination of the Defendants and DO3 (Dracut Police Officer Byam).  This grouping satisfies the structural requirements for an association-in-fact — purpose, relationships, and longevity.

Group A comprises only the individual Defendants in this RICO action, together with DO3 (Dracut Police Officer Gregg Byam), who was — as alleged and shown in the record — an active participant in the scheme but not named as a defendant by Mr. Jakuttis for unexplained reasons.  This grouping comes very close to describing impermissibly an enterprise that is indistinguishable from Defendants, save for the inclusion of DO3 (Officer Byam).  The Eleventh Circuit has explained that the "prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise," such that "a defendant can clearly be a person under the statute and also be *part* of the enterprise."  *United States* v. *Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000); *see also Al-Rayes* v. *Willingham*, 914 F.3d 1302, 1310 (11th Cir. 2019) (suggesting that married couple, where wife was defendant, could constitute association-in-fact enterprise).  Although I am not fully

78

satisfied that Group A could be a valid association-in-fact, because I find Groups B and C meet the RICO enterprise requirement, I set aside the question whether Group A does.

Groups B and C fully satisfy RICO's interstate commerce requirement because RICO's definition of enterprise is "flexible enough to include a police department." *See Cardarelli* v. *Mass. Bay Transp. Auth.*, No. 09-CV-11253-RGS, 2010 WL 1416464, at *8 (D. Mass. Apr. 7, 2010) (citing *United States* v. *Ambrose*, 740 F.2d 505, 512 (7th Cir. 1984), *abrogated on other grounds by United States* v. *Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989); *United States* v. *Karas*, 624 F.2d 500, 504 (4th Cir. 1980); *United States* v. *Brown*, 555 F.2d 407, 415-16 (5th Cir. 1977)). The Dracut Police Department and the individuals that Mr. Jakuttis lists here have all been part of investigating the drug trade, and indeed the Department has systematically worked with federal agencies at the nexus of drug trade in Massachusetts and northern New England.

### 3.   Conduct

The conduct element is established when a defendant has "some part in directing [the RICO enterprise's] affairs," though "RICO liability is not limited to those with primary responsibility." *Reves* v. *Ernst & Young*, 507 U.S. 170, 179 (1993); *see also id.* at 184 ("An enterprise is 'operated' not just by upper management but also by lower rung participants in

the enterprise who are under the direction of upper
management.").  The Supreme Court has explained that "'to
conduct or participate, directly or indirectly, in the conduct
of [an] enterprise's affairs,' § 1962(c), one must participate
in the operation or management of the enterprise itself."  *Id.*
at 185.

All named individual Defendants are law enforcement
officers, whether with the Dracut Police Department or DEA.
With respect to Group B, the remaining association-in-fact, Mr.
Jakuttis' allegations that all named individual Defendants took
various actions in connection with the changes to his employment
status and his treatment at the Dracut Police Department are
adequate to demonstrate "conduct" of the association-in-fact,
though I observe Mr. Jakuttis has not substantiated those claims
with evidence obtained through discovery as to the individual
Dracut Defendants Chartrand and Mellonakos.  Nevertheless, I
find this element satisfied as to his opposition to the
individual federal Defendants' motion to dismiss.

Group C, however, names a legal entity, the Dracut Police
Department, as the enterprise.  As with Group A, the summary
judgment record does not substantiate Mr. Jakuttis's claims as
to the individual Dracut Defendants.  As to the individual
federal Defendants, Messrs. Poirier and O'Hanlon were not
employed by the Dracut Police Department, though under *Reves,*

80

Mr. Jakuttis must show that they "participate[d] in [its]
operation or management."  507 U.S. at 185.  Whether Mr.
Jakuttis's allegations are sufficient to meet the standard under
*Reves* as to the individual federal Defendants*,* I set to the
side, because Mr. Jakuttis has sufficiently alleged that the
individual federal Defendants "participate[d] in the operation
or management" of the Group A association-in-fact.  *Id.*; *see id.*
at 179 ("In order to 'participate, directly or indirectly, in
the conduct of such enterprise's affairs,' one must have some
part in directing those affairs.").  Mr. Jakuttis need only
establish one enterprise.  *Cf. Aetna Cas. Sur. Co.* v. *P&B
Autobody*, 43 F.3d 1546, 1558 (1st Cir. 1994) (explaining, in
RICO conspiracy context, that "plaintiff needed only to prove
some kind of enterprise of that scope, not necessarily an
association-in-fact enterprise"), *abrogated on other grounds by
Velazquez-Fontanez*, 6 F.4th at 213 n.2.  In summary, Mr.
Jakuttis sufficiently alleged that the individual federal
Defendants "participate[d] in the operation or management,"
*Reves*, 507 U.S. at 185, of Group A, an association-in-fact, but
he has failed to demonstrate the same through the summary
judgment record now before me as to the individual Dracut
Defendants.

4.   Requisite Injury

The injury must be related to the plaintiff's business or property in order for him to have standing under RICO.  *See Sedima*, 473 U.S. at 496.  The predicate racketeering activities must form both factual "but for" causation and proximate causation.  *Holmes* v. *Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265-68 (1992).

Mr. Jakuttis has pleaded, and the summary judgment record appears to present, evidence sufficient to satisfy the injury requirement.  The injury alleged is financial because Mr. Jakuttis's opportunity to work and receive overtime has been affected by the changes to his employment assignment.  Further, if Mr. Jakuttis demonstrates that he was retaliated against by Defendants, the predicate act of retaliation against Mr. Jakuttis can be said to be the direct cause of the injury he suffered.  *See DeGuelle* v. *Camilli*, 664 F.3d 192, 199-201 (7th Cir. 2011) (finding proper RICO injury where the plaintiff's employer had retaliated against him for reporting a tax fraud scheme).

With respect to the individual federal Defendants, the operative Complaint is inadequately pleaded on this point.  With respect to the individual Dracut Defendants, as discussed *supra* Section III, Mr. Jakuttis has not raised a colorable claim that these defendants retaliated against him by assigning him to the

patrol unit.  Even with the benefit of discovery as to the
individual Dracut Defendants, Mr. Jakuttis is able only to offer
his own speculative conclusions that Messrs. Chartrand and
Mellonakos retaliated against him.  They cannot be said to have
caused the requisite RICO injury.

    5.  Pattern of Activity

    I now reach the pattern requirement that is at "the heart
of any RICO complaint."  *Agency Holding Corp.*, 483 U.S. at 154.
A "pattern of racketeering activity" under RICO "requires at
least two acts of racketeering activity."  18 U.S.C. § 1961(5).
Although two predicate acts are required by statute, "they may
not be sufficient unless they are both 'related' and 'amount to
or pose a threat of continued criminal activity.'"  *Schultz* v.
*R.I. Hosp. Tr. Nat'l Bank, N.A.*, 94 F.3d 721, 731 (1st Cir.
1996) (citation omitted).  "In other words, a RICO pattern
consists of 'continuity plus relationship.'"  *Id.* (quoting *Sousa*
v. *BP Oil, Inc.*, No. 83-4046-DPW, 1995 WL 842003, at *13 (D.
Mass. Sept. 12, 1995)); *see also H.J. Inc.*, 492 U.S. at 237
(noting that § 1961 "does not so much define a pattern of
racketeering activity as state a minimum necessary condition for
the existence of such a pattern").

    Because continuity "lacks statutory illumination," it is
"puzzling" to define.  *Efron* v. *Embassy Suites (Puerto Rico),
Inc.*, 223 F.3d 12, 15 (1st Cir. 2000).  Neither the Supreme

Court nor the First Circuit has "spell[ed] out specifically how many predicate acts, or how long the racketeering has to endure" to satisfy RICO's pattern element.  *Home Orthopedics Corp.* v. *Rodríguez*, 781 F.3d 521, 529 (1st Cir. 2015).  When the predicate acts only last a short period of time or plaintiff alleges a small number of acts, "closed continuity cannot be established," *id.*, though "where the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity, closed-ended continuity should be found," *Giuliano* v. *Fulton*, 399 F.3d 381, 387 (1st Cir. 2005) (internal quotations and citation omitted).

Other factors providing "indicia of continuity" include "whether the defendants were involved in multiple schemes, as opposed to 'one scheme with a singular objective'; whether the scheme affected many people, or only a 'closed group of targeted victims'; and whether the scheme had the potential to last indefinitely, instead of having a 'finite nature.'"  *Home Orthopedics Corp.*, 781 F.3d at 529 (quoting *Giuliano*, 399 F.3d at 387, then *Efron*, 223 F.3d at 18-19).  "[A]t the end of the day," this inquiry requires a "natural and commonsense approach to RICO's pattern element" in order to "determine whether the specific fact pattern of the case . . . suggests the 'kind of

broad or ongoing criminal behavior at which the RICO statute was aimed.'" *Id.* (quoting *Efron*, 223 F.3d at 18).

The allegations and the existing record here are inadequate to show a pattern of racketeering.  Mr. Jakuttis has alleged and shown through factual development at most a scheme of drug use by two Dracut police officers (Mr. Mellonakos and Officer Byam, DO3), a scheme that two other individuals (Mr. O'Hanlon and Mr. Poirier) later allegedly helped to cover up by removing Mr. Jakuttis from his Task Force assignment.  Even assuming that this "pattern" continued from April 2003 (when the marijuana disappeared) to October 2015 (when Mr. Jakuttis was removed from the DEA Task Force and detective patrol) – nominally a period of twelve and a half years – the facts as pleaded and substantiated simply do not suffice under RICO.  Although twelve years is certainly longer than "a few weeks or months," *cf. H.J. Inc.*, 492 U.S. at 242, the duration of activity is by no means dispositive, *see Langan* v. *Smith*, 312 F. Supp. 3d 201, 207-08 (D. Mass. 2018) (finding pattern of racketeering insufficiently alleged, despite three-and-a-half year duration).[28]

---

[28] To the limited extent that Mr. Jakuttis pleaded [Dkt. No. 70 at 94 at ¶ 447 (stating that there is a "threat and likelihood that the pattern and scheme will continue indefinitely")] or attempted to raise a material fact to show that there is a threat of ongoing criminal activity (in other words, "open-ended" continuity, "past conduct that by its nature projects into the future with a threat of repetition," *H.J. Inc.* v. *N.W.*

The predicate acts here are some indeterminate amounts of drug use within that time (confined mostly to the period from 2006 to 2012 when Mr. Jakuttis was away from the Department due to injury) and later a set of actions to retaliate against Mr. Jakuttis for reporting this drug use. The asserted scheme's objective was very narrow: allowing for drug use by a couple of Dracut police officers and covering up these acts. And the scheme affected few victims — only Mr. Jakuttis and perhaps CS, who suffered an overdose. The "natural and commonsense approach to RICO's pattern element," whether deployed during evaluation of the operative Complaint under a motion to dismiss standard of review, or consideration of the summary judgment record, makes plain the alleged scheme was not the "kind of broad or ongoing criminal behavior at which the RICO statute was aimed." *Home Orthopedics Corp.*, 781 F.3d at 529 (quoting *Efron*, 223 F.3d at 18).[29]

---

*Bell Tel. Co.*, 492 U.S. 229, 241 (1989)), to establish a pattern sufficient under RICO, his allegations fail. Nothing in the record now before me supports this contention.

[29] In addition to demonstrating continuity, a plaintiff must also show a "nexus" between the pattern of racketeering activity and the alleged RICO enterprise. *See United States* v. *Marino*, 277 F.3d 11, 22 (1st Cir. 2002) ("[A] sufficient nexus for the purposes of a substantive RICO violation under 18 U.S.C. § 1962(c) exists between the racketeering acts and the enterprise when the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of his membership in the enterprise."). I need not address this requirement, because Mr. Jakuttis has

*****

Although the issues presented by Mr. Jakuttis in this case are serious and troubling, they are not presented in the manner contemplated for disposition by the federal RICO statute.  Drug use by officers who then attempt to cover up their illegal actions once a fellow officer tries to expose them has not here been shown to be a long-term, organized illicit scheme operated through an enterprise of persons that forms for uniform, illegal purposes.  Accordingly, the development of the individual federal Defendants' aspect of the case did not need to reach the summary judgment stage because the failure of the operative Complaint to plead a RICO violation as to the individual federal Defendants is plain.  I thus will grant Mr. O'Hanlon and Mr. Poirier's motion to dismiss Count VIII for failure to state a claim.  [Dkt. No. 51]

Discovery regarding the RICO claims concerning the individual Dracut Defendants did not provide a stronger case.  Finding no genuine issue of material fact, I will also grant Mr. Mellonakos's and Mr. Chartrand's motions for summary judgment as to Count VIII.  [Dkt. Nos. 121, 123]

---

not demonstrated a pattern of racketeering activity.

**C.    Count IX: 18 U.S.C. §§ 1962(d) and 1964(c) Civil RICO Conspiracy as to All Defendants Except Dracut**

A RICO conspiracy occurs when two or more persons conspire to violate subsections (a), (b), or (c) of 18 U.S.C. § 1962.  18 U.S.C. § 1962(d); *see also Velazquez-Fontanez*, 6 F.4th at 212 ("To prove a RICO conspiracy offense, the government must show that the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators to further [the] endeavor, which, if completed, would satisfy all the elements of a substantive [RICO] offense." (alteration in original) (internal quotations and citations omitted)).  Here, Mr. Jakuttis alleges that the individual federal Defendants and individual Dracut Defendants conspired to violate § 1962(c).  I note in this connection that Mr. Jakuttis has cited to 18 U.S.C. § 1964(d) in his Count IX heading [*see* Dkt. No. 70 at 99].  I presume that he intended to cite to § 1964(c), which provides a civil cause of action to those injured by a RICO conspiracy.

The "well-established common law of civil conspiracy" provides further guidance.[30]  *Beck*, 529 U.S. at 500.  In general, "a plaintiff c[an] bring suit for civil conspiracy only if he ha[s] been injured by an act that was itself tortious."  *Id.* at 501.  This principle has been read into the RICO conspiracy statute; consequently, an "act that is analogous to an act of a

---

[30] *See supra* Section III.F.

tortious character" is required to establish injury from a RICO conspiracy.  *Id.* at 505-06.

For purposes of overcoming a motion to dismiss a RICO conspiracy allegation, a plaintiff must allege sufficiently that the defendants "knowingly entered into an agreement to commit two or more predicate crimes." *Miranda*, 948 F.2d at 47.

Messrs. O'Hanlon and Poirier urge me to dismiss Count IX for the sole reason that Count VIII cannot stand.  [Dkt. No. 52 at 15]  This represents a fundamental misunderstanding of the law of conspiracy generally and of the RICO statute specifically.  That the underlying substantive act was not, in fact, committed or cannot be proven does not automatically disable the count alleging conspiracy.  *See Salinas*, 522 U.S. at 64 ("A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense.").

Mr. Jakuttis has not provided sufficient factual allegations to support a reasonable inference that the Defendants all agreed to work together to silence him through various employment-related decisions across different agencies. To be sure, I must make all reasonable inferences in Mr. Jakuttis's favor, but I cannot conjure up facts not alleged to support such inferences.  On the issue of whether the Defendants all agreed to a scheme to use controlled substances (or turn the

other way while their colleagues did so) and then to silence Mr.
Jakuttis once he found out, Mr. Jakuttis alleges only passing
comments said to have been made while he was being let go from
the DEA Task Force or assigned to patrol that reference other
officers being implicated in the allegations of misconduct.
Even with such reasonable inferences one could draw from such
vagrant comments, I cannot allow the RICO conspiracy count to be
erected on a totem pole of hearsay constructed from such flimsy
material.  Accordingly, I will grant Messrs. O'Hanlon and
Poirier's motion to dismiss as to Count IX.  [Dkt. No. 51]

I similarly find that engagement in discovery adduced no
further evidence to support an agreement involving the Dracut
Defendants seeking summary judgment.  Accordingly, I also grant
the motions for summary judgment as to Count IX [Dkt. Nos. 121,
123] of Messrs. Mellonakos and Chartrand.

## V. PUBLIC DISCLOSURE

The parties in this matter have, to varying degrees, made
efforts to prevent the identities of officers alleged to have
committed the most serious acts of misconduct from becoming
known to the public.  I observe, however, that these efforts
have been at best inconsistent and at worst haphazard.  I see no
need to continue to withhold from the public the identities of
the subject officers either by continuing to seal the parties'
motions and memoranda on dispositive motions or using pseudonyms

to refer to Messrs. Mellonakos, Poirier, and Byam in this
Memorandum.

I am guided in my decision by well-established principles
of presumptive judicial transparency.  There are, of course,
circumstances that require that courts seal records submitted to
them.  "Decisions on the sealing of judicial documents require a
balancing of interests, although the scales tilt decidedly
toward transparency.  The starting point must always be the
common-law presumption in favor of public access to judicial
records." *Nat'l Org. for Marriage* v. *McKee*, 649 F.3d 34, 70
(1st Cir. 2011), *abrogation on other grounds recognized by Frese*
v. *Formella*, 53 F.4th 1, 6 (1st Cir. 2022).  The First Circuit
has instructed that "[o]nly the most compelling reasons can
justify non-disclosure of judicial records." *F.T.C.* v. *Standard
Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (alteration
in original) (quoting *In re Knoxville News-Sentinel Co.*, 723
F.2d 470, 476 (6th Cir. 1983)).

I find no such compelling reason for the continued sealing
of the dispositive motions and memoranda submitted by the
parties in this matter.  Matters involving allegations of
serious official misconduct, like the matter now before me, are
those in which the public has a "substantial stake and
interest." *Id.* at 412.  I am not aware of any competing privacy

considerations that would outweigh the public's interest in the disclosure of these records.

The circumstances that warrant the use of pseudonyms to mask the identities of parties involved in a matter appear to me to be equally narrow.  The public has a weighty interest in learning the identities of litigants in litigated judicial matters.  This typically overcomes any privacy interest the parties may have in remaining anonymous.  *Cf. McKee*, 649 F.3d at 70.  Consequently, Federal Rules of Civil Procedure "make no provision for pseudonymous litigation."  *Qualls* v. *Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005).  Recently, in *Doe* v. *Massachusetts Institute of Technology*, 46 F.4th 61, 70 (1st Cir. 2022), the First Circuit endorsed a "totality of the circumstances" approach to pseudonymity.  In the interest of assuring "clarity and predictability with respect to pseudonym decisions," the First Circuit set out "four general categories of exceptional cases" where pseudonymity typically is appropriate.  *Id.* at 70-71.

None of the four categories provided by the First Circuit fit the matter before me.  First, the parties present no reason to believe that Messrs. Mellonakos, Poirier, and Byam have fears of "unusually severe harm" from being identified by name in this case in which allegations are not subject to definitive determination.  *Id.* at 71.  Their interests, while reputational,

concern the relatively distant past.  Second, there is no threat
of harm to an "innocent non-party"; although a non-party, like
Mr. Byam may "ha[ve] a stronger case for anonymity," any
possible harm presented is, as I have observed, reputational and
concerns the relatively distant past.  *Id.* (citations omitted).
Third, this is not a case where "anonymity is necessary to
forestall a chilling effect on future litigants who may be
similarly situated."  *Id.*  This category primarily appears to
apply to plaintiffs seeking identification by pseudonym; Mr.
Jakuttis has never made such a request.  *Id.*  Finally, the
fourth category is inapplicable here because this is not a
matter "bound up with a prior proceeding made confidential by
law."  *Id.*

In assessing the totality of the circumstances before me, I
note also that the names of these officers "have not been kept
confidential" in this matter and any "interest in anonymity is
weakened where anonymity has already been compromised."  *Doe* v.
*Gerken*, No. 3:21CV01525(SALM), 2022 WL 167914, at *3 (D. Conn.
Jan. 18, 2022) (citation omitted).  For his part, Mr. Jakuttis
used pseudonyms to protect the identities of Messrs. Mellonakos,
Poirier, and Byam in his initial Complaint but later detailed
the full names of each officer in his unsealed Consolidated
Memorandum of Law in Opposition to the Defendants' Several
Motions for Summary Judgment, Dkt. No. 125 at 38.  Mr.

Mellonakos revealed his own name to the public when he failed to file his own Motion for Summary Judgment and accompanying Memorandum in Support under seal, despite being granted leave to do so. [*See* Dkt. Nos. 116, 121, 122]  Mr. Poirier also filed an unsealed motion and memorandum in his own proper name. [*See* Dkt. Nos. 51, 52]  The parties' inconsistent use of pseudonyms and failure to file their submissions under seal have already revealed the identities of these officers to the public and I see no need to continue to refer to them by pseudonym.

Accordingly, I now order that the dispositive motions and memoranda submitted by all parties in this matter be unsealed and that the docket reflect Mr. Mellonakos's and Mr. Poirier's full names, rather than the pseudonyms "John Doe 1" and "John Doe 2".

I recognize that certain exhibits filed in support of the parties' motions and memoranda, such as those contained in Dkt. Nos. 119 and 126-1, contain private financial information, police reports, unrelated to this matter, that name specific defendants, suspects, and informants, potentially sensitive personnel information, and the names of confidential sources. The parties will be afforded sufficient time to compile a list of the exhibits and specific references in filings that contain the private information specified here and show cause as to why those exhibits or references should remain sealed and, if so,

provide appropriate redactions for partial unsealing of appropriate portions of sensitive submissions.  In the absence of identification by the parties of a need for sealing, all other submissions will be unsealed.

## VI. CONCLUSION

For the reasons set forth above, (a) the Motion to Strike [Dkt. No. 128] jointly filed by Defendants Chartrand, Mellonakos, and Dracut is DENIED; (b) the Motions for Summary Judgment filed by Defendants Chartrand, Mellonakos, and Dracut as to Counts I, II, III, IV, VI, VII, VIII, and IX [Dkt. Nos. 117, 121, 123] are GRANTED; and (c) the Motion to Dismiss jointly filed by Defendants O'Hanlon and Poirier as to Counts VIII and IX [Dkt. No. 51] is GRANTED.

And it is FURTHER ORDERED that the parties must submit on or before close of business on March 3, 2023, a specification identifying materials they seek to keep under seal in accordance with the directives of this Memorandum and provide these materials in redacted form for inclusion on the public record.

The Clerk shall enter Final Judgment for the Defendants forthwith.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE